**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

**FILED**

APR - 8 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

)
Jalal Askander Antranick               )
745 Eldorado Blvd # 2324       )
Broomfield, CO 80021          )
)
Plaintiff,            )
)
v.               )
)
Research Triangle Institute, International )
3040 Cornwallis Road         )
PO Box 12194             )
Research Triangle Park, NC 27709-2194 )
)
and              )
)
Unity Resources Group, L.L.C.    )
AL Murooj Hotel and Suites, Office No. 7 )
PO Box 117546           )
Dubai, United Arab Emirates    )
)
Defendants.         )
)

Case: 1:08-cv-00595
Assigned To : Friedman, Paul L.
Assign. Date : 4/8/2008
Description: PI/Malpractice

**JURY ACTION**

**Jury Trial Demanded**

## COMPLAINT

### I. NATURE OF THE ACTION

1.    Genevia Jalal Antranick was a passenger in a car traveling through the Karada neighborhood of Baghdad.  On October 9, 2007, at about 1:45 P.M., as the 1990 Oldsmobile in which she was riding crossed a busy intersection, she was shot through the head and neck by employees of Defendant Unity Resources Group, L.L.C. (hereinafter "URG") Ms. Antranick died as a result of the injuries.

2.    Unity Resources Group is a private security contractor with a contract to provide security services to Defendant Research Triangle Institute, International. (herineafter

"RTI") At the time of Ms. Antranick's death, the URG employees who shot her had just dropped off an employee of RTI and were returning to their base of operations.

3.     The URG employees were riding in a convoy of four armored vehicles. On information and belief, they were masked and wore khaki uniforms. As the Oldsmobile crossed the intersection, one URG employee fired an automatic weapon from a gun portal in the back of the last armored vehicle. Another leaned out of a door and did the same. Approximately forty bullets were fired into the car by the URG employees, from a distance of about seventy-five to one hundred yards.

4.     The driver of the car, Marani Awanis Manook, was also shot through the head and other parts of her body, and also died as a result of this incident. Two other people, riding in the back seat, were injured by bullets and glass shards, but survived.

5.     Ms. Manook, Ms. Antranick, and the other two passengers were unarmed and posed no threat whatsoever to Defendants. They were returning home from church at the time of the incident.

6.     As a passenger in the car, Ms. Antranick had no control over it whatsoever. At a distance of 75 or 100 yards, she could not possibly have harmed Defendants or their agents. On information and belief, a video camera mounted in an RTI armored vehicle shows that no warnings were given before the attack.

7.     An Iraqi policeman at the scene stated that the armored convoy sped off "like gangsters" after the shooting, leaving Ms. Antranick and Ms. Manook to die. The URG employees did not call an ambulance or otherwise try to rescue or assist the people they had just shot. It is unknown whether Ms. Antranick could have survived if medical attention had promptly arrived.

8.      This is not the first time URG employees have killed defenseless people in Baghdad. Last year, URG employees killed 70-year-old professor Kays Juma when he failed to stop at a security checkpoint. On or about June 24, 2007, Defendants' agents shot another civilian in the Karada neighborhood. On information and belief, numerous other incidents have occurred which have not been reported in the press. Defendants failed to take the remedial steps necessary to prevent a recurrence of the unjustified violence and excessive use of force. Reasonable discovery is likely to produce evidence of other killings and injuries, and of Defendants' failure to take remedial measures.

9.      Reasonable discovery is also likely to produce evidence that Defendants have not reported all of these incidents to a Reconstruction Operations Center (hereinafter "ROC") of the U.S. Department of Defense. The ROC's are set up for this purpose, and many Private Military Contractors (hereinafter "PMC's") voluntarily report.

10.     Defendants have created and fostered a culture of lawlessness among their employees and agents, encouraging them to act in Defendants' financial interests at the expense of innocent human life. Defendants have earned huge profits from the war in Iraq.

11.     Plaintiff brings this action against Defendants URG and RTI for both legal and equitable relief. The case is brought under the Alien Tort Claims Act (ATCA), the Torture Victim Protection Act (TVPA) and state tort law, and seeks to remedy and prevent the callous murder of innocent people living in Baghdad. The Defendants are war profiteers, knowingly engaged in an ongoing campaign of terror against the inhabitants of the city.

## II. JURISDICTION AND VENUE

12.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, based on the ATCA and the TVPA, 28 U.S.C. § 1350, for the alleged violations of international human rights law.  Supplemental jurisdiction exists over the state law causes of action pursuant to 28 U.S.C. § 1367.

13.    This Court also has diversity jurisdiction over Defendant RTI pursuant to 28 U.S.C. § 1332 (a)(2).  Plaintiff Jalal Askander Antranick is Genevia Jalal Antranick's father.  He is the executor of her estate and her sole legal heir.  Jalal Askander Antranick is a domicile of Colorado and a U.S. permanent resident.  Defendant RTI is a domicile of North Carolina.  Defendant URG is incorporated in Singapore and headquartered in Dubai, UAE.  On information and belief, URG's owners are citizens and domiciles of Australia.  The amount in dispute between Plaintiff and each defendant exceeds $75,000.

14.    This court has personal jurisdiction over Defendants.  Defendants have minimum contacts with the District of Columbia and have purposely availed themselves of this court's jurisdiction.  The causes of action set forth herein arise from contacts between the United States Agency for International Development (hereinafter "USAID") and Defendant RTI, which contracts with USAID to provide governance services for Iraq. USAID is located in the District of Columbia.  Reasonable discovery as to contract negotiation and formation is likely to show that the parties to this contract anticipated being haled into court in Washington, D.C.

15.    Defendant RTI maintains an office in Washington D.C., located at One Metro Center, 701 13th St. NW, Washington, D.C., 20005.  Reasonable discovery is likely to

show that this office is used by RTI to manage its business dealings with USAID, and the U.S. government in general.

16.    According to press reports, on March 4, 2003, USAID invited three companies to bid on the contract for "local governance" in Iraq. Only RTI submitted a proposal. On March 26, 2003, USAID and RTI established a cost-plus-fixed-fee contract to create 180 local and provincial governments in Iraq and promote Iraqi civic participation in the political process. The contract, which is the largest in RTI's history, was worth $168 million for the first year alone.

17.    The 44-page contract, which gives RTI access to classified information, requires the company to "design, establish and support interim representative bodies that are culturally acceptable, transparent and accountable." RTI is also required to increase the participation in local government by Iraqi women and ethnic and religious minorities. The company has the authority to grant contracts to Iraqi and foreign non-governmental organizations such as URG. RTI's work in Iraq is political in nature, and all work done under the USAID-RTI contract is in furtherance of political objectives.

18.    USAID's inspector general conducted an audit of the procurement process of RTI's contract. The inspector general concluded that USAID had not complied with federal regulations in the award process. According to the inspector general, USAID developed RTI's contract to "justify spending the available funding of approximately $150 million within one year" instead of fitting the contract to the needs of the Iraqi people. Although the USAID-RTI contract is invalid for this reason, conduct pursuant to it is relevant for purposes of establishing jurisdiction.

19.    RTI is also a subcontractor with Creative Associates International Inc., on the USAID education project titled Revitalization of Iraqi Schools and Stabilization of Education.    This is an additional contact showing RTI's continuous and systematic business dealings in the District of Columbia.    Reasonable discovery is likely to show that RTI has other USAID contracts as well.

20.    Further contacts between Defendant RTI and the forum can be found in the numerous, ongoing interconnections among RTI's corporate executives and the U.S. government.    President and Chief Executive Oficer Victoria Haynes serves on the advisory boards of three U.S. government labs: Pacific Northwest Laboratory, Los Alamos National Laboratory and the Sandia Engineering Research Foundation.    Aaron S. Williams, a former high-ranking official at USAID, joined RTI in January 2003 in a newly created position: Vice President of International Business Development.    Williams is also a high-ranking member of the U.S. Senior Foreign Service, a small group of tenured foreign service officers, as well as a member of the Council on Foreign Relations. Chief of Staff Lon E. Maggart is a retired U.S. Army commander who commanded the 1st Brigade, 1st Infantry Division, during the 1991 Gulf War.    These individuals and others have numerous contacts with the forum related to Defendant RTI's contract with USAID.

21.    Defendant URG is a subcontractor which provides security services to RTI, which are necessary for RTI to fulfill its obligations under the USAID contract.    Reasonable discovery is likely to show that as a subcontractor to the RTI-USAID contract, URG is in privity with RTI, and was also on notice of being haled into court in Washington, D.C.

But for RTI's contract with USAID, and the subcontract to URG, the October 9th, 2007 shooting incident would not have occurred.

22.     Defendants continuously and systematically solicit new business of United States Agency for International Development as well as other USAID contractors.

23.     Defendant URG advertises on its website that it is a "U.S. Federal Government Central Contractor Registered." See www.unityresourcesgroup.com. Defendant URG advertises on the website of the U.S. Commercial Service (BuyUSA.gov), and is an active member of the International Peace Operations Association (www.ipoa.gov) and the Private Security Company Association of Iraq (www.pscai.org), both of which continuously and systematically solicit business from the U.S. government on their behalf. On its website, URG says that Neil Marshall is their "Americas" contact. On information and belief, URG does no business in the Americas other than as a USAID subcontractor. Reasonable discovery is likely to show that Mr. Marshall and other URG executives travel to Washington, DC to facilitate their business with the US government.

24.     URG is only permitted to operate in Iraq because of its relationship with the U.S. government as a subcontractor. Its registration as a "U.S. Federal Government Contractor Registered" and its license to operate in Iraq provide independent bases for personal jurisdiction. Further contact with the forum may be found in the fact that URG employs former U.S. military personnel in its ranks. On information and belief, the individual who killed Ms. Antranick is a US citizen employed by URG.

25.     Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b)(2), (c) and (d). The contract between USAID and Defendants RTI and its subcontractor URG was a substantial event giving rise to this claim.

26.    For venue purposes, all corporate defendants "reside" in the District of Columbia, are subject to personal jurisdiction in the District of Columbia, and have systematic and continuous contacts with the District of Columbia. Therefore venue also lies pursuant to 28 U.S.C. §1391(b)(1), (c) and (d).

27.    No adequate forum exists for this case in Iraq. Under Coalition Prvosional Authority Order Number 17, Private Security Contractors are immune from Iraqi legal process.

28.    The ends of justice are served by the exercise of jurisdiction of a U.S. court. The U.S. government has a strong interest in controlling the behavior of USAID contractors and their subcontractors in Iraq. Although the incident giving rise to this claim occurred in Baghdad, and some witnesses live there and speak Arabic, it is unlikely there will be a serious dispute over the details of what occurred. The dispute will be about whether the corporate defendants are liable. The vast majority of the evidence and discovery materials in this case will be in English.

29.    All parties have English-speaking attorneys with offices in Washington, D.C.

### III. PARTIES

#### Plaintiff

30.    The Plaintiff, Jalal Askander Antranick, is Genevia Jalal Antranick's father. He is a domicile of Colorado, living at 745 Eldorado Blvd. #2324, Broomfield, CO, 80021. Mr. Askander was born in Iraq, maintains his Iraqi citizenship, and is a U.S. permanent resident. He has resided in the U.S. since 2005.

31.    Probate proceedings were held in Baghdad on November 1, 2007. Jalal Askander Antranick is the executor of Genevia Jalal Antranick's estate and her sole legal heir. This estate has no property located in the District of Columbia.

32.    The deceased, Genevia Jalal Antranick, was an Iraqi citizen living Baghdad, Iraq at the time of her death. Although she had the opportunity to immigrate to the United States, she chose to remain in Iraq to continue her humanitarian work there.

### Defendants

33.    Defendant Research Triangle Institute, International (RTI) is incorporated in North Carolina with its principal place of business at 3040 Cornwallis Road, PO Box 12194, Research Triangle Park, NC 27709-2194. RTI also maintains an office at One Metro Center, 701 13th St. NW, Washington, D.C., 20005.

34.    Defendant URG is incorporated in Singapore and headquartered in Dubai, United Arab Emirates. On information and belief, URG is a closely held corporation whose owners are citizens and domiciles of Australia. URG maintains an office at Al Murooj Rotana Hotel and Suites, Office No. 7, P.O. Box 117546, Dubai, United Arab Emirates. See Declaration of Kerry Powdrill, Docket Entry # 15-3 in case 08-cv-0096 (PLF).

### IV. BACKGROUND FACTS CONCERNING THE LAWLESSNESS OF PRIVATE SECURITY CONRACTORS IN BAGHDAD

35.    Human rights organizations express their concerns over the lack of accountability for security contractors in Iraq and the aggressive tactics used by many contractors as a normal part of convoy protection. According to a January, 2008 report of Human Rights First, "[c]onvoys often speed down the wrong side of the road, use gunfire as warnings, and fire on civilian vehicles in response to perceived threats. Contractors often say that

they were acting 'defensively.' Their aggressive approach and resort to violent force deeply alienates the local population and ultimately undermines the U.S. military mission. The U.S. government has fallen short of acting upon its legal responsibilities to challenge violations of the international human rights and humanitarian law, which itself quite likely exacerbates and promotes more abuse by contractors." See "Private Security Contractors at War: Ending the Culture of Impunity," Human Rights First (formerly Lawyers Committee on Human Rights), (January 2008) p. 8.

36.    Although Blackwater, U.S.A. has attracted most of the attention to the issue of private security contractor accountability, information available from many other sources shows that these issues extend far beyond one company and one incident, but rather reveal a pervasive problem of lack of accountability for the contractor community at large. Id., p 9.

37.    In a number of cases, contractors and former contractors have themselves spoken out about what they said was the indiscriminate use of force. In February 2004, four former Custer Battles security contractors told NBC News they resigned because fellow contractors "terrorized civilians, shooting indiscriminately as they ran for cover, smashing into and shooting up cars." Id., p. 9, quoting Lisa Meyers and the NBC News Investigative Unit, "U.S. Contractors in Iraq Allege Abuses," NBC News, February 17, 2005.

38.    A former Coalition Provisional Authority (CPA) advisor with experience traveling under both military and contractor escorts described contractor escorts as single-mindedly committed to their particular assignments, and either oblivious to or uninterested in the downside of abusive action. In contrast to military escorts, contractors

focus only on the contract. "What they told me was, 'Our mission is to protect the principal at all costs. If that means pissing off the Iraqis, too bad.'" Id., p. 10, quoting Steve Fainaru, "Where Military Rules Don't Apply: Blackwater's Security Force in Iraq Given Wide Latitude by State Dept.," *Washington Post*, September 20, 2007.

39.     In July 2005, U.S. Army Brigadier General Karl Horst, deputy commander of the 3rd Infantry Division, with responsibility for security in and around Baghdad, spoke to the press about abusive security contractors: "These guys run loose in this country and do stupid stuff. There's no authority over them, so you can't come down on them hard when they escalate force. ... They shoot people, and someone else has to deal with the aftermath. It happens all over the place." Id., p. 10, quoting Jonathan Finer, "Security Contractors in Iraq Under Scrutiny After Shootings," *Washington Post*, September 10, 2005.

40.     Other military commanders have expressed longstanding concerns regarding both the difficulties posed to the regular military by contractor abuses and the mission impact of their methods: "I personally was concerned about any of the civilians running around on the battlefield during my time there," said retired Army Col. Teddy Spain, who commanded a military police brigade in Baghdad. "My main concern was their lack of accountability when things went wrong." Id., p. 10, quoting Sudarsan Raghavan and Thomas E. Ricks, "Private Security Puts Diplomats, Military at Odds: Contractors in Iraq Fuel Debate," *Washington Post*, September 26, 2007.

41.     If a member of the U.S. military deployed to Iraq or Afghanistan is accused of a serious crime, the military has a substantial criminal justice establishment deployed and present in-country to investigate and conduct courts-martial of cases considered worthy

for prosecution. With contractors, however, there is no systematic investigation or prosecution, with the exception of incidents of the highest political profile, which invariably result in late, uncoordinated and <u>ad hoc</u> responses by relevant agencies. Even in these cases, however, investigations by U.S. military or civilian authorities have practically never resulted in prosecutions. The United States, as a sending state, has both the obligation and the capacity to hold its private contractors accountable for crimes overseas. <u>Id</u>., p. 20.

42.     Human Rights First concludes that "[b]oth U.S. military and civilian agencies that contract with and use [Private Security Contractors, or PSC's] (including subcontractors at any level) must develop and provide access to mechanisms to provide just compensation for wrongful deaths, injuries, or damages caused by PSCs in their employ, founded on principles of transparency, consistency, and fairness.

43.     No such mechanisms exist. Defendants have neither compensated the estate of Ms. Antranick, nor accepted responsibility for their wrongful and criminal acts.

## V. DEFENDANTS' VIOLATIONS OF LAW

44.     Defendants' actions violate, and Plaintiff's causes of action arise from, the following laws, agreements, conventions, resolutions and treaties, which constitute specific examples of the applicable law of nations or customary international law:

     (a)     Alien Tort Claims Act, 28 U.S.C. § 1350;

     (b)     Torture Victim Protection Act, 28 U.S.C. § 1350;

     (c)     Common law of the United States of America;

     (d)     United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

(e)   Universal Declaration of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948);

(f)   International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

(g)   Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984)(ratified 10/28/98);

(h)   Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

(i)   Vienna Declaration and Programme of Action (World Conference on Human Rights, 1993);

(j)   Article 3 of the Geneva Conventions; and

(k)   Statutes and common law of the District of Columbia, North Carolina, and Colorado, including but not limited to, wrongful death, negligence, and recklessness.

## VII.  CAUSES OF ACTION

45.   With respect to all of the causes of action described below, the harm to Plaintiff was caused by the acts or omissions of Defendants.

46.   As regards state law claims, until the choice of laws issues are briefed, it would be premature to cite specific laws of the District of Colombia, North Carolina or Colorado. Instead, the elements of wrongful death, negligence, assault and battery, and negligent infliction of emotional distress are pled herein for these states.

## Agency and Vicarious Liability

47.    In committing the conduct alleged herein, the persons who killed Ms. Antranick were acting under the supervision of Defendants and/or as Defendants' agents, and/or were acting within the course and scope of the security duties for which they were retained with the advance knowledge, acquiescence and/or subsequent ratification of Defendants.    Each Defendant acquiesced in the conduct of the others, as alleged herein, and in the conduct of the persons who killed Ms. Antranick.

48.    With regard to war crimes, Defendants had command responsibility for the people who committed the crimes.

## Aiding and Abetting

49.    Defendants aided and abetted the murder of Ms. Antranick by providing substantial assistance to the people who killed her, in the form of money, weapons, instructions, encouragement, and assurances of impunity and/or indemnification.

50.    Defendants had reason to know and/or did know the nature and scope of the conduct alleged herein, as well as conduct carried out through the use and benefit of the funding, equipment and other resources provided by Defendants. With this knowledge or probable knowledge, Defendants provided and continue to provide this funding, equipment and other resources to the persons responsible for the damages alleged herein. Defendants had actual notice of other similar incidents committed by URG employees. Defendants were also on notice of a similar incident involving the murder of eleven innocent Iraqis just four weeks before, by personnel of another security contractor, Blackwater USA, yet failed to take steps to prevent similar incidents by their own agents and employees.

14

### Joint and Several Liability

51.    Defendants are jointly and severally liable for the death of Ms. Antranick because they knowingly or negligently contributed to her injury by their several acts, which operated concurrently as the proximate cause of all of the injuries. The separate and independent acts of the codefendants concurred, commingled and combined to produce indivisible injuries for which damages are sought, so that in effect the damages suffered are rendered inseparable.

52.    All of the Defendants have committed negligent or wrongful acts as alleged herein. Responsibility for Ms. Antranick's death cannot be apportioned with reasonable certainty among the Defendants. Each joint tortfeasor is equally liable for the judgment, regardless of their relative degree of responsibility.

### Joint Venturers

53.    Defendants acted in a joint venture or joint enterprise and had a community or joint interest in the undertaking. They combined their property, skill, and knowledge to carry out the undertaking; each shared in the control of its development; each anticipated receiving substantial profits therefrom; and each cooperated with the others in the development of the joint undertaking. Each Defendant ratified the acts of the others.

54.    Defendants had a common duty to Ms. Antranick, participated in the joint creation of negligent risk, and shared control of the risk. Defendants had actual knowledge of the risks, collected and shared this knowledge as a group, and made joint or cooperative decisions on the basis of the known risks. Defendants acted in concert, and their parallel behavior supports an inference of tacit agreement or cooperation.

Civil Conspiracy

55.    Defendants agreed and conspired to commit the wrongful acts alleged herein, as evidenced by their acts and omissions in response to previous incidents of death, injury, and the use of excessive force by their employees or agents in Baghdad. .

56.    Defendants' overt acts in furtherance of the conspiracy include hiring and employing individuals with questionable backgrounds, failure to investigate incidents of excessive force and report them to relevant authorities, failure to punish the individuals involved in this and in other incidents, and failure to enforce its own rules regarding warnings to be given before deadly force is used.

**First Cause of Action**

**The Alien Tort Claims Act, 28 U.S.C. § 1350,
for War Crimes, Against All Defendants**

57.    Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

58.    Defendants committed violations of international law and war crimes against Genevia Jalal Antranick, causing injury to Plaintiff.  These violations and war crimes include murder, directing an attack on civilians, and / or summary execution.

59.    Defendants provided financial support, arms, and other substantial assistance that contributed to the ability of those agents and/or employees to kill Ms. Antranick.

60.    Defendants were aware of the 2006 murder of professor Kays Juma, and other incidents of the use of excessive force by URG employees.  Defendants were also aware of another incident involving the murder of eleven innocent Iraqi civilians just four weeks before, by personnel of another security contractor, Blackwater, U.S.A.  However,

while having the requisite control to do so, Defendants failed to correct the behavior of their employees and/or agents, or to otherwise protect the lives of innocent inhabitants of Baghdad, such as Ms. Antranick.

61.    Defendants' employees and/or agents were operating under color of law, and, so acting, murdered or summarily executed Genevia Jalal Antranick, or directed an attack on her.    Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and took place during a period of armed conflict.    This misconduct caused grave and forseeable injuries to Plaintiff.

62.    The acts described herein are actionable under the ATCA, and, if such a showing is required, were done with the complicity of state actors.    Private security forces are licensed and openly operate under the laws of Iraq, and are assisted by U.S. and Iraqi government and military officials.

63.    In engaging in joint action and/or a conspiracy with such state government officials, Defendants acted under color of law in violating each of the applicable laws, agreements, conventions, resolutions and treaties listed in ¶ 44, supra.    Further, the Government of Iraq fails to enact laws that would prevent or remedy the violations alleged herein.

64.    The murder of Ms. Antranick was committed in the course of a civil conflict for political purposes.    RTI's work in Iraq is political in nature, and the death of Ms. Antranick occurred in furtherance and within the scope of these activities.    URG and RTI have the additional motive of presenting a tough image to the Iraqi public, and a policy to "shoot first, ask questions later" deters attacks on them.    Since Ms. Antranick was an innocent civilian, her murder in this fashion was a war crime.

65.    URG realizes additional benefits from this kind of behavior. By fostering a culture of lawlessness among their employees and/or agents, they acquire a reputation for ruthlessness which enhances their image as effective security contractors. URG's clients may feel safer knowing they have ruthless bodyguards. However, their acts violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in ¶ 44, supra.

66.    Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in ¶ 44, supra, resulted in the death of Genevia Jalal Antranick.

### Second Cause of Action

**The Torture Victim Protection Act, 28 U.S.C. § 1350
For Extrajudicial Killing, Against All Defendants.**

67.    Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

68.    Defendants engaged in acts and omissions intentionally and tortiously causing their employees and/or agents to murder Genevia Jalal Antranick. Specifically, as is alleged above, the Defendants' employees and/or agents were operating under color of law, and, so acting, murdered or summarily executed, or directed an attack on Genevia Jalal Antranick, in violation of the TVPA. Further, through their employees and/or agents, the Defendants knowingly aided and abetted the murder of Genevia Jalal Antranick by providing instructions and rules of engagement, financial support, arms, and

other substantial assistance that contributed to the ability of their employees and/or agents to murder Genevia Jalal Antranick.

69.    The acts described herein are actionable under the TVPA, and, if such a showing is required, were done with the complicity of state actors.    Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in ¶ 44, supra, resulted in the deaths of Genevia Jalal Antranick.

### Third Cause of Action

### Wrongful Death,  Against All Defendants.

70.    Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

71.    Defendants committed, or acted in concert to commit, or Defendants' employees or agents committed, acts that constitute wrongful death under the laws of the District of Colombia, North Carolina, and Colorado, that caused the death of Genevia Jalal Antranick.

72.    Defendants provided the individuals who shot Ms. Antranick with work instructions and/or rules of engagement to these individuals.  Reasonable discovery is likely to show that these instructions either were not followed, or were inadequate.

73.    Defendants had a duty of reasonable care towards Genevia Jalal Antranick to ensure that neither they nor their agents engaged in conduct leading to or likely to lead to foreseeable harm, injury or death, as described herein.  In engaging in the conduct alleged herein, Defendants and/or their agents have not acted as ordinarily prudent and careful

persons would act in similar circumstances. Defendants failed to use due care to protect Genevia Jalal Antranick from foreseeable injury, harm, and death.

74.    Defendants' actions and omissions were a direct and substantial cause of the death of Genevia Jalal Antranick. Defendants failed to use due care to protect innocent civilians such as Ms. Antranick from injury and harm, breaching this duty, causing, and proximately causing her wrongful death, as well as the emotional suffering of her father and other members of her family.

75.    The death of Ms. Antranick was reasonably forseeable. Defendants were aware of the 2006 murder of professor Kays Juma by URG employees and of other incidents of excessive force by URG personnel. Defendants were also aware of a similar incident involving the murder of eleven innocent Iraqis just four weeks before, by personnel of another security contractor, Blackwater, USA. However, while having the requisite control to do so, Defendants failed to correct the behavior of their employees and/or agents, or to otherwise protect the lives of innocent inhabitants of Baghdad, such as Genevia Jalal Antranick.

## Fourth Cause of Action

### Negligent Hiring and Supervision, Against All Defendants.

76.    Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein, including but not limited to the elements of negligence in the wrongful death count supra.

77.    Defendants were also negligent in hiring and supervising their agents and employees.

20

78.    Defendants and/or their agents selected, hired, retained and/or contracted with persons who were unfit, incompetent or otherwise dangerous. Defendants had a duty to Genevia Jalal Antranick to take reasonable care to ensure that these and/or agents were not unfit, incompetent or otherwise dangerous to Genevia Jalal Antranick. Defendants' conduct constitutes negligent hiring and supervision and is actionable under the laws of the District of Columbia, North Carolina, and Colorado.

79.    Despite actual or constructive knowledge of the violent characteristics of these individuals, Defendants hired, retained, and/or contracted with them. At the time that Defendants selected, hired, retained and/or contracted with these employees and/or agents, and at all other relevant times, Defendants knew or reasonably should have known that they were unfit, incompetent, and/or dangerous, and that, as a result, would intentionally and/or negligently violate, did violate and would continue to harm persons such as Genevia Jalal Antranick, as alleged herein. Defendants failed to exercise reasonable care in selecting, hiring, retaining and contracting for the security personnel whom Defendants and/or their agents retained to perform this work. Defendants breached their duty to Genevia Jalal Antranick, who suffered death as a result. This harm was caused by resources, property, funding and/or equipment under Defendants' control.

80.    Defendants also had a duty to instruct their employees and/or agents as to rules of engagement which comport with their duty to protect the lives of innocent civilians such as Genevia Jalal Antranick. At all relevant times, Defendants and/or their agents, had the power, ability, authority and duty to stop engaging in the conduct described herein and to intervene to prevent or prohibit such conduct.

81.    Defendants exercised control over the operative details of the actions taken by their employees and/or agents, including control over the resources, property, funding and/or equipment used to injure and harm Genevia Jalal Antranick, as well as the rules of engagement under which they operated. Defendants also had the authority to supervise, prohibit, control, and/or regulate their employees and/or agents so as to prevent these acts and omissions from occurring. Defendants also had the ability to suspend the duties of their employees and/or agents until such time as the tortious conduct alleged herein was stopped and/or prevented. Reasonable discovery is likely to show that the persons who killed Ms. Antranick did not follow instructions given to them, were never disciplined, and continue to operate in the same way in Iraq.

82.    Defendants knew, or reasonably should have known, that their employees and/or agents would create a risk of harm and actually harm or otherwise violate Genevia Jalal Antranick's rights, and that, as a direct and proximate result of those violations, persons such as Genevia Jalal Antranick would suffer injuries as alleged herein. Defendants knew, or reasonably should have known, that unless they intervened to protect persons such as Genevia Jalal Antranick and properly supervise, prohibit, control and/or regulate the conduct described herein, their agents and/or employees would perceive their acts and omissions as being ratified and condoned.

83.    Defendants failed to exercise due care by failing to supervise, prohibit, control or regulate their agents and/or employees. Defendants breached their duty to Genevia Jalal Antranick, who suffered harm and injury as a result, including harm and injury caused by resources, property, funding and/or equipment under Defendants' control.

84.    As a direct and proximate result of Defendants' negligent selection, hiring, retention and/or contracting, and negligent supervision of their employees and/or agents, Plaintiff has suffered and continues to suffer injuries entitling Plaintiff to damages in amounts to be proven at trial.

### Fifth Cause of Action

### Negligence in Failing to Rescue, Against All Defendants.

85.    Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

86.    After shooting Genevia Jalal Antranick, Defendants failed to call for assistance, thereby depriving Ms. Antranick of any chance she may have had of surviving the incident.  Instead, Defendants' agents or employees sped away from the scene "like gangsters" according to an Iraqi police witness.

87.    Defendants had a duty to rescue Ms. Antranick, since they created the risk that led to her death.  Defendants' agents or employees breached this duty by speeding away from the scene and not calling for medical assistance.  Defendants had the ability to call for assistance, even as they sped away from the scene.  A reasonable person would have called an ambulance.

88.    The lack of immediate medical attention was a substantial factor in Ms. Antranick's death.  It reduced her chance of living and was of a character naturally leading to her death.

## Sixth Cause of Action

### Assault and Battery, on Behalf of
### All Plaintiffs Against All Defendants.

89.    Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

90.    Defendants and/or their agents caused Genevia Jalal Antranick to imminently fear and/or apprehend harmful, offensive and/or unlawful contact. Defendants acted with the intent to threaten and harm and did actually threaten and harm Genevia Jalal Antranick. Defendants' commissions and omissions, as alleged herein, demonstrated that Defendants had an imminent ability and intent to subject Genevia Jalal Antranick to an intentional, offensive and harmful contact. Defendants knew or should have known that Genevia Jalal Antranick would regard such intentional and harmful contact as offensive. Ms. Antranick did not consent to this conduct. The acts described herein constitute assault, actionable under the laws of the District of Columbia, North Carolina, and Colorado.

91.    Defendants and/or their agents committed intentional knowing, and/or reckless acts which resulted in harmful or offensive contact with the body of Ms. Antranick. Ms. Antranick did not consent to the contact. Defendants acted with the intent to cause injury and actually did cause injury, damage, and loss of life to Ms. Antranick as alleged herein. The acts described herein constitute battery, actionable under the laws of the laws of the District of Columbia, North Carolina, and Colorado.

## Seventh Cause of Action

### Negligent Infliction of Emotional Distress, on Behalf of
### All Plaintiffs Against All Defendants.

92.    Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

93.    Defendants negligently inflicted emotional distress on Plaintiff.

94.    Defendants negligence directly and forseeably harmed Plaintiff.

95.    Defendants engaged in outrageous and extreme acts with reckless disregard for the probability of causing Plaintiff severe emotional distress and did in fact cause Plaintiff to suffer severe emotional distress.

**Damages**

96.    Plaintiff seeks compensatory and punitive damages in amounts to be ascertained at trial. It further seeks equitable relief to prevent further human rights violations.

97.    Ms. Antranick's family has been forced to suffer, and continues to suffer, severe psychological harm as a result of her murder. Plaintiff also seeks damages for pecuniary loss resulting from loss of society, comfort, attention, services and support.

## VIII. DEMAND FOR JURY TRIAL

98.    Plaintiffs demand a trial by jury on all issues so triable.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to:

(a)    enter judgment in favor of Plaintiff on all counts of the Complaint;

(b)    declare that Defendants have violated Genevia Jalal Antranick's human rights and the laws of the District of Columbia and the United States, as set forth herein;

(c)    award Plaintiff compensatory and punitive damages;

(d)    grant Plaintiff equitable relief, permanently enjoining Defendants from further engaging in human rights abuses against other inhabitants of Baghdad;

(e)    award Plaintiff the costs of suit including reasonable attorneys' fees;

(f)    award Plaintiff such other and further relief as the Court deems just under the circumstances.

Respectfully submitted this eighth day of April, 2008.


Paul Wolf
D.C. Bar 480285
PO Box 11244
Washington, D.C. 20008-1244
Tel. (202) 674-9653
paulwolf@icdc.com

B
08-595
PLF

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

---

**I (a) PLAINTIFFS**

Jalal Askander Antranick

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Broomfield
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS**

Research Triangle Institute

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Durham
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Paul Wolf
PO Box 11244    (202) 674 9653
Washington DC 20008

Case: 1:08-cv-00595
Assigned To : Friedman, Paul L.    43
Assign. Date : 4/8/2008
Description: PI/Malpractice

JURY ACTION

---

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

□ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
□ 2 U.S. Government Defendant
□ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | □ 1 | □ 1 | Incorporated or Principal Place of Business in This State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

---

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

**□ A. Antitrust**

□ 410 Antitrust

**☒ B. Personal Injury/ Malpractice**

□ 310 Airplane
□ 315 Airplane Product Liability
□ 320 Assault, Libel & Slander
□ 330 Federal Employers Liability
□ 340 Marine
□ 345 Marine Product Liability
□ 350 Motor Vehicle
□ 355 Motor Vehicle Product Liability
☒ 360 Other Personal Injury
☒ 362 Medical Malpractice
□ 365 Product Liability
□ 368 Asbestos Product Liability

**□ C. Administrative Agency Review**

□ 151 Medicare Act

**Social Security:**
□ 861 HIA ((1395ff))
□ 862 Black Lung (923)
□ 863 DIWC/DIWW (405(g))
□ 864 SSID Title XVI
□ 865 RSI (405(g))

**Other Statutes**
□ 891 Agricultural Acts
□ 892 Economic Stabilization Act
□ 893 Environmental Matters
□ 894 Energy Allocation Act
□ 890 Other Statutory Actions (If Administrative Agency is Involved)

**□ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

**□ E. General Civil (Other) OR □ F. Pro Se General Civil**

**Real Property**
□ 210 Land Condemnation
□ 220 Foreclosure
□ 230 Rent, Lease & Ejectment
□ 240 Torts to Land
□ 245 Tort Product Liability
□ 290 All Other Real Property

**Personal Property**
□ 370 Other Fraud
□ 371 Truth in Lending
□ 380 Other Personal Property Damage
□ 385 Property Damage Product Liability

**Bankruptcy**
□ 422 Appeal 28 USC 158
□ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
□ 535 Death Penalty
□ 540 Mandamus & Other
□ 550 Civil Rights
□ 555 Prison Condition

**Property Rights**
□ 820 Copyrights
□ 830 Patent
□ 840 Trademark

**Federal Tax Suits**
□ 870 Taxes (US plaintiff or defendant
□ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
□ 610 Agriculture
□ 620 Other Food &Drug
□ 625 Drug Related Seizure of Property 21 USC 881
□ 630 Liquor Laws
□ 640 RR & Truck
□ 650 Airline Regs
□ 660 Occupational Safety/Health
□ 690 Other

**Other Statutes**
□ 400 State Reapportionment
□ 430 Banks & Banking
□ 450 Commerce/ICC Rates/etc.
□ 460 Deportation

□ 470 Racketeer Influenced & Corrupt Organizations
□ 480 Consumer Credit
□ 490 Cable/Satellite TV
□ 810 Selective Service
□ 850 Securities/Commodities/ Exchange
□ 875 Customer Challenge 12 USC 3410
□ 900 Appeal of fee determination under equal access to Justice
□ 950 Constitutionality of State Statutes
□ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| □ **G. Habeas Corpus/ 2255**<br><br>□ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | □ **H. Employment Discrimination**<br><br>□ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ **I. FOIA/PRIVACY ACT**<br><br>□ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | □ **J. Student Loan**<br><br>□ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| □ **K. Labor/ERISA (non-employment)**<br><br>□ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ **L. Other Civil Rights (non-employment)**<br><br>□ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ **M. Contract**<br><br>□ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ **N. Three-Judge Court**<br><br>□ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

□ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ Multi district Litigation ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 USC §1350 Alien Tort Claims Act for war crimes

**VII. REQUESTED IN COMPLAINT** CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 □ **DEMAND $** $ 50,000,000. Check YES only if demanded in complaint **JURY DEMAND:** ☒ YES □ NO

**VIII. RELATED CASE(S) IF ANY** (See instruction) ☒ YES □ NO If yes, please complete related case form.

DATE 4/8/08 **SIGNATURE OF ATTORNEY OF RECORD**

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.