IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JALAL ASKANDER ANTRANICK,<br><br>                            Plaintiff,<br><br>            -against-<br><br>RESEARCH TRIANGLE GROUP<br>INTERNATIONAL and UNITY RESOURCES<br>GROUP, L.L.C.,<br><br>                       Defendants. | Civil Case No. 1:08-cv-00595 (PLF)<br><br>Hon. Paul L. Friedman |

**NOTICE OF MOTION AND MOTION OF
DEFENDANT UNITY RESOURCES GROUP PTE. LTD.
TO DISMISS THE FIRST AMENDED COMPLAINT**

Defendant Unity Resources Group Pte. Ltd. ("Unity"), sued herein as Unity Resources Group, L.L.C., respectfully moves this Court, pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, to dismiss the Complaint in this action as against Unity for lack of personal jurisdiction over Unity.

As grounds therefor, Unity respectfully refers the Court to the supporting Memorandum of Law filed herewith, and the accompanying Declarations of Patrick Gaul, David Rolfes and Thomas E. Butler, all dated July 9, 2008.

A proposed order is also submitted herewith.

No advance conferral with opposing counsel was required for this motion under Local Civil Rule 7(m) because this is a dispositive motion.

Dated:    July 10, 2008

CHADBOURNE & PARKE LLP

By_____/s/ Robert A. Schwinger_____
    Robert A. Schwinger (Bar No. NY0092)
    Attorneys for Defendant
        Unity Resources Group Pte. Ltd.
    30 Rockefeller Plaza
    New York, New York  10112
    Tel. (212) 408-5100
    Fax (212) 541-5369

Of Counsel:

Thomas E. Butler
Jonathan C. Cross

Daniel J. Greenwald III
CHADBOURNE & PARKE LLC
City Tower I
Sheikh Zayed Road
P.O. Box 23927
Dubai, United Arab Emirates
Tel:  +971 (4) 331-6123
Fax  +971 (4) 331-0844

William S. D'Amico (Bar No. 2694)
CHADBOURNE & PARKE LLP
1200 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Tel. (202) 974-5600
Fax (202) 974-5602

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

JALAL ASKANDER ANTRANICK,

                         Plaintiff,

          -against-

RESEARCH TRIANGLE GROUP
INTERNATIONAL and UNITY RESOURCES
GROUP, L.L.C.,

                        Defendants.

Civil Case No. 1:08-cv-00595 (PLF)

Hon. Paul L. Friedman

ORAL ARGUMENT REQUESTED

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF
## DEFENDANT UNITY RESOURCES GROUP PTE. LTD.
## TO DISMISS THE COMPLAINT

CHADBOURNE & PARKE LLP
Attorneys for Defendant
  Unity Resources Group Pte. Ltd.
30 Rockefeller Plaza
New York, New York 10112
Tel. (212) 408-5100
Fax (212) 541-5369

Robert A. Schwinger (Bar No. NY0092)
Thomas E. Butler
Jonathan C. Cross
Daniel J. Greenwald III (Dubai)
William S. D'Amico (Bar No. 2694) (D.C.)

Of Counsel

NY2 - 497233.10

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................ii

PRELIMINARY STATEMENT .............................................................................1

SUMMARY OF ALLEGATIONS ..........................................................................2

ARGUMENT............................................................................................................3

I      UNITY IS NOT SUBJECT TO PERSONAL JURISDICTION IN
       THIS DISTRICT ......................................................................................3

       A.     There is No Basis For an Assertion of General Jurisdiction
              Over Unity ......................................................................................5

              1.     Unity has No "Enduring Relationship" With the
                     District of Columbia under § 13-422 ...................................5

              2.     Unity is Not Subject to General Jurisdiction Under
                     § 13-334 ...............................................................................6

                     a.      Unity was Not Properly Served With Process
                             Within the District of Columbia .............................6

                     b.      Unity is Not "Doing Business" in the District of
                             Columbia .................................................................8

       B.     There is No Basis for Exercising Specific Jurisdiction Over
              Unity .............................................................................................19

       C.     Exercising Personal Jurisdiction Over Unity Would
              Contravene Due Process in any Event ...........................................22

CONCLUSION.......................................................................................................23

i

# TABLE OF AUTHORITIES

## CASES

<div align="right">

**Pages**

</div>

3M Distrib. Corp. v. Rugby Corp., 209 A.2d 790 (D.C. 1965) ............................................7

*AGS Int'l Servs. S.A. v. Newmont USA Ltd., 346 F. Supp. 2d 64
   (D.D.C. 2004) ...................................................................................8, 12, 13, 16, 17

Atlantigas Corp. v. Nisource Inc., 290 F. Supp. 2d 34 (D.D.C. 2003) ........................12, 20

Bayles v. K-Mart Corp., 636 F. Supp. 852 (D.D.C. 1986) ..........................................20, 22

Blumenthal v. Drudge, 992 F. Supp. 44 (D.D.C. 1998) ...................................................3, 4

Burman v. Phoenix Worldwide Indus., Inc., 437 F. Supp. 2d 142 (D.D.C. 2006) ............17

Cellutech, Inc. v. Centennial Cellular Corp., 871 F. Supp. 46 (D.D.C. 1994) ...........14, 15

*City of Moundridge, KS v. Exxon Mobil Corp., 471 F. Supp. 2d 20
   (D.D.C. 2007) ...............................................................................................17

*Costa v. Keppel Singmarine Dockyard Pte., Ltd., No. CV-01-11015, 2003 WL
   24242419 (C.D. Cal. Apr. 24, 2003) .......................................................................15

Del Monte Corp. v. Everett S.S. Corp., S/A, 402 F. Supp. 237 (N.D. Cal. 1975) ............18

El-Fadl v. Central Bank of Jordan, 75 F.3d 668 (D.C. Cir. 1996).......................................5

FC Inv. Group LC v. IFX Mkts. Ltd., 479 F. Supp. 2d 30 (D.D.C. 2007) ........................20

Fandel v. Arabian Am. Oil Co., 345 F.2d 87 (D.C. Cir. 1965) ....................................11, 14

*Fasolyak v. The Cradle Soc'y, Inc., No. 06-01126, 2007 WL 2071644
   (D.D.C. July 19, 2007)................................................................................5, 6, 11, 14

Frank E. Basil, Inc. v. Guardino, 424 A.2d 70 (D.C. App. 1980) .....................................14

Ghanem v. Kay, 624 F. Supp. 23 (D.D.C. 1984)........................................................11, 17

*Gonzalez v. Internacional De Elevadores, S.A., 891 A.2d 227 (D.C. 2006) ........6, 10, 21

*Gorman v. Ameritrade Holding Corp., 293 F.3d 506 (D.C. Cir. 2002) ............6, 8, 10, 18

<div align="right">**Pages**</div>

Gowens v. Dyncorp, 132 F. Supp. 2d 38 (D.D.C. 2001)................................................21, 22

Hargrove Displays, Inc. v. Rohe Scientific Corp., 316 A.2d 330 (D.C. 1974) ...................7

Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408 (1984) ..........................8

*Helmer v. Doletskaya, 393 F.3d 201 (D.C. Cir. 2004) .....................................................21

*Hughes v. A.H. Robins Co., 490 A.2d 1140 (D.C. 1985) ..............................................8, 9

Kopff v. Battaglia, 425 F. Supp. 2d 76 (D.D.C. 2006) .....................................................4, 9

Landell v. Northern Pac. Ry. Co., 98 F. Supp. 479 (D.D.C. 1951)..............................11, 17

Lehigh Portland Cement Co. v. Ornstein, 334 F. Supp. 1032 (D.D.C. 1971)..................7, 8

MacInnes v. Fontainebleau Hotel Corp., 257 F.2d 832 (2d Cir. 1958) .............................18

Mantello v. Hall, 947 F. Supp. 92 (S.D.N.Y. 1996) ..........................................................15

Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560 (2d Cir. 1996) .....................22

In re Orshansky, 804 A.2d 1077 (D.C. 2002)....................................................................12

Palmer v. Kawaguchi Iron Works, Ltd., 644 F. Supp. 327 (N.D. Ill. 1986) ...............17, 18

Perkins v. Benguet Consol. Mining Co., 342 U.S. 437 (1952) ............................................8

Rosenberg Bros. & Co. v. Curtis Brown Co., 260 U.S. 516 (1923) ..................................13

Roz Trading Ltd v. Zeromax Group, Inc., 517 F. Supp. 2d 377 (D.D.C. 2007) .........12, 17

Schutter v. Herskowitz, No. 06-1846, 2007 WL 1954416 (D.D.C. July 5, 2007) ......21, 22

Shoppers Food Warehouse v. Moreno, 746 A.2d 320 (D.C. 2000) ...................................22

Steinberg v. Int'l Criminal Police Org, 672 F.2d 927 (D.C. Cir. 1981) .............................4

Willis v. Willis, 655 F.2d 1333 (D.C. Cir. 1981) ..............................................................19

World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286 (1980) ...................................22

<div align="center">iii</div>

## STATUTES AND RULES

**Pages**

D.C. Code § 13-334............................................................................5, 6, 8, 9, 10, 18

D.C. Code § 13-334(a)...........................................................................................6

D.C. Code § 13-422................................................................................................5

D.C. Code § 13-423..............................................................................................19

D.C. Code § 13-423(a)(1)....................................................................................19

D.C. Code § 13-423(a)(3)....................................................................................19

D.C. Code § 13-423(a)(4)....................................................................................19

D.C. Code § 13-423(b).........................................................................................19

D.C. Code § 29-101.99...........................................................................................7

D.C. Code § 29-101.99(a).......................................................................................7

D.C. Code § 29-101.99(b).......................................................................................7

D.C. Code § 29-101.99(e)(2)...............................................................................7, 8

D.C. Code § 29-101.108(c).....................................................................................7

Fed. R. Civ. P. 4(f)(2)(B)(ii)..................................................................................6

Fed. R. Civ. P. 12(b).............................................................................................2

Fed. R. Civ. P. 12(b)(2).......................................................................................3, 4

Fed. R. Civ. P. 12(c).............................................................................................3

28 U.S.C. § 1350...................................................................................................2

NY2 - 497233.10

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JALAL ASKANDER ANTRANICK,<br><br>　　　　　　　　　　　　　　Plaintiff,<br><br>　　　　-against-<br><br>RESEARCH TRIANGLE INSTITUTE,<br>INTERNATIONAL and UNITY RESOURCES<br>GROUP, L.L.C.,<br><br>　　　　　　　　　　　　　　Defendants. | Civil Case No. 1:08-cv-00595 (PLF)<br><br>Hon. Paul L. Friedman |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANT UNITY RESOURCES GROUP PTE. LTD. TO DISMISS THE COMPLAINT

Defendant Unity Resources Group Pte. Ltd., sued herein as Unity Resources Group, L.L.C. ("Unity"), respectfully submits this Memorandum of Law in Support of its Motion to Dismiss the Complaint (the "Complaint" or "Compl."").

## PRELIMINARY STATEMENT

Plaintiff's daughter was an Iraqi national living in Baghdad. Plaintiff alleges that she was killed in Baghdad, Iraq during an altercation with representatives of the defendant Unity, which was providing security services in Iraq to representatives of its co-defendant RTI International ("RTI"), a contractor in Iraq to the U.S. State Department. Because neither the claims nor the parties to this dispute — which revolves around an incident in Iraq between nonresidents of this District — have the requisite connections to

the District of Columbia necessary to support the exercise of personal jurisdiction over Unity, the Complaint should be dismissed under Rule 12(b). Unity simply is not subject to personal jurisdiction in this District, either generally or with respect to the particular claims alleged in the Complaint.

## SUMMARY OF ALLEGATIONS

This action is brought by Jalal Askander Antranick, purportedly as executor of the estate of his daughter Genevia Jalal Antranick. The Complaint alleges that Ms. Antranick, a resident of Baghdad, died while she was a passenger in a car that was involved in an altercation on the streets of Baghdad on or about October 9, 2007 with certain employees of defendant Unity, while Unity was providing security services to RTI, a company engaged by a U.S. government agency to assist in rebuilding local communities in Iraq. (Compl. ¶¶ 1-4.)[1] Unity is a corporation organized under the laws of Singapore, with its principal offices in Dubai, United Arab Emirates. (Declaration of Patrick Gaul, dated July 9, 2008 ("Gaul Decl.") ¶ 2; see also Compl. ¶ 13.)

Plaintiff commenced this action on April 8, 2008. The Complaint asserts claims against Unity and RTI under the Alien Tort Statute, 28 U.S.C. § 1350 (Compl. ¶¶ 57-66) and the Torture Victims Protection Act (Compl. ¶¶ 67-69), as well as various common-

---

[1]    A copy of the Complaint is attached as Exhibit A to the Declaration of Thomas E. Butler, dated July 9, 2008 ("Butler Decl.")

2

law claims for assault and battery, wrongful death, negligent hiring and supervision, and related counts alleging aiding and abetting, failure to rescue, and civil conspiracy (Compl. ¶¶ 70-95), all supposedly arising from the alleged incident that resulted in Ms. Antranick's death. The Complaint also alleges certain purported contacts between Unity and this District or the United States more generally (Compl. ¶¶ 21-24, 29), in an apparent attempt to suggest that there is a basis for asserting personal jurisdiction in this District over the defendant foreign corporation Unity for Plaintiff's claims arising from the incident occurring in Baghdad.

Unity now moves to dismiss this action as against it pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, for lack of personal jurisdiction.[2]

## ARGUMENT

## I

## UNITY IS NOT SUBJECT TO PERSONAL JURISDICTION IN THIS DISTRICT

In order for a federal district court in the District of Columbia to "maintain personal jurisdiction over a non-resident defendant, jurisdiction must be proper" under

---

[2]    The present motion is limited to the threshold issue of personal jurisdiction. In the event that the Court decides that personal jurisdiction exists over Unity, Unity intends to move thereafter for dismissal under the doctrine of <u>forum non conveniens</u>, and to move for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) on various other substantive grounds relating to the specific counts of the Complaint.

the jurisdictional statutes of the District of Columbia, and the exercise of jurisdiction must be "consistent with the demands of due process." Blumenthal v. Drudge, 992 F. Supp. 44, 53 (D.D.C. 1998). Personal jurisdiction may be "general," conferring "authority to entertain a suit against a defendant without regard to the claim's relationship vel non to the defendant's forum-linked activity," or "specific," conferring authority to "entertain controversies based on acts of a defendant that touch and concern the forum." Steinberg v. Int'l Criminal Police Org, 672 F.2d 927, 928 (D.C. Cir. 1981).

It is the Plaintiff's burden to "establish[] that this Court has personal jurisdiction over defendant[s] . . . and alleg[e] specific facts upon which personal jurisdiction may be based." Blumenthal, 992 F. Supp. at 53. The Plaintiff may not "rely on conclusory allegations" to establish personal jurisdiction. Kopff v. Battaglia, 425 F. Supp. 2d 76, 80-81 (D.D.C. 2006). Moreover, on a Rule 12(b)(2) motion, "the Court need not treat all of plaintiffs' allegations as true," but rather "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." Id. at 81.

There is no basis upon which Unity could be subject to personal jurisdiction, either general or specific, in this District. Plaintiff has failed even properly to allege, much less establish, a sufficient basis for this Court to exercise personal jurisdiction over Unity under any of the potentially relevant jurisdictional statutes — and a number of Plaintiff's jurisdictional allegations are flatly wrong, as shown by the declarations that Unity has submitted on this motion.

4

### A. There is No Basis For an Assertion of General Jurisdiction Over Unity

There are two District of Columbia statutes that set forth the permissible bases for the exercise of general jurisdiction over a defendant: D.C. Code § 13-422 provides for personal jurisdiction based upon a defendant's "enduring relationship" with the District of Columbia, while D.C. Code § 13-334 provides for general personal jurisdiction over foreign corporations who are "served . . . in the District" if they are "doing business in the District." Neither provides a basis for the assertion of general jurisdiction over Unity.

#### 1. Unity has No "Enduring Relationship" With the District of Columbia Under § 13-422

The "enduring relationship" provision of D.C. Code § 13-422 states:

> "A District of Columbia court may exercise personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the District of Columbia as to any claim or relief."

Unity is a Singapore corporation with its principal place of business in Dubai. (See Gaul Decl. ¶ 2; see also Compl. ¶ 34 (alleging that Unity is "incorporated in Singapore" and "headquartered in Dubai").) As a result, there is no basis for the assertion of general jurisdiction over Unity under D.C. Code § 13-422. See El-Fadl v. Central Bank of Jordan, 75 F.3d 668, 672 n.6 (D.C. Cir. 1996) (court "lacked jurisdiction under § 13-422 because the record shows that [the defendant] is organized under the laws of Jordan and maintains its principal place of business there"); Fasolyak v. The Cradle Soc'y, Inc., No. 06-01126, 2007 WL 2071644, at *3 n.5 (D.D.C. July 19, 2007) ("jurisdiction under [§ 13-422] is inappropriate when the defendant is organized under the laws of another

5

jurisdiction and maintains its principal place of business in that other jurisdiction")
(Appendix of Cases, Exh. B).

        2.      **Unity is Not Subject to General
Jurisdiction Under § 13-334**

      Under D.C. Code § 13-334, general personal jurisdiction may also be asserted
where a foreign corporation (i) is served with process within the District of Columbia,
and (ii) is "doing business in the District."  See Gorman v. Ameritrade Holding Corp.,
293 F.3d 506, 510, 514 (D.C. Cir. 2002).  Neither requirement is satisfied here.

        a.      **Unity was Not Properly Served With
Process Within the District of Columbia**

      Until just a few days ago, the only purported service of process upon Unity in this
action was via the Clerk's mailing of a copy of the Summons and Complaint to Unity's
Dubai offices pursuant to Fed. R. Civ. P. 4(f)(2)(B)(ii).  (Butler Decl. ¶ 4, Exh. C.)  It is
well-established, however, that jurisdiction under D.C. Code § 13-334 is proper only
where a defendant is physically served within the District of Columbia.  Gonzalez v.
Internacional De Elevadores, S.A., 891 A.2d 227, 233 (D.C. 2006) (holding that there is
"no occasion to consider or decide whether [the defendant] is 'doing business' in the
District of Columbia" where service occurred outside of the District); Gorman, 293 F.3d
at 514 ("[w]here the basis for obtaining jurisdiction over a foreign corporation is § 13-
334(a) . . . a plaintiff who serves the corporation by mail outside the District is foreclosed
from benefitting from the statute's jurisdictional protection") (internal quotation marks
omitted).

In just the last few days, however, Plaintiff purportedly delivered copies of the summons and complaint to the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA").  (Butler Decl. ¶ 5, Exh. D.)  This apparently was an effort to serve process under D.C. Code § 29-101.99(e)(2), which provides that where a nonresident corporation is "transacting business" in this District but is not duly registered, service may be made upon such corporation via service upon "the Mayor" or clerks in "the Mayor's office."  See also D.C. Code § 29-101.108(c).

Leaving aside whether the DCRA can be considered "the Mayor" or "the Mayor's office" for purposes of § 29-101.99, Plaintiff's effort to serve Unity under that provision still does not suffice.  The § 29-101.99(e)(2) procedure is available only when a foreign corporation regularly "transacts business" in the District of Columbia, giving rise to a registration obligation.  See D.C. Code § 29-101.99(b) ("foreign corporation shall not be required to procure a certificate of authority merely . . . by reason of the appointment of an agent for the solicitation of business not to be transacted in the District"); Hargrove Displays, Inc. v. Rohe Scientific Corp., 316 A.2d 330, 330 (D.C. 1974) (defendant "was not transacting business in the District of Columbia within the meaning of the statute and it was therefore inapplicable"); see also 3M Distrib. Corp. v. Rugby Corp., 209 A.2d 790, 791 (D.C. 1965) (foreign corporation's leasing activities "did not constitute the transaction of business by appellee in the District of Columbia within the meaning of the Code"); Lehigh Portland Cement Co. v. Ornstein, 334 F. Supp. 1032, 1034 (D.D.C. 1971) ("such statutes have no application to the acts of a foreign corporation in making sales or

contracts for the sale of products in interstate commerce, or the consummation of such transactions by the delivery or shipping of the goods from outside the states."). But as explained more fully in Point I.A.2.b., infra, Unity is not regularly "doing business" or "transacting business" in the District of Columbia. Accordingly, §29-101.99(e)(2) is inapplicable, and Plaintiff's effort to serve Unity via the DCRA was a nullity. Because Unity has not been validly physically served within the District, general jurisdiction over Unity cannot be grounded upon D.C. Code § 13-334.

### b. Unity is Not "Doing Business" in the District of Columbia

Even if Unity had been physically served with process within this District, it still would not be subject to general jurisdiction under § 13-334, because Unity is not "doing business" in the District. General jurisdiction under D.C. Code § 13-334 "is only permissible if the defendant's business contacts with [the District of Columbia] are 'continuous and systematic,'" Gorman, 293 F.3d at 510 (quoting Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 415 (1984) (quoting Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 438 (1952))), and "substantial" in nature. The "doing business" test "requires an examination of the frequency and volume of the [defendants'] transactions with District [of Columbia] residents." AGS Int'l Servs. S.A. v. Newmont USA Ltd., 346 F. Supp. 2d 64, 74 (D.D.C. 2004) (quoting Gorman, 293 F.3d at 513) (alteration in original). When the injury complained of by the Plaintiff is unrelated to the forum, the Plaintiff's jurisdictional burden under § 13-334 is "fairly extensive." Hughes

8

v. <u>A.H. Robins Co</u>., 490 A.2d 1140, 1149-51 (D.C. 1985) (holding that defendant's continuous solicitation of sales in the District, $3.2 million in revenue from sales in the District, advertising in the District, and sending of marketing letters to doctors in the District were not sufficient to support "doing business" jurisdiction).

The Complaint makes various conclusory and non-specific allegations regarding Unity's purported jurisdictional contacts with this District, or the Unites States more generally. These allegations are not sufficient, individually or in the aggregate, to make a <u>prima facie</u> showing of jurisdiction under D.C. Code § 13-334. Indeed, the minuscule contacts Unity actually has had with the District fall far short of what is required to establish general jurisdiction.

<u>First</u>, the Complaint alleges that <u>RTI</u> — <u>not Unity</u> — contracted with the United States Agency for International Development ("USAID") to provide services in Iraq. (Compl. ¶ 21.) Plaintiff theorizes that Unity "is in privity with RTI" as a "subcontractor" and that, consequently, Unity was somehow "on notice of being haled into court in Washington, D.C." (Compl. ¶ 21.) Plaintiff's "privity" theory of general jurisdiction is contrary to the well-established rule that "plaintiffs cannot aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any individual defendant." <u>Kopff</u>, 425 F. Supp. 2d at 81. Moreover, the District of Columbia Court of Appeals has rejected, as wholly insufficient, similar "creative" allegations of personal jurisdiction over a United States government contractor, stemming from claims brought by a third party <u>against such contractor</u> (not an alleged "subcontractor" such as

9

Unity) on the basis of a contract with the United States Department of State. The Court noted that "the mere existence of a contract between a foreign corporation and a local resident is not enough to establish minimum contacts sufficient to satisfy due process." Gonzales, 891 A.2d at 235-36. Here, the claim of jurisdiction based upon supposed "privity" is far weaker than the argument flatly rejected in Gonzales. Nowhere does the Complaint allege that Unity — as opposed to RTI — had any contract with any District of Columbia resident that had any connection, however attenuated, to Ms. Antranick's death. Moreover, an allegation of a single isolated commercial transaction is insufficient to show the kind of "substantial" and "continuous and systematic" contacts necessary to constitute "doing business" under § 13-334, see Gorman, 293 F.3d at 510, particularly when this allegation contains no specification as to the amount or terms of the contract or when it allegedly was made.

Second, Plaintiff alleges that "[d]efendants continuously and systematically solicit new business of the [USAID] as well as other USAID contractors" and that two trade associations "solicit business from the U.S. Government on [Unity's] behalf." (Compl. ¶¶ 22-23.) Even if taken at face value, these allegations make no claim regarding any activity undertaken in the District of Columbia. Rather, they suggest only that Unity — from an unspecified location — solicits business from the U.S. Government, and/or from a U.S. Government entity based in this District, and/or from unspecified "other . . . contractors" who might be based anywhere in the world. Thus, such alleged "solicitation" may well be through activities undertaken wholly outside of this District.

10

An allegation that fails actually to allege any specific contacts with the forum is not sufficient to establish jurisdiction. See Fasolyak, 2007 WL 2071644, at *3 (prima facie showing of personal jurisdiction must be grounded in "specific facts").

Moreover, under the District of Columbia's "government contacts" exception to personal jurisdiction, it is well-established that "contacts with federal agencies and instrumentalities located in the District of Columbia will not give rise to personal jurisdiction." Id., at *10 (internal quotation marks omitted); see also Fandel v. Arabian Am. Oil Co., 345 F.2d 87, 88-89 (D.C. Cir. 1965) (maintenance of six-room office in District staffed by five employees insufficient to confer personal jurisdiction where purpose of office was to maintain contacts with United States government). Furthermore, solicitation of business, in and of itself, is insufficient to provide a basis for personal jurisdiction over a defendant in any event. Landell v. Northern Pac. Ry. Co., 98 F. Supp. 479, 482 (D.D.C. 1951); see also Ghanem v. Kay, 624 F. Supp. 23, 24-25 (D.D.C. 1984) (holding mere solicitation insufficient under the D.C. long-arm statute, and thus a fortiori insufficient under the more demanding showing needed to establish "doing business"). Finally, the Complaint's speculation that the referenced trade associations solicit business on behalf of Unity is simply wrong. (Gaul Decl. ¶ 5.)

Plaintiff's allegation that Unity "advertises" on the website "BuyUSA.gov" (Compl. ¶ 23) likewise fails to support a finding of personal jurisdiction. Simple inspection of the Unity listing on the "BuyUSA.gov" website shows that it is passive and

11

merely informational, and as such fails as a matter of law to constitute a sufficient forum contact. See Atlantigas Corp. v. Nisource Inc., 290 F. Supp. 2d 34, 51 (D.D.C. 2003).

Third, the Complaint alleges that Unity says on its website that "Neil Marshall is their 'Americas' contact," and further alleges that Mr. Marshall and other Unity executives "travel to Washington, DC to facilitate their business with the US Government." (Compl. ¶ 23.) The Complaint does not allege that Mr. Marshall was a contact person for the District of Columbia, as opposed to the "Americas," and in fact, when the Complaint was filed, Unity did not have any employee established as a "point of contact" in the District of Columbia. (Gaul Decl. ¶ 8.)[3] Moreover, the handful of business and client development trips to this District by Unity executives that actually occurred (see Gaul Decl. ¶ 9) are insufficient as a matter of law to confer general personal jurisdiction on Unity. AGS Int'l Servs., 346 F. Supp. 2d at 76-77 (holding that fourteen trips by defendant employees into the District, ten of them involving meetings with representatives of the International Finance Corporation, were "not of such significant 'frequency and volume' that [the defendant] could reasonably anticipate being haled into court in the District for actions which occurred in Peru pursuant to a contract

---

[3]   "Under District of Columbia law, personal jurisdiction is determined as of the commencement of an action." Roz Trading Ltd v. Zeromax Group, Inc., 517 F. Supp. 2d 377, 384 (D.D.C. 2007); see also In re Orshansky, 804 A.2d 1077, 1091-92 (D.C. 2002).

12

governed by Peruvian law"); see also Rosenberg Bros. & Co. v. Curtis Brown Co., 260 U.S. 516, 518 (1923) (holding that "[v]isits on such business, even if occurring at regular intervals, would not warrant the inference that the corporation was present within the jurisdiction of the state").

Fourth, the Complaint alleges that Unity holds a "license to operate in Iraq." (Compl. ¶ 24.) But the only "licenses" that Unity has to operate in Iraq were granted to it by the Iraqi Ministry of Trade and the Iraqi Ministry of the Interior. (Gaul Decl. ¶ 7.) Licenses granted to a foreign corporation by ministries of a foreign nation to conduct business in that nation provide no basis for the exercise of personal jurisdiction over that foreign corporation by a U.S. court. These allegations are simply bereft of any contention that Unity took any specific action in the District of Columbia, and the law certainly does not provide that interactions with U.S. government or military authorities anywhere in the world create relevant jurisdictional contacts with the District of Columbia.

The Complaint also alleges that Unity is registered with the U.S. Federal Government Central Contractor Registry (Compl. ¶ 24), but that registration merely means that Unity understands the U.S. government contracting system and what it entails. (Gaul Decl. ¶ 6.) That registration does not indicate that Unity is actually doing any business with the U.S. government, nor was Unity's contractual relationship with RTI pursuant to that registration. (Id.) Such registration thus provides no basis to subject

13

Unity to the jurisdiction of any U.S. court. (See Fasolyak, 2007 WL 2071644, at *10, Fandel, 345 F.2d at 88-89 supra at 11.)

Fifth, Plaintiff alleges that Unity "employs former U.S. military personnel in its ranks" and that Ms. Antranick, "on information and belief," was shot by a U.S. citizen. (Compl. ¶ 24.) The employment of U.S. nationals outside the U.S. does not constitute a jurisdictional contact with the District of Columbia, especially when no Unity employee — let alone any Unity employee allegedly involved in the incident at issue in this lawsuit — is alleged to be a resident or domiciliary of the District of Columbia. The Complaint's conjecture that a U.S. national was involved in the underlying Baghdad incident would not, even if true, constitute activity undertaken in or directed towards the District of Columbia. See Frank E. Basil, Inc. v. Guardino, 424 A.2d 70, 76 (D.C. 1980) ("To hold that a foreign corporation has subjected itself to the judicial jurisdiction . . . by the simple act of employing a . . . resident to perform services not within the state . . . would be an unreasonable and an unrealistic extension of jurisdiction over a nonresident foreign corporation.") (internal quotation marks omitted).

Sixth, Plaintiff's last-gasp allegation that Unity has hired English-speaking lawyers in the District of Columbia to defend this lawsuit is even further afield than Plaintiff's other jurisdictional allegations. (Compl. ¶ 29.) It is self-evident that a non-resident defendant does not acquire forum contacts by virtue of hiring counsel to contest personal jurisdiction. In fact, hiring counsel in the District for any purpose generally does not give rise to personal jurisdiction. See Cellutech, Inc. v. Centennial Cellular

14

<u>Corp.</u>, 871 F. Supp. 46, 50 (D.D.C. 1994) ("By obtaining a Washington, D.C., attorney to assist them in the required filing, defendants did not purposely establish minimum contacts such that they could reasonably expect to be haled into the jurisdiction to defend themselves on the breach of contract matter").

     <u>Finally</u>, the fleeting contacts that Unity actually has had with the District of Columbia are clearly insufficient to support a finding of personal jurisdiction.  Unity is organized and exists under the laws of Singapore, with its headquarters in Dubai, United Arab Emirates. (Gaul Decl. ¶ 2.)  While Unity's business consists of providing security services, it provides no such services within the District of Columbia.  (Declaration of David Rolfes, dated July 9, 2008 ("Rolfes Decl."), ¶ 5.)  <u>See</u> <u>Mantello</u> v. <u>Hall</u>, 947 F. Supp. 92, 98 (S.D.N.Y. 1996) (holding that certain New York business activities did not ground personal jurisdiction in New York where "[Defendant's] business is the presentation of plays.  Plaintiff has not alleged that defendant presented . . . any . . . play in New York"); <u>Costa</u> v. <u>Keppel Singmarine Dockyard Pte, Ltd.</u>, No. CV-01-11015, 2003 WL 24242419, at *11 (C.D. Cal. Apr. 24, 2003) (activity within forum insufficient to support jurisdiction, "particularly given evidence that the contracts were consummated outside the state and all work performed pursuant to the contracts was done in Singapore") (Appendix of Cases, Exh. A).

     The most that can be said is that Unity utilizes an independent contractor, David Rolfes, who provides certain services to Unity on a part-time basis, and who occasionally works out of non-private office space in the District of Columbia that Unity rents by the

<div align="center">15</div>

hour. (Rolfes Decl. ¶ 6.)[4] Mr. Rolfes' activities do not provide a basis for the exercise of personal jurisdiction over Unity. Mr. Rolfes resides in Maryland, not in the District of Columbia. (Id. ¶ 4.) His principal responsibilities for Unity involve the solicitation of potential clients both outside and within the District. (Id. ¶ 5.) Mr. Rolfes also has spent a small portion of the limited time that he spends on Unity matters performing client relations and client support tasks. (Id.) Since the Complaint was filed, Mr. Rolfes has used the rented office space in D.C. only twice. (Id. ¶ 6.) Mr. Rolfes is a self-employed independent contractor; he is not paid a salary but rather is paid a fee pursuant to a contract. (Id. ¶¶ 2-3.)

Courts in this District have consistently held that even the maintenance of a full-time office in the District — a contact that is significantly more substantial than the part-time "rent-a-desk" arrangement that Unity utilizes to provide workspace as needed for Mr. Rolfes — is insufficient, without more, to support the exercise of general personal jurisdiction. "[T]he mere presence of a single representative of a corporation who is limited to one type of activity does not ordinarily confer jurisdiction over the corporation as to matters unrelated to those activities." AGS Int'l Servs., 346 F. Supp. 2d at 75

---

[4] At the time the Complaint was filed, Unity was a party to a contract that allowed it to use certain non-private office space in the District for a certain number of hours each month. (Rolfes Decl. ¶ 6.)

16

(quoting <u>Palmer</u> v. <u>Kawaguchi Iron Works, Ltd.</u>, 644 F. Supp. 327, 331 (N.D. Ill. 1986));
<u>see</u> <u>also</u> <u>Roz Trading Ltd</u>, 517 F. Supp. 2d at 386. Without sufficient "factual allegations
as to what, if any, business [the defendant] conducted [in a District of Columbia office] at
the relevant point in time," general personal jurisdiction will not be available. <u>Id.</u>; <u>see</u>
<u>also</u> <u>City of Moundridge, KS</u> v. <u>Exxon Mobil Corp.</u>, 471 F. Supp. 2d 20, 33-34 (D.D.C.
2007) (holding that where the defendant had a corporate office in the District of
Columbia and a Vice President permanently assigned to that office, general jurisdiction
would still be lacking absent "specific facts regarding the nature of [defendant's] business
activity in its District of Columbia office").

Furthermore, even if Mr. Rolfes had been a full-time employee, the nature of his
Unity-related activities in the District of Columbia would not rise to the level of "doing
business," such that the assertion of general jurisdiction over Unity would be appropriate.
The solicitation of business, the primary activity in which Mr. Rolfes is engaged, is
insufficient to provide a basis for personal jurisdiction over a defendant, <u>Landell</u>, 98
F. Supp. at 482; <u>see</u> <u>also</u> <u>Ghanem</u>, 624 F. Supp. at 24-25, particularly given the trivial
level of activity involved here.[5] Mr. Rolfes' client relations and client support tasks

_____

[5]   Mr. Rolfes' efforts have resulted in the generation of less than $200,000 in business, a
tiny percentage of Unity's revenues of $57,000,000. (Gaul Decl. ¶ 11.) <u>Compare</u>
<u>Burman</u> v. <u>Phoenix Worldwide Indus., Inc.</u>, 437 F. Supp. 2d 142, 155 (D.D.C. 2006)

(Cont'd on following page)

likewise provide no basis for jurisdiction over Unity.  <u>See</u> <u>Palmer</u>, 644 F. Supp. at 329, 331 (personal jurisdiction absent where a defendant maintained a resident "service representative" in the forum whose duties involved the provision of technical advice to customers and even the making of service calls).

In short, the activities referenced above are not "continuous and systematic" or "substantial" in nature, and thus do not provide a basis for the assertion of general jurisdiction.  <u>Gorman</u>, 293 F.3d at 510.  Indeed, courts have declined to assert jurisdiction over corporate defendants in circumstances where such defendants were engaged in far more extensive activities within the forum.  <u>See</u> <u>Del Monte Corp</u>. v. <u>Everett S.S. Corp., S/A</u>, 402 F. Supp. 237, 241-42 (N.D. Cal. 1975) (holding jurisdiction lacking where, unlike here, defendant's office in the forum was staffed by a high-ranking corporate officer managing the company's general business activities); <u>MacInnes</u> v. <u>Fontainebleau Hotel Corp</u>., 257 F.2d 832, 834 (2d Cir. 1958) (holding jurisdiction lacking where an office in the forum was staffed "with three employees" who answered customer inquiries, distributed promotional material, and received reservations).

In sum, there is no basis to hold that Unity is "doing business" in the District under § 13-334.

_____

(Cont'd from preceding page)

(holding activities accounting for 0.15% of a corporation's annual income not sufficient to ground jurisdiction).

**B. There is No Basis for Exercising Specific Jurisdiction Over Unity**

There is no allegation in the Complaint that even purports to provide a basis for the assertion of specific jurisdiction over Unity, except perhaps the allegation that "[Unity] is in privity with RTI," and that Unity therefore was supposedly "on notice of being haled into a court in Washington, D.C." (Compl. ¶21.) Even if credited, such allegation does not support a finding of specific jurisdiction.

The District of Columbia "long-arm" statute, D.C. Code § 13-423, contains two provisions relating to jurisdiction over tort claims, §13-423(a)(3) and §13-423(a)(4). Both of these provisions by their terms require that the Defendant have "caus[ed] tortious injury in the District of Columbia." The Complaint alleges no tortious injury in the District of Columbia, and these provisions accordingly cannot provide a basis for exercising specific jurisdiction over Unity.

The "long-arm" statute also provides for "personal jurisdiction over a person . . . as to a claim for relief arising from the person's — (1) transacting any business in the District of Columbia. . . ." (emphasis added). However, § 13-423(b) clearly provides that "only a claim for relief arising from acts enumerated in this section may be asserted" based on the jurisdictional authority of the long-arm statute. Willis v. Willis, 655 F.2d 1333, 1336 (D.C. Cir. 1981) (holding that § 13-423(b) operates as a "bar to claims unrelated to the acts forming the basis for personal jurisdiction") (emphasis added).

Thus, in order to establish personal jurisdiction under D.C. Code § 13-423(a)(1),

> "a plaintiff must demonstrate that: (1) the defendant transacted business in the District of Columbia; (2) the claim arose from the business transacted in the District; (3) the defendant had minimum contacts with the District; and (4) the Court's exercise of personal jurisdiction would not offend 'traditional notions of fair play and substantial justice.'"

FC Inv. Group LC v. IFX Mkts. Ltd., 479 F. Supp. 2d 30, 38 (D.D.C. 2007) (citing Atlantigas Corp., 290 F. Supp. 2d at 43). "Because the 'arising from' requirement serves to ensure that states do not exceed their powers under the due process clause ... it has been strictly enforced by courts in this jurisdiction." Bayles v. K-Mart Corp., 636 F. Supp. 852, 854 (D.D.C. 1986) (internal citation omitted).

While the Complaint here alleges that RTI entered into a contract with USAID, an entity based in this District, to provide services in Iraq, it makes no allegation that Unity was a party to any contract that was executed in the District, or that any of Unity's supposed contacts with the District were in any way connected to Ms. Antranick's death. Since Unity did not "transact" any business in the District of Columbia that was in any way tied to Ms. Antranick's death, there is no basis whatsoever for the assertion of specific jurisdiction over Unity.

But even if Unity's contract with RTI were somehow connected to this District, the assertion of specific jurisdiction still would fail. The Complaint alleges that Unity employees, acting in Baghdad, Iraq, caused the death of Plaintiff's decedent while providing services to RTI's staff in Iraq. (Compl. ¶¶ 1-2.) On their face, such tort claims clearly "arise" from alleged actions and occurrences in Iraq, rather than from the making

of any contract between Unity and RTI or between RTI and USAID. Such tort claims cannot find a jurisdictional basis in a contract between complete strangers to Ms. Antranick that is alleged (incorrectly, as it turns out, see Gaul Decl. ¶3) to have been executed in the District of Columbia. See Gowens v. Dyncorp, 132 F. Supp. 2d 38, 42 (D.D.C. 2001) (long-arm jurisdiction inappropriate because wrongful discharge, fraud and other claims asserted against government contractor by one of its employees were not sufficiently connected to contractor's agreement with United States Government); cf. Gonzalez, 891 A.2d at 231 n.6 (personal jurisdiction lacking because "[t]he present dispute ... cannot be said to arise under the 1996 maintenance contract [containing a District of Columbia choice-of-forum clause], since it is a tort claim rather than a breach of contract claim").

Plaintiff does not even allege any "substantial connection" between the alleged RTI-USAID contract (let alone the Unity-RTI contract) and the District of Columbia, as would be necessary to show that such contract constitutes sufficient "minimum contacts" with the forum. The RTI-USAID contract, by Plaintiff's own admission (Compl. ¶ 16), was entered into for the purpose of performing reconstruction services in Iraq. See Helmer v. Doletskaya, 393 F.3d 201, 207 (D.C. Cir. 2004) (holding that a contract formed with a District of Columbia resident in the District to purchase an apartment in Moscow did not have the requisite "substantial connection with the District of Columbia" when "the contemplated future consequences of the contracts took place in Russia"); Schutter v. Herskowitz, No. 06-1846, 2007 WL 1954416, at *3 (D.D.C. July 5, 2007)

(minimum contacts lacking where contract executed in District of Columbia had no "'substantial connection' with the District of Columbia" because, inter alia, it "dealt exclusively with business and property interests in Pennsylvania") (Appendix of Cases, Exh. C); Gowens, 132 F. Supp. 2d at 41-42 (wrongful discharge claims held not to arise, for jurisdictional purposes, from Defendant's U.S. Government contract).

In sum, because the Plaintiff's claims lack a "substantial connection" to any alleged Unity contacts with the District of Columbia, there is no basis for exercising long-arm jurisdiction over Unity here. Shoppers Food Warehouse v. Moreno, 746 A.2d 320, 335 (D.C. 2000).

## C.    Exercising Personal Jurisdiction Over Unity Would Contravene Due Process in any Event

For the exercise of personal jurisdiction to be permissible under the Due Process Clause, the defendant not only must have sufficient contacts with the forum to support either general or specific jurisdiction, but "the defendant's conduct and connection with the forum State" also must be "such that he should reasonably anticipate being haled into court there." See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). This reasonableness inquiry is warranted as to the exercise of both general and specific jurisdiction. See Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 573 (2d Cir. 1996); Bayles, 636 F. Supp. at 855-56 (applying reasonableness factors in rejecting claims of both specific and general jurisdiction).

22

Even if Unity were deemed to have the "contacts" to support general or specific jurisdiction, there is no basis for Unity — a corporation organized and headquartered thousands of miles and oceans away from this District — to have reasonably anticipated being haled into court in this District for claims over an alleged incident in Baghdad involving an Iraqi resident, brought by the claimed representatives of the decedent's Iraqi estate. While Plaintiff implies that such an expectation was created by the mere possibility that the RTI-USAID contract might have been executed in this District (Compl. ¶¶ 14, 21), the Complaint notably fails to allege that Unity had any idea where the RTI-USAID contract was executed, and in fact Unity did not. (Gaul Decl. ¶ 4.) But there is no logical reason in any event why Unity should reasonably expect to be haled into a court in the District of Columbia just because that was where the RTI-USAID contract might have been executed. The exercise of personal jurisdiction here would therefore violate the principles of due process even if it were somehow permissible under the jurisdictional statutes of the District of Columbia.

## **CONCLUSION**

For the foregoing reasons, Unity respectfully requests that its motion to dismiss be granted in all respects.

Dated: July 10, 2008

Respectfully submitted,

CHADBOURNE & PARKE LLP

By_____/s/ Robert A. Schwinger_____
    Robert A. Schwinger (Bar No. NY0092)
Attorneys for Defendant
   Unity Resources Group Pte. Ltd.
30 Rockefeller Plaza
New York, New York  10112
Tel. (212) 408-5100
Fax (212) 541-5369

Of Counsel:

Thomas E. Butler
Jonathan C. Cross

Daniel J. Greenwald III
CHADBOURNE & PARKE LLC
City Tower I
Sheikh Zayed Road
P.O. Box 23927
Dubai, United Arab Emirates
Tel:  +971 (4) 331-6123
Fax  +971 (4) 331-0844

William S. D'Amico (Bar No. 2694)
CHADBOURNE & PARKE LLP
1200 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Tel. (202) 974-5600
Fax (202) 974-5602

24

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JALAL ASKANDER ANTRANICK, | |
| Plaintiff, | Civil Case No. 1:08-cv-00595 (PLF) |
| -against- | Hon. Paul L. Friedman |
| RESEARCH TRIANGLE GROUP INTERNATIONAL and UNITY RESOURCES GROUP, L.L.C., | |
| Defendants. | |

**APPENDIX OF UNREPORTED CASES CITED IN THE
MEMORANDUM OF LAW IN SUPPORT OF MOTION
OF DEFENDANT UNITY RESOURCES GROUP PTE. LTD.
TO DISMISS THE COMPLAINT**

Defendant Unity Resources Group Pte. Ltd. ("Unity") respectfully submits the

attached copies of the following unreported cases cited in its Memorandum of Law in

support of its motion to dismiss the Complaint.

| Case | Exhibit |
|---|---|
| Costa v. Keppel Singmarine Dockyard Pte., Ltd., No. CV-01-11015 , 2003 WL 24242419 (C.D. Cal. April 24, 2003) | A |
| Fasolyak v. The Cradle Society, Inc., Civ. A. No. 06-01126, 2007 WL 2071644 (D.D.C. July 19, 2007) | B |
| Schutter v. Herskowitz, No. 06-1846, 2007 WL 1954416 (D.D.C. July 5, 2007) | C |

Dated:    July 10, 2008

                             CHADBOURNE & PARKE LLP

                             By        /s/ Robert A. Schwinger        
                                 Robert A. Schwinger (Bar No. NY0092)
                             Attorneys for Defendant
                               Unity Resources Group Pte. Ltd.
                             30 Rockefeller Plaza
                             New York, New York  10112
                             Tel. (212) 408-5100
                             Fax (212) 541-5369

Of Counsel:

Thomas E. Butler
Jonathan C. Cross

Daniel J. Greenwald III
CHADBOURNE & PARKE LLC
City Tower I
Sheikh Zayed Road
P.O. Box 23927
Dubai, United Arab Emirates
Tel.  +971 (4) 331-6123
Fax  +971 (4) 331-0844

William S. D'Amico (Bar No. 2694)
CHADBOURNE & PARKE LLP
1200 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Tel. (202) 974-5600
Fax (202) 974-5602

<div align="center">2</div>

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))

Costa v. Keppel Singmarine Dockyard PTE, Ltd.
C.D.Cal.,2003.
Only the Westlaw citation is currently available.
United States District Court,C.D. California.
Paul Alexander COSTA, Personal Representative of
the Estate of Anthony Peter Costa, Deceased,
Plaintiff,
v.
KEPPEL SINGMARINE DOCKYARD PTE, LTD.,
a corporation, Vilter Manufacturing Corporation, a
corporation, and Does 1-50, inclusive, Defendants.
VILTER MANUFACTURING CORPORATION, a
corporation, Cross-Claimant,
v.
KEPPEL SINGMARINE DOCKYARD PET LTD., a
corporation Cross-Defendant.
**No. CV 01-11015MMM.**

April 24, 2003.

John S. Lopez, William L. Banning, Kurt Micklow,
Banning, Micklow, Bull & Lopez, San Diego, CA,
for Plaintiff.
Andria L. Catalano, Daniel B. MacLeod, MacLeod &
Catalano, San Diego, CA; Kenneth F. Mattfeld, Jr.,
Geoffrey W. Gill, Gerald M. Fisher, Arter & Hadden,
Ernst & Young PLZ, Los Angeles, CA, for
Defendants.
Kenneth F. Mattfeld, Jr., Geoffrey W. Gill, Gerald M.
Fisher, Arter & Hadden, Ernst & Young PLZ, Los
Angeles, CA, for Cross-Claimant.
Andria L. Catalano, Daniel B. MacLeod, MacLeod &
Catalano, San Diego, CA, for Cross-Defendant.

ORDER DENYING DEFENDANT KEPPEL
SINGMARINE DOCKYARD'S MOTION TO
DISMISS

MORROW, J.
**\*1** This case concerns an accident that occurred on
June 20, 2000, aboard the F/V Daniela while it was
sailing in the Western Pacific Ocean. Anthony Peter
Costa, the Daniela's Chief Engineer, was doused with
hot pressurized ammonia when ammonia discharge
valves explosively separated. Costa was air-lifted to a
hospital; in the ensuing months, he received
extensive medical treatment in Malaysia, Singapore,
San Diego and Denver. Costa died some thirteen

months later, on July 5, 2001. The plaintiff in this
action is Pete Costa's brother, Paul Alexander Costa,
who is the personal representative of his estate. Costa
alleges that defendant Vilter Manufacturing
Corporation improperly manufactured and designed
the ammonia valves that exploded, and that defendant
Keppel Singmarine Dockyard ("KSD") improperly
installed the valves while servicing the Daniela at its
Singapore shipyard. Costa pleads claims for
negligence and strict liability under General Maritime
Law, as well as a claim for wrongful death under the
Death on the High Seas Act, 46 U.S.C. §§ 761 et seq.

Vilter filed a cross-complaint for contribution and
indemnity against KSD, alleging that KSD
improperly removed and reinstalled the ammonia
discharge valves that Vilter manufactured. Vilter also
filed a third-party complaint against the Daniela, its
owner, Z No. 2 Fishing Company, and its manager,
Sardinha & Cileu.

On January 31, 2002, KSD filed a motion to dismiss
for lack of personal jurisdiction pursuant to Rule
12(b)(2) of the Federal Rules of Civil Procedure. On
February 25, 2002, this court granted Costa's request
for jurisdictional discovery and continued the hearing
on KSD's motion. After conducting discovery, Costa
and Vilter filed opposition to the motion, arguing that
the court may exercise both general and specific
jurisdiction over KSD, or alternatively, that KSD has
sufficient national contacts that it is subject to
jurisdiction under Rule 4(k)(2).

I. FACTUAL BACKGROUND

A. The Underlying Complaint

Plaintiff Paul Alexander Costa, as personal
representative of the Estate of Anthony Peter Costa,
filed this action in Los Angeles County Superior
Court on June 19, 2001. He filed a First Amended
Complaint, which is the operative pleading, on
November 20, 2001, and served Vilter the following
day. Vilter removed the action to this court on
December 20, 2001.

Costa is a citizen of the United States and a

Not Reported in F.Supp.2d                                                                                                      Page 2
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

California resident.[FN1]At the time of his death, Pete Costa was also a United States citizen and a resident of California.[FN2]Defendant Keppel Singmarine Dockyard Pte Ltd ("KSD") is a foreign corporation incorporated under the laws of the Republic of Singapore.[FN3]Defendant and cross-claimant Vilter Manufacturing Corporation is a Wisconsin corporation that maintains an office in California and is licensed to do business in the state.

> FN1. See First Amended Complaint, ¶ 2.

> FN2.*Id.,* ¶ 3.

> FN3.*Id.,* ¶ 4.

Pete Costa was a United States licensed Chief Engineer who served on the U.S. flagged tuna seiner F/V Daniela. On June 20, 2000, he was fatally injured when the face plate and spindle assembly of an ammonia discharge valve explosively separated from the refrigeration system's housing valve. A large quantity of hot pressurized ammonia chloride gas spewed onto Costa, severely burning his upper torso, lungs, eyes, and groin.[FN4]Decedent lost his eyesight and was ventilator-dependent for twelve and one half months. During this period, he underwent intensive and painful medical treatments. He passed away on July 5, 2001.

> FN4.*Id.,* ¶ 8.

***2** The First Amended Complaint alleges that KSD solicits and transacts business in California and that it has the requisite minimum contacts to be subjected to jurisdiction in the state.[FN5]It further alleges that KSD solicited and entered into a ship repair contract in California with the California-based owner of the Daniela. Pursuant to this contract, KSD allegedly undertook to repair and perform other work on the Daniela's ammonia freezer system. The work was performed at KSD's shipyard in Singapore between January and June 2000.[FN6]Plaintiff contends that in the course of their repair work, KSD personnel improperly removed the ammonia discharge valves, and used the wrong-sized bolts to reattach the valve cover of the No. 2 ammonia valve to the valve housing. He also asserts that KSD personnel removed the No. 2 "check" or "safety" valve from the ammonia system, and reinstalled it without all of its component parts, finally, he contends that KSD failed

to test and/or improperly tested the ammonia system. These acts and omissions, he alleges, caused the accident that injured his brother.[FN7]Plaintiff also alleges that Vilter improperly manufactured and/or designed the ammonia valves that failed aboard the Daniela.[FN8]

> FN5.*Id.,* ¶ 4.

> FN6.*Id.,* ¶ 9.

> FN7.*Id.,* ¶¶ 10, 11.

> FN8.*Id.,* ¶ 12.

B. KSD's Contacts With California

1. General Contacts With The State

KSD does not own or lease any property in California, and has no offices or facilities in the state.[FN9]None of its employees, agents, officers, or directors are domiciled in California,[FN10] and none of its subsidiaries operates here.[FN11]KSD has not applied for any licenses in the state, does not pay taxes here, and has no California banking relationships.[FN12]While KSD has been sued in California and has not challenged personal jurisdiction, it has not initiated litigation here.[FN13]

> FN9. Declaration of Fok Swee Yin ("Fok Decl."), ¶¶ 28, 29.

> FN10.*Id.,* ¶ 30.

> FN11.*Id.,* ¶ 39.

> FN12.*Id.,* ¶¶ 34-36.

> FN13.*Id.,* ¶ 40; Declaration of William Banning ("Banning Decl."), ¶ 3.

1. The August 1999 Visit To San Diego

a. Undisputed Facts

KSD is an established shipyard in the Western Pacific Ocean that is well-known within the tuna fishing industry.[FN14]In August 1999, Fok Swee Yin,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))

Page 3

KSD's Assistant General Manager for Ship Repair, Allen Ng, also a KSD employee, and Lee Tai Kwee [FN15] traveled to California.[FN16]Lee was General Manager of Precision Craft (88) Pte Ltd., a company that specializes in the manufacture of aluminum hull boats. Precision Craft is not owned or operated by KSD; it is also not a subsidiary of KSD. Lee accompanied Fok and Ng to explore opportunities to buy used tuna boats that Precision Craft contemplated having KSD modify for sale to the Thailand Department of Fisheries.[FN17]Lee became KSD's Deputy General Manager on January 2, 2001.

FN14.*Id.*, ¶ 7.

FN15. The parties refer variously to Lee Tai Kwee, K.T. Lee, Mr. Lee, and Mr. Kwee. For consistency, the court will refer to Mr. Lee. Similarly, the parties refer to Fok Swee Yin variously as Fok or Yin. Again for consistency, the court will refer to Mr. Fok.

FN16.*Id.*, ¶¶ 4, 5.

FN17. Declaration of Lee Tai Kwee ("Lee Decl."), ¶¶ 4, 5.

While in San Diego on August 9, 1999, Fok Ng, and Lee met with Paul Krampe of the United Tuna Cooperative,[FN18] Italo "Itchy" Cileu of Sardinha & Cileu Management (S & C), and Joe Finete of C & F Ltd.[FN19] S & C manages the Daniela for her owner, Z No. 2 Fishing Co., Inc., a Northern Marianas corporation.[FN20]On August 10, 1999, Fok, Lee, and Ng had lunch with various persons in the tuna fishing industry.[FN21]

FN18. Fok Decl., ¶ 15.

FN19.*Id.*, ¶ 16.

FN20. Declaration of Lee Chee Weng ("Weng Decl."), ¶ 17. Costa has moved to strike Weng's declaration in its entirety on the basis that it contradicts his deposition testimony. It also objects to paragraphs 5, 6, 9, and 10 on the basis that they lack foundation and are designed to mislead the court. As respects Costa's argument that specific paragraphs of the declaration lack

foundation, Weng is Superintendent of KSD's Commercial Division and is responsible for negotiating ship repair contracts. Because his declaration concerns KSD's solicitation of and entry into contracts for vessel repair and construction, it addresses facts within his personal knowledge. As respects inconsistencies, Costa contends that Weng's statement that he has not directed anyone at KSD to travel to the United States contradicts his deposition testimony that he does not have responsibility for directing KSD employees to travel to this country. (Compare Weng. Decl., ¶ 5 with Weng 4/12/02 Depo. at 45:5-46:7.) Costa also asserts that Weng's statement that he reviewed shipyard and business records of repair contracts and quotations is contradicted by his deposition testimony that he referred only to the estimate book of repairs and bids attached to his deposition as Exhibit 8. It is not clear that this is an inconsistency, as the "estimate book" appears to be the primary record used by KSD to record its bids and contracts. Finally Costa asserts that Weng's statement that KSD was solicited in Singapore to submit a bid on the Sea Encounter should not be admitted given his refusal to answer questions on this subject during his deposition. (Compare Weng Decl., ¶ 10 with Weng 4/12/02 Depo. at 74:7-24.) As there is no indication that Costa sought to compel answers to questions regarding the Sea Encounter, the court will not exclude Weng's declaration statements concerning the subject. Regarding purported inconsistencies generally, the court resolves disputed facts in Costa's favor on this motion. Thus, to the extent Costa relies on Weng's deposition testimony, the court accepts that testimony as true. Additionally, the court accepts the independent evidence proffered by Costa regarding KSD's solicitation of work on the Sea Encounter. For all these reasons, the court denies Costa's motion to strike the declaration of Lee Chee Weng.

FN21. Fok Decl., ¶ 17.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 4
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

b. Disputed Facts

1. KSD's Version

**\*3** The parties dispute the purpose of the visit Fok, Lee and Ng made to San Diego, as well as the nature of the activities in which they engaged while there. Fok contends that the purpose of the visit was to conclude negotiations with Les Chikami of Western Pacific Fisheries concerning a contract to extend the hull of F/V Western Pacific. Chikami had invited KSD to submit a bid for the work and sent it a proposed specification.[FN22] At the time of the visit, KSD had already inspected the vessel in Samoa, and Ng had furnished a quotation for the work to be done from Singapore. KSD did not receive a response to the quotation, and learned that a competitor was also bidding on the job. Accordingly, Fok and Ng were sent to California to see if they could secure the contract.[FN23] Fok contends that he did not come to the state to solicit work from S & C, C & F or any other tuna vessel management company or owner,[FN24] and that the visit was a departure from KSD's usual business practice.[FN25]

> **FN22.** Declaration of Les Chikami ("Chikami Decl."), ¶ 3.

> **FN23.** Lee Decl., ¶ 6; Fok Decl., ¶ 5; Declaration of Allen Ng Eng Cheng ("Ng Decl."), ¶ 6.

> **FN24.** Fok Decl., ¶¶ 18, 19.

> **FN25.** *Id.,* ¶ 13.

Negotiations with Chikami were conducted at his home in Hermosa Beach, California. They consumed many hours over a two day period.[FN26] When agreement was finally reached, Chikami states that Fok said he would have the contract typed at Keppel Singmarine's office in Anaheim, California.[FN27] The agreement was signed two days later at Chikami's home in Hermosa Beach.[FN28]

> **FN26.** Chikami Decl., ¶ 6; Deposition of Fok Swee Yin ("Fok Depo.") at 71:2-6.

> **FN27.** Chikami Decl., ¶ 6.

> **FN28.** *Id.,* ¶ 8.

Chikami states that, after the negotiation of the contract had been concluded, Fok asked for the names of other vessel owners and managers from whom he could solicit similar business. Chikami referred Fok to Joe DeSilva and Julie Zolezzi in San Diego, and Fok said that he and Ng would visit these individuals while the contract for the Western Pacific was being prepared.[FN29] Chikami asserts that when Fok returned with the contract two days later, he explained that Precision Craft wanted to buy used fishing vessels to refurbish and sell in Thailand, and asked that Chikami give him the names of owners or managers who might have vessels for sale.[FN30] Based on his conversations with Fok, Chikami states it was apparent that the primary focus of Fok and Ng's trip was to solicit business from other owners interested in having their vessels jumboized.[FN31]

> **FN29.** *Id.,* ¶ 7. See also Ng Decl., ¶ 10.

> **FN30.** *Id.,* ¶ 9.

> **FN31.** *Id.,*

KSD proffers evidence, however, that it was Chikami who urged that Lee travel to San Diego to explore opportunities to purchase used fishing vessels, even before Fok, Ng and Lee arrived in the United States. Lee states that Chikami sent a facsimile to KSD in Singapore on July 20, 1999, suggesting that he meet with representatives of the Tuna Fishing Association. Chikami recommended that Lee contact Paul Krampe of the United Tuna Cooperative and Dave Burney of the U.S. Tuna Foundation.[FN32]

> **FN32.** Lee Decl., ¶ 8.

On August 9, 1999, Fok, Ng and Lee met with Krampe, Cileu and Finete. Lee and Fok state that Cileu and Finete had offices in the same building as Krampe, and that they were known to Fok as a result of prior repair contracts. They contend they "briefly updated [Cileu and Finete] about [KSD's] ship repair capabilities" and "exchanged business cards."[FN33] Ng states that the men "generally discussed the tuna market," and that Cileu mentioned that his vessels would be due for repair soon. He did not describe the repairs in any detail.[FN34]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 5
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

FN33. Lee Decl., ¶ 10; Fok Decl., ¶ 16.

FN34. Ng Decl., ¶ 12.

**\*4** On August 10, 1999, Fok, Ng and Lee had lunch with various people involved in the tuna fishing industry. Fok contends the lunch was arranged by Chikami, who was in San Diego to attend a meeting of the Tuna Cooperative. Fok and Lee assert that the primary topic of conversation at the luncheon was the tuna market, although they also discussed opportunities to purchase used tuna vessels for conversion.[FN35]

FN35. Lee Decl., ¶ 11; Fok Decl., ¶ 17.

In addition to these meetings, Fok, Ng and Lee visited Joe DeSilva's residence to discuss DeSilva's vessel, the F/V Sea Encounter. KSD had previously bid on work on this vessel. During the meeting, DeSilva said that he had changed the specifications for the work, relating primarily to the lengthening of the hull, and that Cileu would give KSD new drawings so that it could prepare a new bid.[FN36] Fok, Lee and Ng also had dinner with John Freitas, who had solicited a bid from KSD in December 1998 for work on the F/V Carol Linda.[FN37]

FN36. Ng Decl., ¶ 13.

FN37.*Id.*, ¶ 14.

2. Costa's Evidence [FN38]

FN38. KSD asserts that the declarations of Italo Cileu, John Freitas Paul Krampe and Cathy Dellenback should be stricken or given substantially reduced weight because each declarant's deposition was noticed, delayed and ultimately cancelled after Costa and Vilter secured the witness' declaration. When KSD sought to renotice the depositions, Costa and Vilter purportedly objected and thwarted KSD's efforts to cross-examine the declarants. (See Declaration of Andria Catalano ("Catalano Decl."), ¶¶ 9-12; May 2, 2002 Declaration of Paul Krampe, ¶ 6.) Lawyers frequently prefer to obtain declarations from third-party

witnesses in lieu of deposing them. Moreover, the evidence that Costa and Vilter interfered with KSD's ability to obtain depositions from the witnesses is weak at best. The court therefore declines to strike the declarations or accord them less weight. Should subsequent examination of the witnesses reveal that the statements contained in their declarations are false or materially misleading, KSD may bring this to the court's attention through an appropriate motion for reconsideration.

Costa's evidence regarding the December 1999 visit to San Diego is quite different. Cileu contends that Fok telephoned him Fok in mid-summer 1999, stated that KSD was looking for shipyard work, and was prepared to offer good deals and competitive pricing. Fok asked whether Cileu was planning to dry-dock any of the vessels under S & C's management and whether any of the owners Cileu knew were planning to lengthen or "jumboize" their vessels. Fok said he would be visiting the San Diego area soon, and asked if Cileu would introduce him to owners and managers interested in dry-dock or extension services.[FN39] When Cileu met with Fok and Ng in August, they gave him business cards and a sales brochure for a company called "Keppel Singmarine."[FN40] Cileu discussed the fact that S & C planned to dry-dock the Daniela soon, and Fok said he wanted to bid on the work, that KSD was qualified to do the job and that it would give Cileu a very competitive price.[FN41] Fok also allegedly pressed Cileu to introduce him to other tuna vessel owners and managers who might be interested in dry-dock or jumboizing services.[FN42] Cileu provided the names of several potential customers, including the owners of tuna seiners Jennine, Lone Wolf, M.J. Souza, Carol Linda and Sea Encounter. The Sea Encounter is owned by Joe DeSilva, and Cileu knew that DeSilva was interested in jumboizing the vessel. He states he told Fok this, and Fok purportedly said he wanted to meet with DeSilva to solicit the business. Cileu called DeSilva, and drove Fok and Ng to his house for a meeting.[FN43] DeSilva showed Fok and Ng his plans for the extension, and Fok said that KSD was capable of doing the work and wanted to bid on the project. He suggested that KSD personnel meet with the naval architect working on the extension, Robert Rados, and DeSilva gave him Rados' address.[FN44] This version of the DeSilva meeting is in direct contrast to that offered by Ng, who, as noted earlier, asserts that KSD had already

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

submitted a bid on the Sea Encounter project as of August 1999, and the parties discussed modifications to the project and the submission of a revised bid as a result.

> FN39. Declaration of Italo J. Cileu ("Cileu Decl."), ¶ 4. Because Fok was acting within the scope of his employment for KSD when he made the purported statements, and because the evidence reflects that Fok traveled to San Diego on KSD's behalf, the statements he allegedly made regarding the solicitation of business are not hearsay when offered against KSD. FED.R.EVID. 801(d)(2)(D).

> FN40. *Id.,* ¶ 5.

> FN41. *Id.,* ¶ 6.

> FN42. Ng disputes this, contending that Fok asked only for the names of owners who might be interested in selling their vessels to Lee. (See Ng Decl., ¶ 12.)

> FN43. *Id.,* ¶ 7.

> FN44. *Id.,* ¶ 8.

**\*5** Costa proffers evidence that Fok, Ng and Lee also met with John Freitas, president of the company that owns the Carol Linda, during the August 1999 visit to San Diego. Like Cileu, Freitas states that Fok called him to advise that he was traveling to San Diego to develop ship repair and jumboizing contracts.[FN45] He contends that Fok stated that KSD's business was slow and that he intended to offer potential customers discounts and competitive contracts. Freitas states that, during his subsequent meeting with the KSD representatives, they discussed not only the status of the United States tuna fleet, as Fok and Lee assert, but also KSD's ability to provide shipyard services for Freitas' vessel.[FN46] Fok said that KSD had upgraded and expanded its facilities and that it would discount the price of shipyard services that Freitas purchased. Specifically, Fok said that KSD had given Chikami a discount on the work it was performing on F/V Western Pacific, and that he would offer Freitas a similar discount. He also gave Freitas a sales brochure.[FN47] Fok asked Freitas whom

he should contact in the San Diego tuna industry to solicit additional business. Fok purportedly said he had come to the California to market KSD's capabilities and services to the U.S. tuna fleet, and wanted to meet with as many owners as possible.[FN48] Lee introduced himself as a representative from Keppel's California office in the Los Angeles/Orange County area.[FN49]

> FN45. Declaration of John J. Freitas ("Freitas Decl."), ¶ 5.

> FN46. *Id.,* ¶ 6.

> FN47. *Id.,* ¶¶ 6, 7.

> FN48. *Id.,* ¶ 8.

> FN49. *Id.,* ¶ 6.

Fok, Ng and Lee also met with Paul Krampe of the United Tuna Cooperative,[FN50] to whom they gave a sale brochure,[FN51] and Joe Finete, owner of F/V Diana, to discuss KSD's ship repair capabilities.[FN52] Finete subsequently engaged KSD to perform work on the Diana.[FN53]

> FN50. Declaration of Paul Krampe ("Krampe Decl."), ¶ 1. Krampe does not specifically place the meeting in August 1999. Rather, he recalls that KSD representatives visited his office sometime before June 2000. (*Id.*)

> FN51. *Id.,* ¶ 4. Defendants object to so much of Krampe's declaration as refers to the brochure on the basis that it lacks foundation and is not authenticated. Krampe has personal knowledge of the fact that KSD representatives approached him at UTC's offices and gave him a brochure. He asserts that the brochure attached as an exhibit to his declaration is similar or identical to one he received. This testimony is sufficient to authenticate the exhibit. See FED.R.EVID. 901(b)(1).

> FN52. Fok Depo. at 36:4-7.

> FN53. *Id.* at 47:3-5. Ng states that he had met

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

Finete and Freitas in 1998 when they visited KSD's shipyard. (Ng Decl., ¶ 12.)

2. Solicitation Of Work On The Daniela

On September 16, 1999, S & C sent letters to five shipyards, inviting them to bid on work to be done on the Daniela and the Sea Encounter.[FN54] Cileu contends that the upcoming overhaul of the Daniela was discussed during his meeting with Fok, Ng and Lee in August 1999, and that Fok said KSD would like to bid on the project at that time. Cileu maintains, moreover, that he decided to award the repair contract to KSD as a result of KSD's solicitations, including Fok and Ng's visit to San Diego.[FN55] Indeed, he states "with certainty" that Fok's August 1999 solicitation of the business was "a substantial factor" in S & C's decision to send the Daniela to KSD for repairs.[FN56] In response, Fok asserts that he did not "specifically discuss" the repairs needed to the Daniela's ammonia cooling or other systems while in San Diego.[FN57]

FN54. Cileu Decl., ¶ 11; Weng Decl., ¶ 16.

FN55. Cileu Decl., ¶ 11. Defendants object to this portion of Cileu's declaration on the ground that it lacks foundation and that it constitutes improper opinion testimony and hearsay. As previously noted, statements regarding future shipyard contracts made by Fok and Ng during their visit to San Diego are not hearsay. Moreover, Cileu is a principal in S & C, which selected the shipyard to overhaul the Daniela. (See Cileu Decl., ¶¶ 2, 11.) He thus has the requisite personal knowledge to offer an opinion as to the reason his firm awarded the repair contract to KSD. Finally, the opinion is rationally based on Cileu's perception, and helpful to the determination of a fact in issue. It is thus admissible under Rule 701. See FED.R.EVID. 701.

FN56. *Id.,* ¶ 12.

FN57. Fok Decl., ¶ 20. See also Lee Decl., ¶ 14 ("I did not have any conversations with Messrs. William Sardinha or Italo Cileu while in San Diego, California concerning repairs to the ammonia cooling system or

any other systems aboard F/V Daniela").

On September 21, 1999, KSD personnel inspected the Daniela while it was docked in the Philippines. S & C's William Sardinha furnished a detailed specification of the work to be performed, and invited KSD to submit a bid on the job.[FN58] KSD faxed a quotation to S & C at its San Diego office on October 12, 1999. On November 16, 1999, S & C e-mailed additional information to KSD and invited a revised bid. A second quotation was submitted on November 27, 1999. The parties also agreed that KSD would reinspect the vessel in the Philippines.[FN59] This inspection took place on December 15, 1999. Sardinha was present, and at the end of the meeting, took KSD's draft quotation and incorporated it into an electronic version of the company's earlier bids that he had on his laptop computer.[FN60]

FN58. Weng Decl., ¶ 18.

FN59. *Id.,* ¶¶ 19-21.

FN60. *Id.,* ¶ 22.

**\*6** Negotiations continued via e-mail and fax between Sardinha in San Diego and KSD in Singapore. On December 29, 1999, KSD faxed Sardinha a final price quotation from Singapore. Sardinha faxed back a handwritten confirmation that the companies had reached agreement. He sent the a final version of the quotation, including work specifications, to Singapore by e-mail on December 30, 1999.[FN61]

FN61. *Id.,* ¶ 23.

All work on the Daniela was done in Singapore.[FN62] Sardinha signed a detailed work order that stated the agreement would be governed by and construed in accordance with the law of Singapore. It further stated that the parties submitted to the non-exclusive jurisdiction of the Singapore courts.[FN63]

FN62. See *id.,* ¶ 24.

FN63. *Id.,* ¶¶ 24, 25, Ex B.

3. KSD's Efforts To Secure Repair And Jumboizing Contracts On Vessels Other Than The Daniela

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

KSD's contract and bid records reflect that between 1995 and 2000, it performed repair or jumboizing work on five U.S. flag vessels-the Toaimoana, Fuiono, Western Pacific, Diana and Daniela-and bid on contracts for at least four others-the Koorale, Carol Linda, Sea Encounter, and Andrea C.J.[FN64]

> FN64. See Exhibits to April 10, 2002-April 16, 2002 depositions, Ex. 8 at K00001-00142; Cileu Decl., ¶ 7. Cileu asserts that Fok solicited work on the Carol Linda, Proud Heritage, Legacy, Tradition, and Rafaello. This is disputed by the Superintendent of KSD's Commercial Division, Lee Chee Weng, who contends there are no records that KSD ever solicited work on the Proud Heritage or Rafaello. (See Weng Decl., ¶ 7.) The basis of Cileu's knowledge of these facts is unclear, as it could be derived either from KSD representatives or from the managers and/or owners of the vessels. If Cileu's source of information is the latter group, the testimony is inadmissible hearsay. Because he does not specify the source of his information, the court has considered only Cileu's testimony regarding KSD's solicitation of a contract to perform work on the Sea Encounter. There is independent evidence that KSD sought to work on the Carol Linda, Toaimoana and Fuiono, however, and the court considers these facts established as a result. (See Freitas Decl., ¶ 3; Declaration of Carlos M. Sanchez ("Sanchez Decl."), ¶ 2.)

As respects the contracts/bids for the Daniela and Sea Encounter, Cileu states that he recalls receiving a sales brochure from L.H. Chan, then Assistant General Manager of KSD, KSD on April 28, 1992 at his office in San Diego.[FN65] In connection with KSD's bid for work to be performed on the Sea Encounter, S & C, which assisted Sea Encounter's owner DeSilva, communicated from San Diego with KSD in Singapore via courier, mail, telephone and fax. It received bid documents and a proposed contract from KSD at its office in San Diego.[FN66] Similarly, John Freitas, owner of the Carol Linda, states that he received a KSD brochure through the mail in San Diego, and that KSD contacted him in 1998 to discuss its shipyard and extension services on tuna seiners.[FN67] Freitas states that, primarily as a result of that 1998 contact, he invited KSD to bid on the jumboization of the Carol Linda in late 1998 or early 1999.[FN68] Weng states that Joe Finete, the owner of the Diana, telephoned KSD in Singapore to inquire about its services.[FN69] There is evidence that Fok, Ng and Lee met with Finete in San Diego in August 1999; Finete invited KSD to submit a bid on the work shortly thereafter, on August 25, 1999.[FN70]

> FN65. Cileu Decl., ¶ 3.

> FN66. Id., ¶ 10. Ng states that KSD bid on the Sea Encounter project prior to the August 1999 visit to California. (Ng Decl., ¶ 11.)

> FN67. KSD objects to so much of Freitas' declaration as states that the attached exhibit is substantially similar to the brochure he received on the basis that the testimony lacks foundation, is argumentative and conclusory, and constitutes an impermissible opinion. Freitas states that the facts set forth in his declaration are known to him personally. As president of the company that owns the Carol Linda, Freitas' responsibilities include overseeing arrangements for maintenance and repair work on the vessel. Accordingly, his statements regarding bids and contracts for maintenance work on the Carol Linda do not lack foundation. Moreover, his testimony that the brochure is substantially similar to one he received from KSD is based on personal knowledge, is not argumentative or conclusory, and constitutes a permissible lay opinion, as it is based on Freitas' perception and is helpful in resolving an issue in dispute. See FED.R.EVID. 701.

> FN68. Freitas Decl., ¶ 3.

> FN69. Weng Decl., ¶ 14.

> FN70. Id.

Carlos M. Sanchez, former General Manager of Fleet Operations for Caribbean Fishing Company, Inc., states that Fok solicited shipyard work from him in

Not Reported in F.Supp.2d                                                                                              Page 9
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

California, and that, as a result, he contracted with KSD to overhaul and jumboize the Toaimoana and Fuiono.[FN71] Sanchez contends that he was solicited by other KSD representatives as well, via telephone and mail, and that he received sales brochures from the company, all of which contributed to his decision to engage the shipyard to perform work on the vessels. Sanchez contends that he negotiated the contracts, which generated revenue in excess of $4 million for KSD, with the company during 1998 and 1999.[FN72] Ng provides a conflicting account of the circumstances surrounding CFCI's decision to engage KSD to jumboize the Toaimoana and Fuiono. He states that KSD was introduced to the project by a New Zealand consultant working for Sanchez in 1997. He states that after the consultant, John Briggs, visited KSD's shipyard in Singapore, KSD inspected the Fuiono in Singapore and submitted a bid in October 1997. Briggs allegedly introduced the Toaimoana project to KSD in January 1998. Ng states that the first time he or any other KSD representative met Sanchez was after the contracts had been let, when Sanchez traveled to Singapore during work on the vessels in 1998 or 1999.[FN73]

> FN71. Declaration of Carlos M. Sanchez ("Sanchez Decl."), ¶¶ 1-4. Caribbean Fishing Company ("CFCI") was formerly the owner/manager of the largest fleet of United States documented flag tuna purse seiners trading out of American Samoa. CFCI was a wholly-owned subsidiary of Star-Kist Foods, Inc. (*Id.,* ¶ 1.) Defendants objects to paragraphs 3 and 4 of Sanchez's declaration on the basis that they lack foundation and omit the fact that Sanchez made prior proposals to KDS. The matters to which Sanchez testifies are within his personal knowledge, as Sanchez's job responsibilities for CFCI included negotiating and contracting with shipyards for the repair of vessels owned by the company. The fact that Sanchez does not indicate that recount other facts regarding his communications with KDS and the decision to contract with it for the jumboization of the Toaimoana and Fuiono does not render his testimony inadmissible. Rather, it affects the weight and credibility of the evidence.

> FN72. *Id.,* ¶ 2.

> FN73. Ng Decl., ¶ 20. Vilter has proffered the declaration of Cathy Dellanbach as evidence of KSD's further contacts with California. Dellanbach states that, while working at M/V Sea Quest, Inc., she was approached on an unknown date by representatives of Singmarine Shipyard, who had come to solicit dry-dock and jumboizing work from her father, the president of the company. As her father was not in the office, the men left two sales brochures and business cards. KSD objects to the declaration on the ground that it lacks foundation and consists of hearsay. Other evidence in the record indicates that KSD's predecessor company was Singmarine Slipway. Slipway merged with Singmarine Shipyard in the late 1980's or in the 1990's. The brochure that Dellanbach proffers is from Singmarine Shipyard, and thus may predate the merger of the companies' operations in 1987. If so, the representatives who visited M/V Sea Quest did not act on behalf of KSD's predecessor company. Because it is unclear that they were in fact representatives of KSD, the court excludes the declaration on the basis that it lacks foundation and constitutes inadmissible hearsay. See FED.R.EVID. 801(d)(2)(C), (D).

C. Keppel Corporation

1. The Conglomerate's Organizational Structure

**\*7** In addition to evidence regarding KSD's solicitation of business and entry into contracts with American vessel owners or managers, the parties also proffer conflicting evidence regarding the corporate structure of Keppel Corporation, the entities it owns directly or indirectly, and KSD's role as a Keppel subsidiary.[FN74] Keppel Corporation's "marine businesses" include KSD, Keppel Shipyards, Keppel FELS and Keppel Hitachi Zosen ("KHZ").[FN75] KSD is a wholly-owned subsidiary of KHZ.[FN76] The companies are distinct subsidiaries that perform work on vessels of different lengths and types. KSD, for example, services vessels up to 150 meters long. Vessels longer than 150 meters are built or repaired

Not Reported in F.Supp.2d                                                                   Page 10
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

by KHZ and Keppel Shipyard.[FN77]Keppel FELS performs maintenance and construction on oil rigs.[FN78]During 1999, KSD was a subsidiary of KHZ, which was, in turn, a subsidiary of Keppel Corporation.[FN79]

> FN74. Vilter has proffered evidence regarding Keppel Corporation's structure from a website purportedly maintained by it. (See Declaration of Kenneth F. Mattfeld In Support of Vilter's Opposition ("Mattfeld Decl."), Exs. C, D, E.) Mattfeld asserts that he personally downloaded the pages attached to his declaration from Keppel Corporation's website. (*Id.* ¶¶ 4-7.)As Vilter does not proffer the testimony of a Keppel Corporation representative attesting that the information on the website was placed there by the corporation, the court declines to consider it. See *Wady v. Provident Life and Accident Ins. Co. of America,* --- F.Supp.2d ----, No. Civ. 01-10818, 2002 WL 988557, *2 (C.D.Cal. Apr.30, 2002)* ("Rule 901(a) of the Federal Rules of Evidence states that documents are sufficiently authenticated by evidence that will support a finding that they are what their proponent claims them to be. The court agrees that Gravitt cannot authenticate these documents as statements of UnumProvident"). See also *United States v. Jackson,* 208 F.3d 633, 638 (7th Cir.2000) (holding that evidence taken from the Internet lacked authentication where the proponent was unable to show that the information had been posted by the organizations to which she attributed it); *St. Clair v. Johnny's Oyster & Shrimp, Inc.,* 76 F.Supp.2d 773, 775 (S.D.Tex.1999) ("Anyone can put anything on the Internet. No web-site is monitored for accuracy and nothing contained therein is under oath or even subject to independent verification absent underlying documentation. Moreover, the Court holds no illusions that hackers can adulterate the content on any web-site from any location at any time. For these reasons, any evidence procured off the Internet is adequate for almost nothing ...").

> FN75. On May 2, 2002, Keppel FELS and KHZ combined to form Keppel Offshore &

Marine. The merged entity will include the businesses previously operated as Keppel FELS, KHZ, Keppel Shipyards, and KSD. (See Deposition of Simon Thiam Hock Soh ("Soh Depo.") at 101:20-22; 131:14-18.)

> FN76.*Id.* at 102:3-6.

> FN77.*Id.* at 124:14-15.;Fok Depo. at 86:11-13; 18-20.

> FN78. Soh Depo. at 125:12-15.

> FN79. Deposition of Ronald Lim ("Lim Depo.") at 90:14-25.

2. Keppel Marine Agencies

The parties also dispute the relationship the Keppel entities have with Keppel Marine Agency. Keppel Marine Agencies acts generally as Keppel Shipyard's U.S. agent, and forwards inquiries it receives regarding shipyard services to Shipyard.[FN80]If the referral concerns a smaller vessel or if Shipyard cannot handle the contract, Shipyard, not Marine Agencies, forwards the inquiry to KSD.[FN81] If KSD wishes to bid, it provides a quote to Marine Agencies to transmit to the ship owner or management company.[FN82]In the event the owner or manager accepts the bid, Keppel Marine Agencies is entitled to receive a commission.[FN83]While there is evidence in the record that a few vessels originally referred to Keppel Shipyard were in turn presented to KSD, there is no evidence that any of the referrals resulted in a contract or that Marine Agencies has ever received a commission from KSD.

> FN80. Lim Depo. at 74:8-11; 92:25-93:2.

> FN81.*Id.* at 74:1-15.

> FN82.*Id.* at 76:16-19.

> FN83.*Id.* at 77:1-7; 97:3-7.

Costa challenges KSD's attempt to distance itself from Keppel Marine Agencies. Costa cites the fact that KSD would have to pay Marine Agencies a commission if it were to bid successfully on a contract that it referred, evidence that John Bajor,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

President of Keppel Marine Agency, has visited KSD, and evidence that Keppel Marine Agency's Vice President, Michael Holcomb, was recently at KSD for meetings with Fok.[FN84] There is also evidence that Lee met Bajor in 1995 at a house owned by Singmarine Land Corporation in Placentia. There is no evidence that the two have met since that time.[FN85]

> FN84. While Bajor met with Fok at KSD, the evidence indicates that they have spoken only once or twice. (See Fok Depo. at 75:20-22; 79:2-25; 88:2-3.)

> FN85. Lee Depo. at 18:1-5.

### 3. Keppel's Land Holding Corporations

Singmarine Land Corporation is a California entity that Costa contends was established to hold properties used by Keppel Corporation's American subsidiaries. The company was originally owned by Keppel Marine Industries, and was transferred to Keppel Corporation in January 1999.[FN86] Among the properties Singmarine Land Corporation owns is a house in Placentia where Lee met Keppel Marine Agencies' Bajor in 1995, and Fok, Ng and Lee stayed when they came to California in 1999. It is unclear whether this residence is also the "office in Anaheim" or Orange County that Fok and Lee allegedly referenced during their meetings in San Diego in 1999. The extent of land and properties held by Singmarine Land is unclear, although evidence indicates that its property is used primarily to house Keppel employees.[FN87] Singmarine Land is neither a subsidiary of KSD nor within the family of marine-related Keppel entities.[FN88]

> FN86. Soh Depo. at 114: 16-19.

> FN87. Soh Depo. at 115:19-23.

> FN88. Lee Depo. at 15:6-10.

**\*8** Costa and Vilter have submitted evidence suggesting that the corporate form of various Keppel entities is not consistently or formally maintained. They have also proffered evidence that Lim, President of Singmarine Land, took a three-day trip with Lee in 2002 to Mississippi and Houston.[FN89] The

address of one of Singmarine Land's principals is KSD's address.[FN90]

> FN89. *Id.* at 39:25-42:9.

> FN90. Declaration of William L. Banning In Opposition to Motion to Dismiss ("Banning Decl."), Ex. H. While the evidence proffered regarding KSD's address is a website printout and hence inadmissible (see note 74, *supra* ), correspondence in the record confirms that Gul Road is the location KSD's Singapore business office.

## II. DISCUSSION

### A. Standard Governing Motions To Dismiss For Lack Of Personal Jurisdiction Under Rule 12(b)(2)

#### 1. Procedural Considerations

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, the court may decide a question of personal jurisdiction on the basis of affidavits and documentary evidence submitted by the parties, or may hold an evidentiary hearing on the matter. See 5A C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE, § 1351, at pp. 253-59 and n. 31-35 (2d ed.1990); *Rose v. Granite City Police Dept.,* 813 F.Supp. 319, 321 (E.D.Pa.1993). Whichever procedure is used, plaintiff bears the burden of establishing that jurisdiction is proper. See *Ziegler v. Indian River County,* 64 F.3d 470, 473 (9th Cir.1995); *Flynt Distributing Co. v. Harvey,* 734 F.2d 1389, 1392 (9th Cir.1984). In this case, the pleadings, declarations and documentary evidence submitted by the parties provide an adequate basis for evaluating jurisdiction. Accordingly, no evidentiary hearing is necessary.

Because the matter is being decided on the basis of affidavits and documentary evidence, Costa and Vilter need only make a prima facie showing of personal jurisdiction. See *Fields v. Sedgwick Associated Risks, Ltd.,* 796 F.2d 299, 301 (9th Cir.1986). All allegations in the complaint and cross-complaint must be taken as true, to the extent not controverted by KSD's affidavits, and all conflicts in the evidence must be resolved in favor of Costa and Vilter. See *AT & T Co. v. Compagnie Bruxelles*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

_Lambert,_ 94 F.3d 586, 588 (9th Cir.1996) (citing _WNS, Inc. v. Farrow,_ 884 F.2d 200, 203 (5th Cir.1989)). A prima facie showing by Costa and Vilter will support a finding of jurisdiction " 'notwithstanding [a] contrary presentation by the moving party." ' _Wenz v. Memery Crystal,_ 55 F.3d 1503, 1505 (10th Cir.1995).

### 2. Substantive Standard

Whether a federal court can exercise personal jurisdiction over a non-resident defendant turns on two independent considerations: whether an applicable state rule or statute permits service of process on the defendant, and whether the assertion of personal jurisdiction comports with constitutional due process principles. See _Pacific Atlantic Trading Co. v. M/V Main Express,_ 758 F.2d 1325, 1327 (9th Cir.1985).

California's long-arm statute extends jurisdiction to the limits of constitutional due process. See _Gordy v. Daily News, L.P.,_ 95 F.3d 829, 831 (9th Cir.1996); CAL.CODE. CIV. PROC. § 410.10 ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States"). Consequently, when service of process is effected under California law, the two prongs of the jurisdictional analysis collapse into one-whether the exercise of jurisdiction over defendant comports with due process. See _Fireman's Fund Ins. Co. v. National Bank of Cooperative,_ 103 F.3d 888, 893 (9th Cir.1996); _Aanestad v. Beech Aircraft Corp.,_ 521 F.2d 1298, 1300 (9th Cir.1974).

**\*9** The Fourteenth Amendment's Due Process Clause permits courts to exercise personal jurisdiction over a defendant who has sufficient "minimum contacts" with the forum state that "maintenance of the suit does not offend traditional notions of fair play and substantial justice."_International Shoe Co. v. Washington,_ 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). There are two recognized bases for personal jurisdiction over nonresident defendants: (1) "general jurisdiction," which arises where the defendant's activities in the forum state are sufficiently "substantial" or "continuous and systematic" to justify the exercise of jurisdiction over it in all matters; and (2) "specific jurisdiction," which arises when a defendant's specific contacts with the forum have given rise to the claim in question. See

_Helicopteros Nacionales de Columbia S.A. v. Hall,_ 466 U.S. 408, 414-16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). See _Doe v. American Nat'l Red Cross,_ 112 F.3d 1048, 1050-51 (9th Cir.1997); _Fields, supra,_ 796 F.2d at 301-02.

### 3. There Is No Basis For Exercising General Jurisdiction Over KSD

A court has general jurisdiction over a defendant if the defendant's contacts with the forum are "substantial" or "continuous and systematic." _International Shoe, supra,_ 326 U.S. at 316; see also _Data Disc, Inc. v. Systems Technology Associates, Inc.,_ 557 F.2d 1280, 1287 (9th Cir.1977). When properly invoked, general jurisdiction allows a federal court to hear _any_ cause of action, even one unrelated to defendant's activities within the state. See _Perkins v. Benguet Consolidated Mining Co.,_ 342 U.S. 437, 445, 72 S.Ct. 413, 96 L.Ed. 485 (1952). To determine if a defendant's activities within the forum are "continuous and systematic" or "substantial," the court must examine all of its activities impacting the state. See _Helicopteros, supra,_ 466 U.S. at 411;_World-Wide Volkswagen Corp. v. Woodson,_ 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); _Perkins, supra,_ 342 U.S. at 445-49 (1952).

Costa asserts that the court may exercise general jurisdiction over KSD because it has conducted substantial, systematic and continuous activities in California. Costa relies, in this regard, on evidence that KSD has solicited work and entered into contracts worth millions of dollars with vessels owners or managers located in California, evidence concerning the August 1999 visit of Fok, Ng and Lee, and evidence regarding the United States ties of other Keppel Corporation entities.[FN91]

> FN91. See Plaintiff's Memorandum of Points and Authorities in Opposition to Motion to Dismiss ("Pl.'s Opp.") at 3:13-15.

Even resolving all conflicts in the evidence in favor of Costa and Vilter, the court cannot find that KSD has engaged in substantial, systematic and continuous activities in California. First, KSD is not licensed to do business in California, it has not designated an agent for service of process in the state, it does not pay taxes or maintain bank accounts here, or it does

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))

not own property or have employees or agents domiciled in California.[FN92] Evidence regarding the residence in Placentia/Anaheim indicates that it is not owned by KSD; loose statements by Fok and Lee regarding offices in Anaheim do not refute or contradict this fact.[FN93] Between 1995 and 2000, KSD secured five contracts for ship repair and/or jumboization work from California residents.[FN94] It bid on four others. While admittedly each of the contracts generated millions of dollars in revenue for KSD, and together they appear to represent a not significant percentage of KSD's business,[FN95] this alone is not sufficient to support a finding of general jurisdiction.

> FN92. Kwee Decl., ¶¶ 17, 20, 24-25; Fok Decl., 27, 30, 34-35.

> FN93. See Chikami Decl., ¶ 6; Freitas Decl., ¶ 6. At the time he purportedly told Freitas that he was from Keppel's Los Angeles or Orange County office, Lee was not a KSD employee. Accordingly, the statement is hearsay when offered against KSD.

> FN94. Sanchez Decl., ¶ 2 (Toaimoana, Fuiono); Freitas Decl., ¶ 3 (Carol Linda); Cileu Decl., ¶¶ 6, 8 (Daniela, Sea Encounter).

> FN95. There is no direct evidence in the record regarding KSD's total inventory of shipyard work during this period. Costa extrapolates from evidence regarding the company's revenues for the period, however, that contracts for repair and/or jumboization of the Daniela, Western Pacific, Toaimoana and Fuiono accounted for 11.75% of KSD's gross receipts from shipyard work between 1995 and 2000. (See Pl.'s Opp. at 5, n. 6; Soh Depo. at 67:8-68:8, 63:23-64:10.)

*10 The Supreme Court has upheld a finding of general jurisdiction only once, in a case involving contacts significantly more comprehensive than those presented here. See *Perkins, supra,* 342 U.S. at 445-49. The Ninth Circuit has also regularly declined to find general jurisdiction "even [in cases] where the [defendant's] contacts were quite extensive." *Amoco Egypt Oil Co. v. Leonis Navigation Co.,* Inc., 1 F.3d 848, 851 (9th Cir.1993).

Courts have routinely rejected the suggestion that generating substantial revenue from the sale of products or services to forum state residents is by itself sufficient to support the exercise of general jurisdiction. See, e.g., *Dalton v. R & W Marine, Inc.,* 897 F.2d 1359, 1362 (5th Cir.1990) (holding that general jurisdiction did not exist despite the fact that the defendant company chartered boats to its Louisiana subsidiaries (accounting for approximately 13% of the company's revenues), engaged in advertising which reached Louisiana, and purchased vessels within the state, because these contacts were not sufficiently "systematic and continuous to constitute a general presence in the state"); *LeBlanc v. Patton-Tully Transportation LLC,* 138 F.Supp.2d 817, 819 (S.D.Tex.2001) ("The Court concludes that out-of-state work performed for a Texas business, even if accounting for ten to fifteen percent of Defendant's revenue, cannot possibly give rise, by itself, to general jurisdiction in Texas over the Defendant"); *L.H. Carbide Corp. v. Piece Maker Co.,* 852 F.Supp. 1425, 1435 (N.D.Ind.1994) ("The facts in the present case indicate that Piece Maker has none of the pervasive contacts with the State of Indiana as the Benguet Consolidated Mining Company did with the State of Ohio in *Perkins.* The only presence Piece Maker has in Indiana is one salesman who periodically drives through the state to ascertain whether the four (4) or five (5) customers who reside in Indiana, and make up only eight percent (8%) of Piece Maker's total annual sales for the past year, require any products from Piece Maker. This sole contact does not rise to the level of 'continuous and systematic contacts' as that test has been applied by other courts to find the existence of general personal jurisdiction"). Cf. *Helicopteros, supra,* 466 U.S. at 411, 417-18 (holding that the non-resident defendant's purchase of 80% of its helicopter fleet, as well as spare parts and accessories for the aircraft, at a cost of several million dollars over a seven-year period was not sufficient to support the exercise of general jurisdiction over it); *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 573 (2d Cir.1996) (noting that the defendant's "$4 million dollars in sales in Vermont between 1987 and 1993, standing alone, may not have been sufficient" to subject it general jurisdiction in the state, but holding that "its relationship with dealers selling its products and its so-called 'authorized' builders, the visits to those dealers and builders by Robertson personnel, the advertising and support available to Vermont

Not Reported in F.Supp.2d                                                                                                    Page 14
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

residents regarding Robertson's products, and the deliberate targeting of Vermont architectural firms as sales prospects" was, in combination with the sales, sufficient satisfy the "minimum contacts" requirement).

**\*11** This is particularly true where, as here, the non-resident defendant structures its business transactions so that they are consummated outside the state and contracted work is performed outside the state. See _Bearry v. Beech Aircraft Corp., 818 F.2d 370, 375-76 (5th Cir.1987)_ ("[the fact] that Beech products flow into Texas [did] not create a general presence in that state" because "Beech exercised its right to structure its affairs in a manner calculated to shield it from the general jurisdiction of the courts of other states such as Texas, carefully requiring the negotiation, completion, and performance of all contracts in Kansas. Beech has not afforded itself the benefits and protections of the laws of Texas, but instead has calculatedly avoided them").

KSD does not have a registered agent for service of process in California, it does not own property in the state, or have bank accounts or employees here. It also has no sales representatives, agents or marketing personnel who reside in the state or who are here on a frequent or even routine basis. Its contacts with the state are thus insufficient to permit the exercise of general jurisdiction. See, e.g., _Shute v. Carnival Cruise Lines, 897 F.2d 377, 381 (9th Cir.1990)_ (declining to exercise general jurisdiction where, despite the existence of other contacts in Washington, defendant "has no offices and no exclusive agents in Washington, it is not registered to do business there, and it pays no taxes there"), overruled on other grounds, _499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991)_; _Cubbage v. Merchent, 744 F.2d 665, 667-68 (9th Cir.1984)_ (declining to exercise general jurisdiction over defendants who were not residents of or licensed by the forum state, and who did not perform services within the state). Compare _Perkins, supra,_ 342 U.S. at 447 (corporation's president and principal shareholder conducted the defendant company's wartime business from his home in Ohio, since corporate operations were halted by the Japanese occupation of the Philippines; the president corresponded on the company's behalf, had custody of the corporate files, issued salary checks, maintained two bank accounts carrying substantial balances of company funds, held directors' meetings

at his home, and supervised the rehabilitation of the company's properties in the Philippines).

Moreover, even if one were to credit Costa's assertion that KSD maintains an office in Anaheim, this would not change the analysis. See, e.g., _In re Rationis Enterprises, Inc. of Panama, 261 F.3d 264, 269 (2d Cir.2001)_ ("While a local office may constitute a 'continuous and systematic' contact sufficient to allow a court to hold that a defendant subjected itself to the general jurisdiction of the forum state, ... the presence of such an office is not dispositive"); _Glater v. Eli Lilly & Co.,_ 744 F.2d 213, 215, 217 (1st Cir.1984) (the defendant corporation's general business contacts were too fragmentary to satisfy the constitutional standard for general jurisdiction where it advertised its pharmaceutical product in trade journals reaching the forum state and employed eight sales representatives to service physicians, pharmacies, and hospitals within the state); _Congoleum Corp. v. DLW Aktiengesellschaft,_ 729 F.2d 1240, 1242 (9th Cir.1984) ("[N]o court has ever held that the maintenance of even a substantial sales force within the state is a sufficient contact to assert jurisdiction in an unrelated cause of action"). As noted earlier, the totality of a defendant's contacts with the state must be assessed in determining whether the exercise of general jurisdiction is appropriate. Here, the evidence reflects a single visit to the state by KSD representatives to solicit business, the receipt by some potential customers of sales brochures over an eight- to ten-year period, and some telephone and mail solicitation from KSD's home office in Singapore. This activity, which may have contributed to generating 11-12% of KSD's revenue over a five-year period, is not sufficient to permit the exercise of general jurisdiction, particularly given evidence that the contracts were consummated outside the state and all work performed pursuant to the contracts was done in Singapore.

**\*12** Costa also asserts that the court may exercise general jurisdiction over KSD because other subsidiaries of Keppel Corporation have ties to the United States, and KSD employs one of the subsidiaries-Keppel Marine Agencies-as an agent to obtain work from U.S. vessel managers and owners. Costa cites no authority demonstrating that a parent corporation's contacts can be imputed to a subsidiary, or that one subsidiary's contacts can be imputed to

Not Reported in F.Supp.2d                                                                                  Page 15
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

another, in determining whether to exercise general jurisdiction over the subsidiary.

"[A] parent's corporation's ties to a forum do not create personal jurisdiction over the subsidiary." *Fields v. Sedgwick Associated Risks, Ltd.,* 796 F.2d 299, 301-02 (9th Cir.1986). See also *County of Stanislaus v. Pacific Gas & Elec. Co.,* No. CV-F-93-5866, 1995 WL 819149, *2 (E.D.Cal. Dec.18, 1995)* ("That A & S is a wholly-owned subsidiary of PG & E, a California corporation that actively conducts business in this state, is irrelevant to the question of whether there is personal jurisdiction over A & S. Only A & S's own contacts with this forum may be considered in assessing jurisdiction").

Similarly, courts do not impute the contacts of a subsidiary into its parent to determine whether personal jurisdiction over the parent exists. See *Doe v. Unocal Corp.,* 248 F.3d 915, 925 (9th Cir.2001) ("The existence of a relationship between a parent company and its subsidiaries is not sufficient to establish personal jurisdiction over the parent on the basis of the subsidiaries' minimum contacts with the forum"); *Naxos Resources v. Southam Inc.,* No. CV 96-2314, 1996 WL 662451, *2 (C.D.Cal., Aug.16, 1996)* ("Plaintiffs instead argue that because four of Southam's subsidiaries conduct business in California, Southam should be deemed to have 'continuous and systematic' contacts with California. In general, mere presence of a subsidiary in a forum state will not suffice to establish personal jurisdiction over a nonresident parent company"). Before such imputation is appropriate, there must be evidence that " 'the parent and subsidiary are not really separate entities, or [that] one acts as an agent of the other.' " *Doe, supra,* 248 F.3d at 926 (quoting *El-Fadl v. Central Bank of Jordan,* 75 F.3d 668, 676 (D.C.Cir.1996)). This requires evidence that the parent controls the subsidiary's internal affairs or daily operations. *Id.* See also *American Telephone & Telegraph Co. v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 591 (9th Cir.1996) ("A parent corporation's relationship with its subsidiary may confer personal jurisdiction over the parent if the subsidiary is acting as the parent company's alter ego, 'so as to justify disregard of the corporate entity' ").

Here, there is no evidence that would support a finding that Keppel Corporation or any of its subsidiaries controls KSD's internal daily operations.

Nor is there evidence that Keppel Corporation itself has sufficient contacts with California to support the exercise of general jurisdiction over it. At best, there is evidence that certain present or former Keppel subsidiaries-Singmarine Land Corporation, MIL-I Precision and Pacific Seacraft-are incorporated or do business in the state. There is also evidence that Land Corporation owns at least one piece of property here,[FN96] and that other Keppel subsidiaries have a presence in Texas and New Jersey.[FN97] The only evidence linking KSD to Singmarine Land Corporation is Fok's reference to "an office in Anaheim," the fact that Fok, Ng and Lee stayed at the Placentia residence owned by Land Corporation while they were in California in 1999, and the fact that one of the directors of Land Corporation lists an address on the company's corporate filing that is KSD's address in Singapore. This is not sufficient to support a finding that either Keppel Corporation or Land Corporation controls KSD's daily operations, or that there is a basis for disregarding the companies' corporate form. Similarly, there is no evidence that KSD's business is or was linked in any fashion with the businesses of MIL-I Precision or Pacific Seacraft. MIL-I Precision, in fact, makes aircraft components for McDonnell Douglas and Boeing.[FN98] While the evidence reflects that executives within the Keppel family of companies move from one business to another, this is not a basis for disregarding the corporate form. Accordingly, the court concludes that the contacts of Keppel Corporation and its subsidiaries are not relevant to the jurisdictional analysis in this case.

> FN96. Land Corporation previously owned a factory in the state that was used by Pacific Seacraft. (See Soh Depo. at 115:10-13.)

> FN97. There is also evidence that Lee, KSD's Deputy General Manager, traveled to Mississippi with the General Manager of Keppel Corporation to investigate an investment opportunity. (See Lee Depo. at 39:25-40:9, 41:6-12, 55:5-20.)

> FN98. See Lee Depo. at 1:16-3:20.

**\*13** Costa and Vilter contend that KSD has a direct relationship with Keppel Marine Agencies, and that Marine Agencies contacts with the United States are sufficient to confer personal jurisdiction over KSD.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))

In the first place, there is little, if any, evidence that Marine Agencies has "substantial" or "continuous and systematic" contacts with California. The company is apparently based in New Jersey, and there is no evidence that it has solicited or obtained shipyard contracts from California owners and managers. Nor is there evidence that a large portion of its commission revenue is generated in the state.

Even were this not the case, the Ninth Circuit has established a high threshold that must be met before a subsidiary's contacts may be imputed to the parent corporation on an agency theory. The test "requires a showing that the subsidiary functions as the parent corporation's representative in that it performs services that are 'sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.'" _Doe, supra,_ 248 F.3d at 928 (quoting _Chan v. Society Expeditions, Inc.,_ 39 F.3d 1398, 1405 (9th Cir.1994)). Stated otherwise, the services the agent subsidiary performs must be sufficiently meaningful that its presence in the state substitutes for [the] presence of the principal."_Id._ at 930.

Costa and Vilter proffer no evidence that Marine Agencies operates as a surrogate for KSD in California. Rather, the evidence reflects that Marine Agencies is primarily the agent of Keppel Shipyard, and that its dealings with KSD are indirect only. As noted earlier, Marine Agencies refers potential ship repair/jumboization customers to Shipyard. If the projects involve smaller vessels that are more appropriate for KSD, Shipyard refers the business to it. While Marine Agencies stands to earn a commission if KSD contracts with the customer and performs the work, there is no evidence that it has in fact even received a commission from KSD.[FN99] Thus, even if the evidence supported a finding that Marine Agencies is present in California (which it does not), there is no proof that its absence from the state would cause KSD itself to establish a presence here. See _Doe, supra,_ 248 F.3d at 929 ("There is no evidence that in the absence of Total's California subsidiaries involved in the petrochemical and chemical operations, Total would conduct and control those operations"). For this reason, there is no basis upon which to disregard the corporate separateness of Marine Agencies and KSD. See, e.g., _Naxos, supra,_ 1996 WL 662451 at *3 ("the Court cannot conclude

that the evidence adduced by Naxos regarding defendants' subsidiaries is sufficient to merit the extraordinary remedy of disregarding corporate separateness and imputing the presence of defendants' subsidiaries in California to defendants for general jurisdiction purposes").[FN100]

FN99. Vilter argues that Marine Agencies has referred nine potential projects to KSD over an unspecified period of years. (See Vilter Memorandum of Points and Authorities in Opposition to Keppel Singmarine's Motion to Dismiss ("Vilter Opp.") at 9:10-10:3.) Vilter cites no evidence, however, that the vessels identified have California owners or managers, and the deposition references it provides do not correlate to any of the transcript pages that were lodged with the court.

FN100. The same result would follow if the court applied the general test for imputing the contacts of an agent in the state to its principal. See, e.g., _Genetic Implant Systems v. Core-Vent Corp.,_ 123 F.3d 1455, 1458-59 (Fed.Cir.1997) (where a manufacturer appointed an exclusive distributor to sell its patented products, and the distributor maintained sales agents in Washington, the forum state, and sold a substantial amount of product there, the manufacturer purposefully availed itself of the benefits of doing business in Washington, warranting the exercise of jurisdiction over it in that forum).

**\*14** In sum, whether analyzed in terms of its own contacts with the forum, the contacts of Keppel Corporation and its subsidiaries generally, or both, KSD has not engaged in sufficiently "substantial" or "continuous and systematic" activity in California to support the exercise of general jurisdiction over it in this case.

4. The Court May Exercise Specific Jurisdiction Over KSD

Before the court may exercise specific jurisdiction over a defendant, three things must be shown: (1) that the defendant did some act or consummated some

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

transaction in California by which it purposefully availed itself of the privilege of conducting activities in the state; (2) that the claims against it arise out of such activities; and (3) that the exercise of jurisdiction is reasonable. _Fireman's Fund, supra,_ _103 F.3d at 894;Ballard v. Savage,_ 65 F.3d 1495, 1498 (9th Cir.1995).

a. Purposeful Availment

"Purposeful availment analysis examines whether the defendant's contacts with the forum are attributable to his own actions or are solely the actions of the plaintiff."_Sinatra v. National Enquirer,_ 854 F.2d 1191, 1195 (9th Cir.1988). To demonstrate purposeful availment, plaintiffs must show that the defendant "engage[d] in some form of affirmative conduct allowing or promoting the transaction of business within the forum state."_Gray & Co. v._ _Firstenberg Machinery Co.,_ 913 F.2d 758, 760 (9th Cir.1990) (citing _Shute, supra,_ 897 F.2d at 381). See also _Burger King v. Rudzewicz,_ 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, ... or of the 'unilateral activity of another party or a third person ...'"). A defendant's contacts must be such that it should "reasonably anticipate being haled into court there."See _World-Wide_ _Volkswagen, supra,_ 444 U.S. at 297.

Courts distinguish between contract and tort actions in assessing whether a defendant has purposefully availed itself of the benefits of conducting activities in the forum. See _Roth v. Garcia-Marquez,_ 942 F.2d 617, 621 (9th Cir.1991). In tort cases, courts exercise jurisdiction over defendants who engage in an act that has an effect in the forum state, even if the act itself takes place outside state boundaries. _Id.;Paccar_ _Int'l, Inc. v. Commercial Bank of Kuwait, S.A.K.,_ 757 F.2d 1058, 1064 (9th Cir.1985) ("The commission of an intentional tort in a state is a purposeful act that will satisfy the first two requirements under _Data_ _Disc_ [, _supra,_ 557 F.2d at 1288]. A tortious act, standing alone, can satisfy all three requirements under _Data Disc_ if the act is aimed at a resident of the state or has effects in the state").

In contrast, in a case based on contract, the fact that the defendant entered into a contract with a forum resident, standing alone, is not sufficient to establish purposeful availment. See _Burger King, supra,_ 471 U.S. at 478;_Gray, supra,_ 913 F.2d at 760;_Sher, supra,_ 911 F.2d at 1362. Rather, the court must assess "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine whether it is appropriate to exercise specific jurisdiction over the defendant. _Burger King, supra,_ 471 U.S. at 479-80. When tort claims arise from a contractual relationship between plaintiff and defendant, the Ninth Circuit applies the test utilized in assessing jurisdiction in contract cases. See _Sher, supra,_ 911 F.2d at 1362 ("Although some of Sher's claims sound in tort, all arise out of Sher's contractual relationship with the defendants. In such a case, the mere existence of a contract with a party in the forum state does not constitute sufficient minimum contacts for jurisdiction.... Instead, we must look to 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing' to determine if the defendant's contacts are 'substantial' and not merely 'random, fortuitous, or attenuated' ").

**\*15** In the instant case, the claims against KSD arise out of its performance of contractual obligations, as the company undertook to repair the Daniela only as a consequence of its entry into a contract with Z No. 2 Fishing Company. While Pete Costa was not a party to the contract, his negligence and strict liability claims flow from the obligations undertaken and duties imposed on KSD by the contract. Accordingly, it is appropriate to apply a contract analysis in assessing whether specific jurisdiction exists. See _Unic Oil Compania v. Internacional De Granos E_ _Insumos S.A. De C.V.,_ 92 F.3d 1194, 1996 WL 429172, *4 (9th Cir. July 9, 1996) (Unpub.Disp.) ("Unic's claims, including those sounding in tort, are related to the letters of intent and distribution agreement concluded between Unic and the Honduran companies. Gonzales, the only defendant remaining in this appeal, was not a party to any of these documents. Yet his role involved extensive solicitation of business and several negotiations regarding the documents by telephone from Miami and on location in Honduras.... These contacts and developments form the basis for the tort claims alleged here").

_Burger King_ emphasizes that courts must use a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))

"highly realistic" approach in evaluating minimum contacts in a contract case that "recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.'...It is these factors-prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing-that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum."*Burger King, supra,* 471 U.S. at 479.

The Ninth Circuit has applied this standard in a number of decisions that provide guidance in resolving the pending dispute. In *Roth, supra,* 942 F.2d 617, the court considered an author's challenge to the exercise of personal jurisdiction over him in a contract dispute concerning movie rights to one of his works. A California film producer contacted the author in Mexico and expressed interest in making a film based on his book. *Id.* at 619.Originally, the author insisted that the film be shot in Columbia; later, he agreed it could be filmed in Brazil. *Id.* The court noted that the mere existence of a contract between a forum resident and a non-resident defendant does not suffice to subject the non-resident to jurisdiction. *Id.* at 621.Rather, it is critical to ascertain whether "the defendant's contacts [with the forum state] are attributable to 'actions by the defendant *himself,'* or conversely to the unilateral activity of another party."*Id.* (emphasis original). It is only "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state,' " the court said, who "are subject to regulation and sanctions in the other State for the consequences of their actions." *Id.* (quoting *Burger King, supra,* 471 U.S. at 473).

**\*16** Applying these principles to the case before it, the court held that the fact that the film producer had solicited the author to enter into the contract weighed against subjecting the author to jurisdiction in California. Similarly it held that the author's minimal presence in the state suggested there had been no purposeful availment. *Id.* at 622.Calling the matter "a very close call," the court nonetheless concluded that "a final and broader issue appear[ed] to swing the first prong for [the film producer], namely the *future consequences* of the contract."*Id.* (emphasis original). It stated:

"The ... contract concerned a film, most of the work for which would have been performed in California. Though the shooting most likely would have taken place in Brazil, all of the editing, production work, and advertising would have occurred in California. This is not an instance where the contract was a one-shot deal that was merely negotiated and signed by one party in the forum; on the contrary, most of the future of the contract would have centered on the forum. The checks that [the producer] would have sent [the author], ... would have depended upon activities in California and the United States. In looking at the 'economic reality,' ... it seems that the contract's subject would have continuing and extensive involvement with the forum."*Id.*

See also *Ting v. Orbit Communication Co., Ltd.,* 105 F.3d 666, 1997 WL 8470, \*3-4 (9th Cir. Jan.7, 1997) (Unpub.Disp.) (holding that an employment contract between a non-resident employer and a resident employee, which allegedly required the employer to open an office in Los Angeles, contemplated a continuing relationship with the forum state, as the resident employee was to be based there). Compare *Slepian v. Guerin,* 172 F.3d 58, 1999 WL 109676 (9th Cir. Jan.11, 1999) (Unpub.Disp.) (holding that an employment contract between a resident and a non-resident employer did not give rise to personal jurisdiction over the employer because the employer's accommodation of the employee's choice of residence was not coupled with other contacts directed toward the forum state, the contract was negotiated outside the state, and the employee's work was not directed at residents of the forum state but was "nationwide").

By contrast, in *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802 (9th Cir.1988), a California resident and his wholly owned company entered into oral and written agreements with Shell International Chemical Co., Ltd., to market and sell PB pipe grade industrial resin in South America, Africa and the Middle East. *Id.* at 805.Pursuant to the contract, the California plaintiffs were to be paid a commission on actual sales. *Id.* The parties' agreement was negotiated in England. "[C]ontract execution" occurred "by international mail," although the document was signed by the plaintiffs in California. *Id.* at 816.The contract made no reference to California (or the United States) as plaintiffs' place of residence or as the forum for the

Page 19

resolution of disputes.*Id.* Nor did it reference "any reliance on [plaintiffs'] facilities in California." *Id.* at 917.Plaintiffs alleged that "they [had] 'performed 90% of [their] activities [in furtherance of the contract] in the Bay Area.' ' *Id.* at 816.The court rejected this as a basis for exercising jurisdiction, noting that Shell International performed no part of the contract in California, and that plaintiffs' actions constituted "unilateral activity" only. This it found insufficient, as "a plaintiff's performance in California cannot give jurisdiction ... over a nonresident defendant; it is [the] defendant's activity that must provide the basis for jurisdiction." *Id.* at 816-17 (internal quotations and parentheticals omitted).

**\*17** The contract at issue here is more similar to that involved in *McGlinchy* than it is to the agreement in *Roth.*KSD was obligated to perform a discrete body of work outlined in the contract; it had no obligation to provide ongoing maintenance or services for the vessel once the repairs were complete. All work, moreover, was performed in Singapore. KSD negotiated the contract with S & C from Singapore via fax and e-mail, following inspections of the vessel that occurred in the Philippines. The contract specifically stated that Singapore law would apply to resolve disputes arising thereunder.

The contract thus involved a "one-shot deal" that did not contemplate ongoing involvement with California. In *GATX Capital Corp. v. Fifth Third Bank,* No. C 99-3568 MJJ, 1999 WL 1244147 (N.D.Cal. Dec.10, 1999), the court concluded that it could not exercise personal jurisdiction over a non-resident company that entered into a contract for brokerage services with a California entity. The brokerage agreement concerned the leasing of fifty barges. The California-based broker identified a lessee, and the non-resident corporation entered into a twenty-five year lease with the entity. *Id.* at *1. The court found that the brokerage contract was "more like a 'one-shot deal' than an ongoing relationship" despite the fact that it contemplated the provision of additional brokerage services once the initial lease expired as well as yearly tax services. *Id.* at *3. The court further found that the " 'future consequences' as between [the barge owner] and the [broker] were minimal."*Id.* at *4. Consequently, it declined to exercise jurisdiction over the non-resident barge owner. *Id.* See also *Van Steenwyk v. Interamerican*

*Mgmt. Consulting Corp.,* 834 F.Supp. 336, 342 (E.D.Wash.1993) (finding no personal jurisdiction where, unlike *Roth,*"the contract in issue ... would not have created ongoing work in this state" as the resident plaintiff was to have performed his part of the agreement in Indonesia). Compare *Walker & Zanger (West Coast) Ltd. v. Stone Design, S.A.,* 4 F.Supp.2d 931, 939 (C.D.Cal.1997) (concluding that it was proper to exercise personal jurisdiction over an Italian company that had shipped limestone to, and accepted payment from, a California plaintiff over a period of eight years, as this was the sort of "affirmative conduct which allows or promotes the transaction of business within the forum state").

Despite the fact that the contract contemplated that KSD's work would be performed outside the forum state, and despite the fact that KSD negotiated the contract from Singapore and provided for the application of Singapore law, there are Ninth Circuit cases suggesting that KSD's solicitation of the contract in California is sufficient to support a finding of purposeful availment. See *Shute, supra,* 863 F.2d at 1441 ("This circuit has held that a non-resident defendant's act of soliciting business in the forum state will generally be considered purposeful availment if that solicitation results in contract negotiations or the transaction of business"); *Sinatra, supra,* 854 F.2d at 1195 ("the solicitation of business in the forum state that results in business being transacted or contract negotiations will probably be considered purposeful availment"); *Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 840 (9th Cir.1986) ("if the defendant directly solicits business in the forum state, the resulting transactions will probably constitute the deliberate transaction of business invoking the benefits of the forum state's laws"). See also *Burger King, supra,* 471 U.S. at 479-80 (holding that the court could exercise specific jurisdiction over defendant in part because he "deliberately 'reach[ed] out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long term contract").

**\*18** Some courts have concluded that the results in these cases are best explained by the fact that there were "additional, substantial contacts with the respective forums" beyond the initial solicitation. See, e.g., *Reyes v. Riggs,* No. 87-4053, 1989 WL 71456, *3 (9th Cir. June 26, 1989) (Unpub.Disp.) (discussing *Shute* and *Decker,* the court stated: "In

Not Reported in F.Supp.2d                                                                                                    Page 20
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

two recent decisions we noted that the solicitation of business in the forum state will generally be considered purposeful availment if it results in contract negotiations or the transaction of business.... One might argue here that defendants' communications with the plaintiff resulted in a transaction of business. We conclude, however, that the present case is distinguishable from *Shute* and *Decker.*In *Shute,* the plaintiff advertised in local media, promoted its business through brochures sent to travel agents throughout the forum state, paid commissions to those agents for sales, and conducted promotional seminars within the state to solicit increased sales.... In *Decker,* while the contacts were not as great, the contract specified that performance was to be made in the forum state.... Thus, both *Shute* and *Decker* involved additional, substantial contacts with the respective forums").

In a recent, unpublished opinion, however, a Ninth Circuit panel held that a nonresident's solicitation of business involving a "one-shot" transaction constituted purposeful availment sufficient to subject the defendant to jurisdiction on a contract claim. In _Asad v. Pioneer Balloon,_ 10 Fed. Appx. 624, 2001 WL 615269, *2 (9th Cir.2001) (Unpub.Disp.), the non-resident defendant mailed three advertisements to plaintiff after meeting its representatives at a trade show outside the forum state. The parties entered into a contract pursuant to which defendant agreed to deliver balloon products to plaintiff in the United Arab Emirates. No ongoing relationship was anticipated and performance of the contract occurred outside of the forum state. *Id.* at *1. Citing *Shute* and relying on the general rule that "soliciting business in the forum state will generally suffice if it results in the contract negotiations or the transaction of business," the panel nonetheless held that defendant's action in sending three advertisements to plaintiff in the forum state demonstrated that it had purposefully availed itself of the privilege of doing business there. *Id.* at *2 (citing _Shute, supra,_ 897 F.2d at 381). See also _Unic Oil, supra,_ 1996 WL 429172 at *4 (holding that jurisdiction could properly be asserted over a non-resident defendant in California with respect to tort claims arising out of a contract to distribute plaintiff's lubrication products in Honduras because defendant had engaged in "extensive solicitation of business," conducted "several negotiations regarding the [contract] by telephone from Miami and on location in Honduras," and "affirmatively sought out Unic").

*19 In the present case, it is undisputed that KSD executives came to California in August 1999. Costa has adduced evidence, which must be accepted as true for purposes of this proceeding, that prior to arriving, KSD's Fok telephoned S & C's Cileu, and stated that KSD was looking for shipyard work and was prepared to offer good deals and competitive pricing. Fok purportedly asked whether Cileu was planning to dry-dock any of the vessels under S & C's management and whether any of the owners Cileu knew were planning to lengthen or "jumboize" their vessels. When Fok, Ng and Lee arrived in San Diego, they solicited shipyard business from California vessel owners and managers. Among the managers they saw was Cileu. Plaintiff's evidence reflects that KSD representatives met with Cileu, and specifically solicited future business from him. Cileu states that, during the meeting, the upcoming overhaul of the Daniela was discussed, and KSD's Fok said that his company wanted to bid the job and was prepared to offer a very competitive price to secure the contract. Cileu also states that the visit was a "substantial factor" in S & C's decision to award the contract to KSD. Plaintiff's evidence thus demonstrates that KSD actively solicited the contract that gives rise to the claims here at issue by traveling to California and meeting with Cileu.

Under the rule announced in *Shute, Sinatra* and *Decker,* this is sufficient to support a finding of purposeful availment. See, e.g., _Whitson v. Stolpman,_ 174 F.Supp.2d 1131, 1133-34 (W.D.Wash.2001) (holding that jurisdiction was properly exercised over a California lawyer in Washington where plaintiff contacted the lawyer in California regarding her case, but defendant thereafter "took steps to acquire the representation that were aimed toward Washington and designed to obtain business from Washington residents. In particular, defendant provided information about his interest and qualifications via correspondence directed to plaintiff's Seattle office ... and traveled to Washington in a successful attempt to obtain the legal representation"); _Forum Financial Group, Ltd. Liability Co. v. President and Fellows of Harvard College,_ 173 F.Supp.2d 72, 90 (D.Me.2001) ("Defendants in this case allegedly purposefully sought out Forum, in Maine, because of its expertise, and they traveled to Maine and initiated contacts with Forum in Maine in order to create the business relationship, which became the subject of the

Consulting Contract. Such a course of conduct shows that Defendants focused their business efforts on entities and persons in the State of Maine"); *Elbeco Inc. v. Estrella de Plato Corp., 989 F.Supp. 669, 675 (E.D.Pa.1997)* ( "Defendants initiated contact with Elbeco through a phone call into Pennsylvania. Additionally, defendants continued their solicitation of Elbeco through sending promotional materials and sample shirts into Pennsylvania. After the contract was entered into, there was continued contact with Pennsylvania through mail and telephone communications. Further, representatives of Estrella and Maquiladora visited Pennsylvania in connection with this contract on two separate occasions.... The defendants' contacts with Pennsylvania as outlined above indicate a voluntary entry into Pennsylvania sufficient for this Court to exercise specific jurisdiction").

**\*20** In *Omeluk v. Langsten Slip & Batbyggeri A/S, 52 F.3d 267 (9th Cir.1995),* the Ninth Circuit held that the district court lacked jurisdiction over a Norwegian company that had rebuilt the fishing vessel on which plaintiff was injured. The accident itself occurred while the vessel was in the Bering Sea. The Norwegian ship rebuilder did not maintain offices, employees, property, or bank accounts in the forum state of Washington. Nor had it solicited business there. *Id.* at 269. It worked on the vessels it contracted to rebuild in Norway, and redelivered them to their owners there as well. The contract to refurbish the vessel on which plaintiff was injured was negotiated and signed in Norway and Denmark. *Id.* The ship builder's only direct connections with the forum state were its purchase, at the owner's direction, of certain electronic components for the vessel from a company in Washington and the attendance of representatives at cocktail receptions and ship christenings on four occasions in the past. *Id.* The Ninth Circuit held that the ship builder had not purposefully availed itself of the privilege of conducting business in Washington. *Id.* at 271. Had KSD not purposefully injected itself into California to solicit the repair contract on the Daniela, the result would be the same. The fact that it did so, however, warrants a different result. The Norwegian ship builder did not solicit business in Washington or the United States generally. KSD did. As the claims at issue in this case arise out of work KSD secured as a direct result of its solicitation of S & C in California, there is sufficient evidence of purposeful availment to support the exercise of specific jurisdiction over

KSD.

**b. Whether The Claims Against KSD Arise Out Of The Contacts**

Because the court has found that KSD has sufficient contacts with California to warrant exercising specific jurisdiction over it, the court must consider whether Costa's and Vilter's claims against KSD arise out of its contacts, and whether the exercise of jurisdiction over KSD would be reasonable.

A lawsuit arises out of a defendant's contacts with the forum state if there is a direct nexus between the cause of action and the defendant's activities. See *Shute, supra,* 897 F.2d at 385. The Ninth Circuit has adopted a "but for" test in assessing whether an action arises out of a defendant's contacts with the forum state. See *Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1322 (9th Cir.1998)* ("We must determine if the plaintiff Panavision would not have been injured 'but for' the defendant Toeppen's conduct directed toward Panavision in California"); *American Nat'l. Red Cross, supra,* 112 F.3d at 1051-52 ("... it cannot be said that Appellant would not have sustained her injury, 'but for' Donohue's alleged misconduct").

In the present case, Costa alleges that his brother was killed as a result of KSD's negligent repair of the Daniela. Vilter's indemnity cross-claim similarly arises out of KSD's repair of the vessel. Costa has adduced evidence that S & C would not have entered into the contract with KSD but for KSD's solicitation of it, most specifically, Fok's visit to San Diego.[FN101] To paraphrase the court in *Shute, supra,* KSD's "solicitation of business in [California]" was "forum-related activit[y] that put the parties within 'tortious striking distance' of one another." *Shute, supra,* 897 F.2d 386. But for such activity, KSD would not have been awarded the repair contract, and the decedent allegedly would not have been injured. Accordingly, the court finds that the second requirement for the exercise of specific jurisdiction has been met.

FN101. Cileu Decl., ¶ 12.

**c. Whether Exercising Jurisdiction Over Defendants Is Reasonable**

**\*21** The final prong of the jurisdictional test examines whether it is reasonable to subject the defendant to suit in the forum state. Reasonableness is assessed by weighing the following factors: (1) the extent of the defendant's purposeful injection into the forum; (2) the defendant's burden in litigating in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. *Ziegler, supra,* 64 F.3d at 474. See also *World-Wide Volkswagen, supra,* 444 U.S. at 292.

1. Extent Of KSD'S Purposeful Interjection

If a non-resident defendant has purposefully availed itself of the benefits of conducting activities in the forum state, it is "presumptively not unreasonable" to subject it to litigation in that forum. See *Burger King, supra,* 471 U.S. at 476-77 ("[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable").

Here, the court has found that KSD purposefully availed itself of the benefits of conducting activities in California. Fok and Ng actively solicited business on KSD's behalf from California residents, and specifically solicited a contract for repair work on the Daniela from S & C. See *Sinatra, supra,* 854 F.2d at 1199 ("The factor of purposeful interjection is analogous to the purposeful direction analysis discussed above.... Because we have determined that the Clinic purposefully directed its activities toward California residents, we cannot conclude that it did not deliberately avail itself of the benefits of California laws ...").

The fact that the court has made this finding, however, does not obviate the need to consider the degree of defendants' intrusion into the state. " 'Even if there is sufficient "interjection" into [California] to satisfy the [purposeful availment prong], the degree of interjection is a factor to be weighed in assessing the overall reasonableness of jurisdiction under the [reasonableness prong]." ' *Ziegler v. Indian River County,* 64 F.3d 470, 475 (9th Cir.1995) (quoting *Core-Vent Corp. v. Nobel Industries AB,* 11 F.3d 1482, 1488 (9th Cir.1993) (brackets original), and *Insurance Company of North America v. Marina Salina Cruz,* 649 F.2d 1266, 1271 (9th Cir.1981)). See also *Dole Food Co., Inc. v. Watts,* 303 F.3d 1104, 1114-15 (9th Cir.2002) ("There may be circumstances under which the level of purposeful injection into the forum supports a finding of purposeful availment yet still weighs against the reasonableness of jurisdiction ..."); *Panavision, supra,* 141 F.3d at 1323 (quoting *Core-Vent* );*nMotion, Inc. v. Environmental Tectonics Corp.,* 196 F.Supp.2d 1051, 1060 (D.Or.2001) ("While [the purposeful interjection] factor weighs in favor of exercising jurisdiction, the contacts at issue are not 'considerable' or widespread. This factor, therefore, does not tilt heavily toward a finding of reasonableness"). KSD's contacts with the forum, while sufficient for due process purposes, are not significant or substantial. Thus, while the first factor favors exercising jurisdiction over KSD on Costa and Vilter's claims, it does so only slightly.

2. KSD'S Burden In Litigating In This Forum

**\*22** Turning to the second factor, the court must "examine the burden on the defendant in light of the corresponding burden on the plaintiff."*Sinatra, supra,* 854 F.2d at 1199. While it would no doubt be less burdensome for KSD to litigate this matter in Singapore, it would be more convenient for plaintiff and Vilter to prosecute their claims here. See *Nissan Motor Co., Ltd. v. Nissan Computer Corp.,* 89 F.Supp.2d 1154, 1161 (C.D.Cal.2000). KSD contends that Costa has significant resources because he received $7 million in settlement from the Daniela's owner. This may be true. The fact remains, however, that in terms of relative resources, KSD, a company that has annual gross revenues of tens of millions of dollars, retains the edge.

KSD contends that it would be unduly burdensome for it to litigate the case in the United States because it is a foreign company. In *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), the Supreme Court stated that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 23
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

stretching the long arm of personal jurisdiction over national borders."Courts have interpreted this statement as a direction that plaintiffs must satisfy a more stringent reasonableness test when the defendant is a foreign national or company. See, e.g., *Walker & Zanger, supra,* 4 F.Supp.2d at 940 ("Because Stone Design is a foreign national, the reasonableness standard is somewhat more stringent"); *Technology Development Associates v. Victor Company of Japan, Ltd.,* C-93-1336 MHP ARB, 1993 WL 266651, *8 (N.D.Cal. July 14, 1993) ("Litigation involving a nonresident defendant from a foreign nation creates a higher jurisdictional barrier for a finding that personal jurisdiction is reasonable"). Nonetheless, "modern advances in communication and transportation have significantly reduced the burden of litigating in another country."*Sinatra, supra,* 854 F.2d at 1199 ("The Supreme Court recently reiterated its concern with the burdens of defending a suit in a foreign country.... However, modern advances in communications and transportation have significantly reduced the burden of litigating in another country").

Here, KSD will face significant burdens if it is required to litigate this action in California. This is particularly true since many of the acts that give rise to the claim occurred in Singapore, documents regarding the claim are located there, and many of its knowledgeable witnesses are located there as well. See *Amoco, supra,* 1 F.3d at 852 (" 'The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.'...The burden on Leonis of defending the suit in Washington is considerable. Leonis' base of operations is in Manila. The company presently has no connections with Washington, nor does it have an agent or office anywhere else in the United States.... Potential witnesses and evidence are not located in Washington"); *Congoleum, supra,* 729 F.2d at 1243 ("It would not comport with fair play and substantial justice to assert jurisdiction over a West German corporation in the distant forum of California on a claim that arises out of activities in Europe, where the corporation had no contact with California other than a developing sales market"); *Rocke v. Canadian Auto. Sport Club,* 660 F.2d 395, 399 (9th Cir.1981) (holding that "[although] modern transportation had indeed reduced some of the burden of litigation in a faraway forum," the Canadian defendant

organizations "nonetheless face[d] a significantly greater burden defending [an] action in California than in [Canada]," particularly where the alleged acts giving rise to the claim occurred in Canada and most of the discovery would be centered in Canada"); *Callaway Golf Corp. v. Royal Canadian Golf Ass'n.,* 125 F.Supp.2d 1194, 1206 (C.D.Cal.2000) ("Here, the defendant's burden of litigating in California is likewise great. The members of the Rules Committee, likely witnesses in this case, are all located in Canada, as are other employee witnesses to defendant's conduct at issue.... [D]efendant here employs no agents in California and has no offices or license to conduct business in California"). This factor thus favors a finding that exercising jurisdiction in this case is not reasonable.

3. The Extent Of Conflict With The Sovereignty Of The Defendant's State

**\*23** The third factor requires that the court evaluate the extent of any conflict with the sovereignty of defendant's state. It too is more significant in the international context. See *Pacific Atlantic Trading Co., supra,* 758 F.2d at 1330 (noting that "when the nonresident defendant is from a foreign nation, rather than another state in our federal system, the sovereignty barrier is higher, undermining the reasonableness of personal jurisdiction"); *Rocke, supra,* 660 F.2d at 399 (same); *Cruz, supra,* 649 F.2d at 1272 ("We do not minimize the sovereignty of the states within our federal system when we conclude that foreign nations present a higher sovereignty barrier than that between two states within our union. This is only a recognition of what is obvious").

Defendant has adduced evidence that the Singapore government owns a 32% interest in KSD indirectly through a Singapore private holding company.[FN102] Citing *Cruz,* it argues that this militates against a finding that the exercise of jurisdiction is reasonable. See *Cruz, supra,* 649 F.2d at 1272 ("[a] second factor bearing on the seriousness of the affront to sovereignty in the present case is the fact that the shipyard belongs to an agency of a foreign sovereign.... We ... conclude that [the] sovereign status of a defendant militates against the reasonableness of jurisdiction at least in cases arising before the passage of the ... FSIA"). In *Cruz,* the defendant was owned and operated by the Mexican Navy, and adjudication of plaintiff's claim would

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))

have required compelling the testimony of members of the Navy.*Id.* at 1269, 1272.KSD, by contrast, is a private company in which the Singapore government has only a partial, indirect interest. Its connection with a foreign government is thus substantially more attenuated than that of the defendant in *Cruz.*Moreover, it has not asserted FSIA immunity as a defense, and there is no indication that any government witnesses will be required to testify. For these reasons, the court finds *Cruz* somewhat inapposite. Nonetheless, because KSD is a foreign national, and because the Singapore government has an ownership interest in it, this factor weighs slightly against a finding that exercising jurisdiction would be reasonable in this case. See *Ballard, supra,* 65 F.3d at 1501 ("Although we reject Royal's invitation to decline jurisdiction on the basis of 'international comity,' we nevertheless agree with Royal and the district court that an exercise of jurisdiction would implicate Austria's sovereignty interest"); *Amoco, supra,* 1 F.3d at 852 (holding that the potential for conflict with the sovereignty of defendant's state weighed against a finding of reasonableness because of "[t]he international context of th[e] case"); *Callaway Golf Corp., supra,* 125 F.Supp.2d at 1206 ("The fact that defendant is 'unquestionably [a] resident [ ] of Canada ... tends to undermine the reasonableness of personal jurisdiction in this case,' particularly because defendant has a corporate charter by the Canadian government to administer Canadian rules of men's amateur golf in Canada," quoting *Rocke, supra,* 660 F.2d at 399).

> FN102. Declaration of Lum Chee Kong ("Kong Decl."), ¶ 10.

4. The Forum State's Interest In Adjudicating The Dispute

***24** Turning to the next factor, KSD contends that California does not have an interest in this case because Pete Costa's last residence was Panama, and the accident occurred while the Daniela was sailing in the Western Pacific Ocean.[FN103]The Daniela was a U.S. flagged vessel, however, and the plaintiff in the action is a California resident administering a California estate. See *Cruz, supra,* 649 F.2d at 1272 ("Alaska has an interest in the protection of its non-resident fishing fleet from negligent foreign repairs"). Cf. *Panavision, supra,* 141 F.3d at 1323 (" 'California maintains a strong interest in providing an

effective means of redress for its residents tortiously injured," ' quoting *Gordy v. Daily News, L.P.,* 95 F.3d 829, 836 (9th Cir.1996)). Consideration of the forum state's interest thus weighs slightly in favor of exercising jurisdiction.

> FN103. Costa disputes that the decedent's last residence was Panama, noting that he lived in California (presumably because he was being treated by California physicians) following the accident. (Pl.'s Supp. Opp. at 14:2-5.)

5. The Most Efficient Judicial Resolution Of The Controversy

Whether California or Singapore will provide a more efficient and effective forum for the resolution of the claims is hotly contested by the parties. This factor typically focuses on the location of the evidence and witnesses. See *Panavision, supra,* 141 F.3d at 1323.

In its moving papers, KSD asserted in conclusory fashion that the majority of witnesses are located in Singapore.[FN104]In its reply, KSD contended that twenty-four of its employees, all of whom reside in Singapore, had relevant information regarding the action.[FN105]It further stated that the vessel owner appointed five Singapore investigators to examine the Daniela following the accident, and that the decedent received medical care in Singapore immediately following the accident as well.[FN106]

> FN104. Declaration of Andria L. Catalano ("Catalano Decl."), ¶ 10.

> FN105. Declaration of Simon Soh Thiam Hock ("Soh Decl."). ¶ 7.

> FN106.*Id.,* ¶¶ 8, 9.

Following oral argument, both Costa and KSD proffered additional evidence regarding the location of witnesses in supplemental briefing requested by the court.[FN107]Costa asserts that the majority of witnesses-i.e., crewmen aboard the Daniela when the accident occurred, doctors who treated Pete Costa prior to his death, members of the Costa family, representatives of the vessel owner and manager, the Chief Engineer involved in the vessel overhaul, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 25
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

those who serviced and maintained the Daniela over the last ten years-reside in California, Hawaii, or American Samoa. A list of crewmen submitted indicates that many are Filipino, Portuguese, and Croatian nationals; Costa's evidence, moreover, suggests that the crew is hired and discharged primarily in American Samoa, and that the vessel rarely, if ever, makes port in Singapore. Other evidence indicates that the valves that are the subject of the lawsuit are presently in the custody and control of the vessel owner, Z No. 2 Fishing Company.[FN108]

> FN107. While KSD objects to the court's consideration of Costa's evidence in this regard, the court notes that KSD's original showing on this issue was minimal, and that it did not specifically identify any witnesses until it filed its reply. It is therefore appropriate to consider the additional evidence proffered by Costa on the subject. The court likewise considers the amplification of KSD's evidence in its supplemental brief.

> FN108. Plaintiff's Supplemental Memorandum In Opposition to Defendant's Motion to Dismiss ("Pl.'s Supp. Opp."), Ex. 2, Declaration of William L. Banning ("Banning Decl."), ¶¶ 11, 14, 16, 20.

Costa contends that KSD will need to bring at most two or three witnesses from Singapore to the United States for trial. He bases this contention on the testimony of George Copitas, who has served for thirty years as a licensed Chief Engineer on U.S. flagged tuna seiners, and who has participated in valve overhauls performed by KSD on other vessels.[FN109] Based on his experience with other projects, Copitas asserts that the only KSD witnesses with relevant information regarding the valve overhaul will be the foreman or superintendent of the repair yard.[FN110] KSD, by contrast, contends that there are more than twenty witnesses with relevant knowledge located in Singapore, including KSD employees involved in negotiating the repair contract, in purchasing and project management, in producing repair parts, and in the repair work itself. It notes further that some of the work was subcontracted to other companies, and that certain of these companies' employees-located in Singapore-may have information relevant to the suit.[FN111] Citing *Cruz,* it

asserts that the real issue in this case is liability rather than damages, and that in cases "involving complex factual questions about a major repair that required several weeks to complete and in which the repaired object probably cannot economically be recovered for inspection, the site of the repair will usually be the source of most of the witnesses, documents, and physical evidence on which the case will turn."*Cruz, supra,* 649 F.2d at 1273. What may "usually" be the case does not control the outcome here, where the record reveals that some witnesses who participated in the repair work are located in Singapore, but others are located elsewhere-e.g., in Hawaii or on vessels in the South Pacific[FN112]-and where it also reflects that the valves themselves are in the custody and under the control of the vessel owner, a California-based company.[FN113] While documents pertinent to KSD's performance of the contract will be found in Singapore, there will be little burden in transporting these to California. Moreover, contrary to KSD's assumption, it is not clear, at this stage of the litigation, that witnesses and documents reflecting performance of the contract will be more central to a determination of liability than the testimony of those aboard the vessel when the explosion occurred. Stated otherwise, while it will be important to ascertain the nature of the work performed on the valve during the vessel overhaul, and the identity of those who supervised and performed that work, it will also be important to determine how the valve malfunctioned aboard the vessel, if it did, so as to determine whether any of the repair work actually caused the explosion that injured the decedent. Given the fact that the Daniela's crew will likely be found on vessels throughout the South Pacific, that the majority of the decedent's physicians are located in the United States, and that Chief Engineer Yoke, who allegedly supervised the repair work, resides in Hawaii, the court concludes that witnesses and evidence are most probably dispersed in a variety of locations, and that neither California nor Singapore is a significantly more efficient forum than the other in this regard. See *Dole Food Co., supra,* 303 F.3d at 1116 ("There are some witnesses in Europe and some in California, so neither forum has a clear efficiency advantage with respect to witnesses").

> FN109. Pl.'s Supp. Opp., Ex. 1, Declaration of George Copitas ("Copitas Decl."), ¶ 3.

> FN110. *Id.*

FN111. Defendant's Supplemental Brief ("Def.'s Supp. Brief") at 1, n. 1. It is unclear how many of these individuals have knowledge specific to the work done on ammonia refrigeration valve, as the scope of the contract was significantly broader, and involved the entire vessel.

FN112. KSD asserts that it "did not perform any work on the failed valve," and that "[a]ll work in th[e] area of the ammonia refrigeration system was undertaken by the crew [of the Daniela] under the supervision of Mr. Costa's supervisor, Jonathan Yoke."(Defendant's Memorandum of Points and Authorities in Support of Motion to Dismiss for Lack of Jurisdiction over the Person of Defendant ("Def.'s Mem.") at 11:11-13. See also Weng Decl., ¶¶ 26, 27.)

FN113. KSD asserts that the valves are currently in Singapore because of an ongoing arbitration between it and Z No. 2 Fishing Company. (See Supp. Brief at 2:20-25.) The record contains no information regarding the estimated length of the arbitration proceedings, and there appears to be no dispute that Z No. 2 Fishing Company retains dominion over the valves and could return them to the United States should it choose to do so.

**\*25** In its supplemental brief, KSD asserts that the efficiency factor favors Singapore because the contract between it and the vessel owner is governed by Singapore law, and thus that country's law will provide the applicable standard of care. While KSD is correct that the contract contains a Singapore choice of law provision,FN114 this does not automatically necessitate a finding that the efficiency factor favors dismissal. First, KSD proffers no authority for the proposition that the contract provision it cites controls choice of law in a tort action brought pursuant to an American maritime statute. Assuming the contract requires that Singapore law be applied to determine the applicable standard of care, however, there is substantial question as to whether that country's law would be significantly different from the American rules of decision the court would otherwise apply. KSD has

submitted the declaration of a Singapore solicitor, R. Srivathsan, who states that the country is a common law jurisdiction "patterned on the English model," which provides a remedy for injuries "caused by the negligence of a defendant."FN115To the extent this is true, the applicable standard of care will be governed, not by any country's law, but by the relevant customs and practices of shipbuilding and repair industry. For this reason, the court cannot find, on the present record, that choice of law issues make Singapore a more efficient forum. See *id.*("The choice-of-law analysis ... at this stage ... cannot be said to favor either party").FN116

FN114. See Weng Decl., Ex. B.

FN115. Declaration of R. Srivathsan ("Srivathsan Decl."), ¶¶ 2, 5.

FN116. In arguing that Singapore constitutes an adequate available forum, KSD in fact appears to concede that the negligence standards will be similar.

For their part, Costa and Vilter argue that efficiency demands that the action be tried in this jurisdiction, because any other outcome will result in duplicative litigation with the risk of potentially inconsistent judgments. Whether or not exercising jurisdiction will permit resolution of all claims against all parties in a single forum is a factor courts take into consideration in assessing whether the reasonableness test is met. See, e.g., *nMotion, supra,* 196 F.Supp.2d at 1061-62 ("nMotion has brought claims in this Court against ETC-PZL and its parent corporation, ETC-USA. ETC-USA has not challenged this Court's jurisdiction. Thus, the dismissal of ETC-PZL could require nMotion to litigate two separate actions, one against ETC-USA in Oregon and a separate action against ETC-PZL in another forum. Both actions necessarily would involve proof that ETC-PZL worked on the integration of Pro Pilot into the existing GAT 2 software with the assistance of ETC-Interactive in Oregon. Separate actions would substantially inconvenience nMotion and could result in inconsistent and ineffective outcomes, especially regarding nMotion's request for an order enjoining both Defendants from future use of the Pro Pilot program. Thus, this factor as well weighs in favor of exercising jurisdiction over ETC-PZL"); *Washington State University Foundation v. Oswald,* No. Civ. 99-

Not Reported in F.Supp.2d                                                                                                  Page 27
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

907, 2000 WL 251661, *3 (D.Or. Jan. 3, 2000) (exercising personal jurisdiction where the forum state "appear[d] to be the only jurisdiction in which the parties may totally resolve this action"); *Gutierrez v. Givens,* 1 F.Supp.2d 1077, 1083 (S.D.Cal.1998) (holding that the exercise of jurisdiction was reasonable because "... judicial efficiency is best served by the consolidation of Plaintiffs' causes of action in this single suit. Plaintiffs allege that if their suit against Colonial is dismissed for lack of personal jurisdiction or improper venue, they will continue to maintain this suit in California and would file a second class action against Colonial in the Middle District of Florida"); *United Kingdom Mutual Steamship Assurance Association [Bermuda] Limited v. Continental Maritime of San Francisco, Inc.,* No. C-91-2798 RFP, 1992 WL 486937, *6 (N.D.Cal. Aug.31, 1992)* ("... the most effective and convenient resolution of this issue is likely to occur through the litigation of all the related claims in a single action. If VPSI is dismissed from this action, Continental will be required to initiate a second, largely duplicative action in Canada to seek indemnification from VPSI"); *Abuan v. General Electric Co.,* 735 F.Supp. 1479, 1483 (D.Guam 1990) (concluding that the exercise of jurisdiction over the foreign manufacturer of PCB's in a class action suit brought by 189 named plaintiffs was reasonable, *inter alia,* because "[t]he most efficient judicial resolution of the suit commands that it be consolidated; severing Monsanto for litigation in a distant forum portends duplication and piecemeal adjudication, an inefficient result"). Cf. *Core-Vent, supra,* 11 F.3d at 1489 ("The fact that the lawsuit will continue in California with other parties tips the efficiency factor in Core-Vent's favor").[FN117]

> FN117. Certain of these cases analyze the prospect of duplicative litigation and inconsistent results in considering plaintiff's interest in convenient and effective relief. See, e.g., *nMotion, supra,* 196 F.Supp.2d at 1062;*United Kingdom Mutual Steamship Assurance Ass'n., supra,* 1992 WL 486937 at *6. In the present case, it is appropriate to consider the question in analyzing whether efficient judicial resolution of the dispute indicates that the exercise of jurisdiction is reasonable because Vilter, which did not initiate this proceeding and filed a third-party complaint against KSD only after it was itself sued, will be disadvantaged if

KSD does not remain a defendant in this litigation. Under these circumstances, the issue is not simply one of plaintiff's convenience, but one of ensuring the effectiveness and efficiency of the judicial proceeding in which Vilter has been named as a party.

**\*26** Costa and Vilter contend that, whether or not KSD is a party to this suit, the issue of its negligence will have to be adjudicated to determine Vilter's proportionate share of fault. See *McDermott, Inc. v. AmClyde and River Don Castings, Inc.,* 511 U.S. 202, 217, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994). They argue that if KSD's motion to dismiss is granted, they will have to try the issues *inter se* in the United States, and then try them a second time against KSD in Singapore, with the possibility of inconsistent results. KSD responds that Vilter may submit to jurisdiction voluntarily in Singapore, and avoid this problem. Reasonableness, however, must be evaluated without regard to a co-defendant/counterclaimant's willingness to submit voluntarily to jurisdiction in a distant foreign land. Without such a stipulation, it appears clear that Costa could not join all defendants in a single action in Singapore. Compare *OMI Holdings, Inc. v. Royal Ins. Co. of America,* 149 F.3d 1086, 1097 (10th Cir.1998) (stating that one "factor in [the] reasonableness inquiry [is] whether ... jurisdiction is necessary to prevent piecemeal litigation," and holding that because "a Canadian forum was apparently available in which Plaintiff could join all Defendants in one location ... litigating the dispute in Kansas would not be more efficient than in Canada"). More fundamentally, it is entirely unclear that Costa would forego his action against Vilter in the United States, since he represents that the law is significantly more favorable here than it is in Singapore. Thus, dismissing KSD will most likely give rise to parallel actions-one in California and one in Singapore-regarding essentially the same issues. As a consequence, efficient judicial resolution favors a finding that exercising jurisdiction over KSD in this action is reasonable.

6. The Importance Of The Forum To Plaintiff's Interest In Convenient And Effective Relief

The importance of this forum to plaintiff's interest in convenient and effective relief similarly favors

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

exercising jurisdiction. Given the distances involved, and the time demands of litigating in Singapore, California is clearly a more convenient forum from Costa's point of view. Additionally, Costa is able to sue Vilter is this forum; unless Vilter were to consent voluntarily to suit in Singapore, it does not appear that Costa could obtain jurisdiction over it there. Because the Central District of California is closer to Costa's home than Singapore, and because exercising jurisdiction over KSD in this action will permit resolution of his claims in a single action, this factor weighs in favor of exercising jurisdiction in this case.

7. The Existence Of An Alternative Forum [FN118]

> FN118. Costa asserts that this factor may be considered only if the court determines, on the basis of the remaining factors, that the exercise of jurisdiction would be unreasonable. See *Sinatra, supra,* 854 F.2d at 1201 ("... [w]hether another reasonable forum exists becomes an issue only when the forum state is shown to be unreasonable," quoting *Corporate Inv. Business Brokers v. Melcher,* 824 F.2d 786, 791 (9th Cir.1987)). The plaintiff in *Dole Food Co.* made a similar argument. See *Dole Food Co., supra,* 303 F.3d at 1116. While acknowledging the statement in *Sinatra,* the *Dole* court nonetheless appeared to balance the factor along with the remaining considerations in determining that the exercise of jurisdiction was reasonable. See *id.* at 1116-17.Moreover, myriad Ninth Circuit cases treat the availability of an alternative forum as one of multiple factors to be assessed. See, e.g., *Glencore Grain Rotterdam B.V. v. Shivnath Harnarain Co.,* 284 F.3d 1114, 1126 (9th Cir.2002); *Panavision, supra,* 141 F.3d at 1324;*Ziegler, supra,* 64 F.3d at 476;*Amoco, supra,* 1 F.3d at 853. Accordingly, the court will consider the availability of an alternative forum as one of multiple relevant factors in determining whether it would be reasonable to exercise jurisdiction over KSD in this case.

The final factor in assessing the reasonableness of exercising jurisdiction is the availability of an alternate forum. Costa and Vilter bear the burden of demonstrating that Singapore does not constitute an adequate forum. *Pacific Atlantic Trading Co., supra,* 758 F.2d at 1331.[FN119]KSD asserts that Singapore is an adequate alternate forum because it is an English-law jurisdiction that recognizes causes of action similar to those alleged in this case.[FN120]At oral argument, Costa disputed this, asserting that Singapore law would not allow any recovery against KSD. As part of his supplemental filing, he has proffered the declaration of a Singapore solicitor, Prem Gurbani, who asserts that, under Singapore law, the settlement Costa received from the vessel owner in prior litigation will be offset against any award he may obtain from KSD.[FN121] Given the size of the settlement, and of his potential recovery against KSD, Costa contends that the offset will effectively preclude him from recovering against KSD if he is required to sue in Singapore.[FN122]

> FN119. Costa contends that the burden lies with KSD. (See Pl.'s Supp. Opp. at 10, n. 4.) Multiple Ninth Circuit and district court cases hold that plaintiff bears the burden of establishing that no alternate forum is available. See, e.g., *Core-Vent, supra,* 11 F.3d at 1490 ("The plaintiff bears the burden of proving the unavailability of an alternative forum"); *Paccar International, Inc. v. Commercial Bank of Kuwait, S.A.K.,* 757 F.2d 1058, 1066 (9th Cir.1985) (placing the burden of proof with respect to demonstrating the existence of an alternative forum on plaintiff); *Miracle v. N.Y.P. Holdings, Inc.,* 87 F.Supp.2d 1060, 1070 (D.Haw.2000) ( "The plaintiff bears the burden of proving the unavailability of an alternative forum"); *Technology Development Associates v. Victor Company of Japan, Inc.,* No. C-93-1336, 1993 WL 266651, *9 (N.D.Cal. July 14, 1993) (same). But see *Ballard, supra,* 65 F.3d at 1502 (stating that defendant "erroneously assum[ed] that the burden is on [plaintiff] to prove the lack of an alternate forum"). The Ninth Circuit recently noted the "split" in its case law on this subject, but declined to resolve the question. See *Dole Food Co., supra,* 303 F.3d at 1116-17 ("Our case law appears to be split on this issue, but we need not resolve the split in this case"). For the reasons stated *infra,* even if the burden lies with Costa, the court concludes he has met it

in this case.

FN120. Srivathsan Decl., ¶¶ 2, 3.

FN121. Declaration of Prem K. Gurbani ("Gurbani Decl."), ¶ 8.

FN122. After this evidence was submitted, KSD sent a letter to the court, objecting to the submission of Gurbani's declaration and asking that it be stricken. Sending a letter, of course, violated the Local Rules. See CA CD L.R. 83-2.11. Nonetheless, the court has considered the objections, and concluded that, under the circumstances of this case, it should consider the declaration. The parties' initial briefing focused primarily on purposeful availment, and the court specifically invited further briefing on the adequacy of the Singapore forum. The court also notes KSD's assertion that its Singapore law expert disputes certain of Gurbani's conclusions.

Gurbani asserts, *inter alia,* that Singapore's "one action rule" may preclude Costa from suing KSD altogether. (*Id.,* ¶ 9 ("Under Section 20(5) of the Singapore Civil Law Act (Cap 43) not more than one action shall lie for or in respect of the same subject matter of complaint. As the Z Action was brought Plaintiff Paul Costa, Personal Representative for the estate of Chief Costa ... against the shipowner in the United States and the action was concluded with a dismissal [with] prejudice, a similar action based on death caused by the wrongful act, neglect or default would constitute a second action in respect of the same subject matter")). This is hotly disputed by KSD. (See Letter from Andria Catalano at 1-2.) Given its view of the setoff issue, the court need not resolve this conflict, and assumes for purposes of its analysis that Costa will be able to sue KSD in Singapore despite the fact that he earlier filed an action against the vessel owner.

**\*27** Generally, an alternative forum is considered

inadequate if the plaintiff would be deprived of all remedies there. See, e.g., *Baumgart v. Fairchild Aircraft Corp.,* 981 F.2d 824, 835 (5th Cir.1993); *Reid-Walen v. Hansen,* 933 F.2d 1390, 1393 n. 2 (8th Cir.1991). Cf. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) ("Of course, if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight; the district court may conclude that dismissal would not be in the interests of justice").FN123 Here, Costa could bring negligence claims in Singapore based on the events alleged in the complaint. While Costa asserts he would not be able to recover certain types of damages that he could seek under United States law,FN124 this alone does not render Singapore an inadequate forum. See *Leon v. Million Air, Inc.,* 251 F.3d 1305, 1310 (11th Cir.2001) ("The fact that punitive damages would be unavailable in Ecuador was of no moment because the 'potential for a smaller damage award is not a basis for the denial' of a *forum non conveniens* motion; the remedy provided by the Ecuadorian courts would not be " 'so clearly inadequate or unsatisfactory that it is no remedy at all' " '); *Lockman Foundation v. Evangelical Alliance Mission,* 930 F.2d 764, 768-69 (9th Cir.1991) ("Even if the RICO and Lanham Act claims were unavailable in Japan, that would not furnish a sufficient reason to preclude dismissal. The 'possibility of an unfavorable change in the law' is not to be given conclusive or substantial weight in a *forum non conveniens* inquiry, quoting *Piper Aircraft, supra,* 454 U.S. at 249-51);*De Melo v. Lederle Laboratories,* 801 F.2d 1058, 1061 (8th Cir.1986) ("De Melo contends that the unavailability under Brazilian law of punitive damages and recovery for pain and suffering suggests that any recovery she may obtain in Brazil will be grossly inadequate to compensate her for her injuries and deter future misconduct by multinational corporations like the defendant.... [T]he Supreme Court explicitly held in *Piper Aircraft* that, ordinarily, the fact that the alternative forum's substantive law is decidedly less favorable to the plaintiff should not be given substantial weight in *forum non conveniens* determinations.... [U]nder Brazilian law, de Melo may recover lost wages, indirect losses, and twice the amount of her medical expenses. These damages, whatever they amount to in this case, are not so paltry as to render the available remedy illusory"); *Varnelo v. Eastwind Transport, Ltd.,* No.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

02Civ.2084(KMW)(AJP), 2003 WL 230741, *17 (S.D.N.Y. Feb. 3, 2003) ("Under well-settled case law, however, lower recovery in Russia would not render that forum inadequate. The fact that 'the substantive law that would be applied in the alternative forum is less favorable to the plaintiffs than that of the present forum ... should ordinarily not be given conclusive or even substantial weight in the *forum non conveniens* inquiry' ").

FN123. While this definition has developed in the *forum non conveniens* context, it is applicable by analogy here.

FN124. See Gurbani Decl., ¶ 10.

**\*28** It is only where the alternative forum does not recognize a cause of action for the injuries plaintiff alleges, or where the remedy afforded is so inadequate that it constitutes "no remedy at all" that courts find the forum to be inadequate. See *Piper Aircraft, supra,* 454 U.S. at 254 ("... if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight; the district court may conclude that dismissal would not be in the interests of justice"); *Leetsch v. Freedman,* 260 F.3d 1100, 1103 (9th Cir.2001) ("The existence of an adequate alternative forum depends upon whether or not an alternative forum is 'so clearly inadequate or unsatisfactory that it is no remedy at all' "); *Lueck v. Sunstrand Corp.,* 236 F.3d 1137, 1143-45 (9th Cir.2001) ("The foreign forum must provide the plaintiff with some remedy for his wrong in order for the alternative forum to be adequate.... [I]t is only in 'rare circumstances ... where the remedy provided by the alternative forum ... is so clearly inadequate or unsatisfactory, that it is no remedy at all,' that this requirement is not met.... Although New Zealand law does not permit Plaintiffs to maintain this exact suit, New Zealand, through its no-fault accident compensation scheme, has provided and continues to provide a remedy for Plaintiffs' losses. Plaintiffs have not shown that this type of administrative remedy is so inadequate that it is tantamount to no remedy at all"); *Mattel, Inc. v. MCA Records, Inc.,* 28 F.Supp.2d 1120, 1129 (C.D.Cal.1998) (concluding there was no available alternative forum where Sweden and Denmark did not recognize a cause of action comparable to plaintiff's trademark claim);

*Seltzer Sister Bottling Co., Inc. v. Source Perrier, S.A.,* No. C-90-1468, 1991 WL 279273, \*9 (N.D.Cal. May 1, 1991) (exercising jurisdiction over French corporation in part because "a mechanism for class relief for the type of injuries asserted ... may not be available in France," and consequently "plaintiffs [did] not necessarily have a choice of forum"). Compare *Core-Vent, supra,* 11 F.3d at 1490 (dismissing antitrust and libel claims for lack of personal jurisdiction where "the maintenance of a suit in Sweden may be costly and inconvenient for [plaintiff], but [plaintiff] has not shown that its libel claims cannot be effectively remedied there").

The question is whether the prospect that the amount of Costa's settlement with the vessel owner will be offset against any damages KSD might otherwise be required to pay affords him "no remedy at all" in Singapore. Courts typically take defenses that can be raised to defeat recovery into account in assessing whether an alternate forum is adequate. See, e.g., *Bank of Credit and Commerce International (Overseas) Ltd. v. State Bank of Pakistan,* 273 F.3d 241, 246 (2d Cir.2001) ("An alternative forum is generally adequate if: '(1) the defendants are subject to service of process there; and (2) the forum permits "litigation of the subject matter of the dispute." ' ... It follows that an adequate forum does not exist if a statute of limitations bars the bringing of the case in that forum"); *Miracle, supra,* 87 F.Supp.2d at 1071 ("The plaintiff bears the burden of proving the unavailability of an alternative forum.... Here, Plaintiff has met that burden. As discussed above, Plaintiff has demonstrated that under New York law Plaintiff would be precluded by a one-year statute of limitations from bringing the action. Defendants do not argue with Plaintiff's assertion that she would be barred by the statute of limitations. Due to the fact that Plaintiff would be barred from bringing this action in New York, this factor weighs in Plaintiff's favor"); *Crimson Semiconductor, Inc. v. Electronum,* 629 F.Supp. 903, 909 (S.D.N.Y.1986) ("The statute of limitations bar in Romania does not go to the merits of plaintiff's claim, or to the quantum of damages, but to the very existence of the claim in the foreign forum. Thus, this is one of the 'rare circumstances' in which the foreign forum is 'clearly unsatisfactory' ").

**\*29** KSD argues that any offset defense it may be able to assert in Singapore is a direct result of the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

Page 31

litigation strategy Costa chose to employ, not the inadequacy of Singapore's legal rules or procedures. This type of argument can often be made with respect to a plaintiff who delays filing an action until the statute of limitations has run in an alternative forum. Nonetheless, most courts focus solely on the availability of a remedy, not on the parties' respective fault, and conclude that the alternative forum is not adequate. Here, the parties do not appear to dispute that Costa may avoid an offset by filing separate actions under American maritime law as he has done. The fact that, by contrast, he cannot avoid an offset in Singapore, and that this will effectively preclude his ability to recover damages from KSD, renders Singapore an inadequate forum. Cf. *Nemariam v. Federal Democratic Republic of Ethiopia,* 315 F.3d 390, 394-95 (D.C.Cir.2003) (holding that a commission formed to arbitrate all claims for loss or damage arising out of a border war between Eritrea and Ethiopia was not an adequate alternative forum given "the Commission's inability to make an award directly to Nemariam, and the possibility that Eritrea could set off [plaintiff's] claims or even an award in her favor against claims made by or an award in favor of Ethiopia," and noting that "[w]hile a more limited recovery than is available in the plaintiff's forum of choice does not automatically make the alternative forum inadequate, we fail to see how an alternative forum in which the plaintiff can recover nothing for a valid claim may also be deemed adequate. In other words, it would be peculiar indeed to dismiss Nemariam's claim in the United States District Court-a forum in which, assuming the court has jurisdiction, she is certain to be awarded full relief if she wins on the merits of her claim-in favor of a forum in which she has no certainty of getting any relief for a meritorious claim").

Additionally, as noted previously, it does not appear that Costa could compel Vilter to appear and defend in Singapore. In and of itself, this may render Singapore an inadequate forum. See *Dole Food Co., supra,* 303 F.3d at 1118 ("Only Watts has agreed to submit to personal jurisdiction in The Netherlands. Thus, even assuming that there is no valid statute of limitations defense, it is unclear whether there is an alternative forum in The Netherlands, for it is unclear that Boenneken could be compelled to appear in a court there," citing *Lueck, supra,* 236 F.3d at 1143 (holding that an alternative forum was available because all defendants indicated they would accept service of process in New Zealand), and *Alpine View*

*Co. Ltd. v. Atlas Copco,* 205 F.3d 208, 221 (5th Cir.2000) ("A foreign forum is available when the *entire case and all parties* can come within the jurisdiction of that forum" (emphasis added by the *Dole* court)).

Accordingly, the court concludes that Singapore does not constitute an adequate alternative forum under the circumstances of this case, and that this factor favors a finding that it is reasonable to exercise jurisdiction over KSD in California.

8. Balancing The Factors

**\*30** Looking at the reasonableness factors in combination, the extent of KSD's purposeful availment favors a finding that it is reasonable to exercise jurisdiction in this case, but only slightly, as Costa's showing regarding KSD's contacts with the jurisdiction, while sufficient to satisfy due process, is not substantial. The burden that will be imposed on KSD if it is forced to litigate in this forum weighs against a finding of reasonableness, as does the extent of conflict with the sovereignty of its state. By contrast, it is clearly in plaintiff's interest to litigate the case here, and California has some interest in having the dispute adjudicated here, although not as strong an interest as is typically seen in suits brought by residents of the state. Before considering the most efficient judicial resolution of the controversy and the adequacy of the alternative forum, therefore, it appears that two factors strongly favor KSD, one strongly favors Costa, and two tip slightly in his direction.[FN125] The factors favoring plaintiff are those that typically weigh in favor of a plaintiff litigating in his home forum.

> FN125. During oral argument and in its supplemental brief, Vilter chastised the court for engaging in what it characterized as box-score analysis. (See Vilter's Supplemental Opposition to Motion to Dismiss ("Vilter's Supp. Opp.") at 3:7-14.) To the contrary, the court has attempted to analyze and weigh the various considerations as they relate to the facts of this case, and to assign to them the importance they deserve. Unfortunately, it is often difficult to discuss the factors and explain the manner in which they are being weighed without noting in some fashion the number that favor one party versus the other.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

Page 32

See, e.g., *Dole Food Co., supra*, 303 F.3d at 1117 ("In this case, only two of the seven factors-burden on defendants and sovereignty conflicts-favor Watts and Boenneken"); *Ziegler, supra*, 64 F.3d at 474 ("In sum, factors 3 and 7 (Florida's sovereignty interests and available alternative forum) favor defendants. Ziegler has a slight edge on factors 2 and 6 (respective burdens and convenience and effectiveness of relief), and factors 4 and 5 (California's interest and efficiency) decisively favor him. Defendants' interjection into California was significant; therefore, factor 1 weighs in favor of Ziegler").

When efficient judicial resolution and adequacy of the alternative forum are added to the calculus, however, the result comes into clearer focus. Both of these factors strongly favor Costa, and tip the balance sharply in his favor. Because Costa's showing of purposeful availment was not overly strong, the quantum of evidence required to demonstrate that it is reasonable to exercise jurisdiction increases. See, e.g., *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 209 (1st Cir.1994) ("The conclusion that we draw from this line of reasoning is that appellant has made only the most marginal of showings that Alioto purposefully availed himself of an opportunity to act in Massachusetts. And the weakness of this showing assumes decretory significance when we step back and evaluate the fairness of asserting jurisdiction in the totality of the circumstances"); *Core-Vent, supra*, 11 F.3d at 1488 ("In *Burger King*, 471 U.S. at 476,... the Court stated that the minimum contacts must be evaluated 'in light of' the reasonableness factors, suggesting that the minimum contacts and reasonableness factors occupy a sliding scale"); *Cruz, supra*, 649 F.2d at 1271 ("The smaller the element of purposeful interjection, the less is jurisdiction to be anticipated and the less reasonable is its exercise"); *Washington State University Foundation, supra*, 2000 WL 251661 at *3 ("... the Ninth Circuit indicated that this three-part test is to be applied flexibly. For example, a strong showing of reasonableness lessens the required showing of minimum contacts"). Even raising the bar in this fashion, however, the lack of an adequate alternative forum, and the fact that both Costa and Vilter would likely be forced to litigate in two fora rather than one to secure complete relief demonstrate that the requisite showing has been made.

**\*31** This is particularly true when one considers that a defendant in KSD's position must present a "compelling case" as to why the exercise of jurisdiction would be unreasonable. See *Dole Food Co., supra*, 303 F.3d at 1117 ("A number of our cases emphasize the heavy burden on both domestic and foreign defendants in proving a 'compelling case' of unreasonableness to defeat jurisdiction"); *Panavision, supra*, 141 F.3d at 1324 ("[Defendant] failed to present a compelling case that district court's exercise of jurisdiction in California would be unreasonable"); *Ballard, supra*, 65 F.3d at 1502 ("In fine, Royal has not carried its heavy burden of presenting a 'compelling case' against jurisdiction"); *Caruth v. International Psychoanalytical Ass'n.*, 59 F.3d 126, 129 (9th Cir.1995) ("[G]iven the closeness of the factors, we conclude that [defendant] has not presented a 'compelling case' that exercising jurisdiction over it would be unreasonable"); *Roth, supra*, 942 F.2d at 621-22 ("Once purposeful availment has been established, the forum's exercise of jurisdiction is presumptively reasonable. To rebut that presumption, a defendant must present a compelling case that the exercise of jurisdiction would, in fact, be unreasonable"). Here, given the fact that a majority of the factors favor the retention of jurisdiction, the fact that there is no adequate alternative forum, and the fact that dismissal will leave the parties to litigate their dispute piecemeal, the court concludes that KSD has not presented a compelling case as to why the exercise of jurisdiction would be unreasonable. This is particularly true since the factors that favor KSD are those that "are likely to favor foreign defendants every time personal jurisdiction in the United States is considered."*Dole Food Co., supra*, 303 F.3d at 1117. KSD's motion is, accordingly, denied.[FN126]

> **FN126.** Because the court has found that KSD has sufficient minimum contacts with California to support the exercise of specific jurisdiction in this case, and because it has further concluded that the exercise of such jurisdiction is reasonable, it need not address the argument made by Costa and Vilter that KSD is subject to jurisdiction under Rule 4(k)(2) of the Federal Rules of Civil Procedure.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 33
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.))**

### III. CONCLUSION

For the foregoing reasons, the court denies defendant's motion to dismiss for lack of personal jurisdiction (Docket No. 19). As noted in footnote 20, the court also denies plaintiff's motion to strike the declaration of Lee Chee Weng (Docket No. 71).

C.D.Cal.,2003.
Costa v. Keppel Singmarine Dockyard PTE, Ltd.
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Slip Copy                                                                                      Page 1
Slip Copy, 2007 WL 2071644 (D.D.C.)
**(Cite as: 2007 WL 2071644 (D.D.C.))**

C Fasolyak v. The Cradle Society, Inc.
D.D.C.,2007.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
Dmitry FASOLYAK, Plaintiff,
v.
THE CRADLE SOCIETY, INC., Defendant.
**Civil Action No. 06-01126(TFH).**

July 19, 2007.

John David Quinn, Claxton, Sale & Quinn, P.C.,
Washington, DC, for Plaintiff.
Robert P. Lynch, Macleay, Lynch, Gregg & Lynch,
PC, Washington, DC, for Defendant.

*MEMORANDUM OPINION*

THOMAS F. HOGAN, Chief Judge.
**\*1** Pending before the Court are two motions filed by
the defendant, The Cradle Society, Inc., the first of
which requests that this case be dismissed for lack of
personal jurisdiction pursuant to Federal Rule of
Civil Procedure 12(b)(2) and the second of which
seeks a protective order prohibiting the plaintiff,
Dmitry Fasolyak, from conducting any discovery,
presumably until the Court makes this determination
about whether it has personal jurisdiction over the
defendant. Also pending before the Court is the
plaintiff's Motion to Compel Discovery and
Alternative Motion to Compel Rule 26(f) Conference
and Motion for Emergency Hearing, which requests
that the Court enter an order permitting discovery to
proceed immediately and compelling the defendant to
attend a scheduling conference. For the reasons set
forth below, the Court finds that it lacks personal
jurisdiction but that jurisdiction may be appropriate
in the United States District Court for the Northen
District of Illinois. Accordingly, this case will be
transferred to the United States District Court for the
Northern District of Illinois pursuant to 28 U.S.C. §
1631.

**BACKGROUND**

This case is traveling a road to resolution that
involves detours through multiple jurisdictions. The

plaintiff is an individual who resides in Maryland and
the defendant is a not-for-profit corporation
incorporated in Illinois, which also is where its
principal office is located. Compl. ¶¶ 1-2. The
plaintiff alleges that he and the defendant entered into
a contract according to which the defendant agreed to
pay the plaintiff a fee for consulting services to
establish and coordinate an international adoption
program in the Russian Federation for the purpose of
placing Russian children with adoptive parents in the
United States.[FN1]Compl. ¶¶ 8-11; Rule 16(b)
Statement 1 (Plaintiff's Statement of Fact). The
plaintiff claims that he set up an office in Moscow for
the defendant, identified individuals the defendant
could employ to process adoptions in Russia, and
assisted to secure accreditation from the Russian
government to authorize the defendant to conduct
adoptions in that country, among other services
performed. Rule 16(b) Statement 2. According to the
plaintiff, however, after the Moscow office became
operational the defendant engaged in a number of
activities that were intended to "circumvent" the
plaintiff "to avoid paying his fee" and otherwise
interfere with his contract performance, which
allegedly culminated in the defendant wrongfully
terminating the contract and defaming the plaintiff.
*Id.;* Compl. ¶¶ 92-100, 155. Accordingly, the plaintiff
filed the instant lawsuit against the defendant seeking
(1) damages for breach of contract, intentional
misrepresentation (fraud and deceit), negligent
misrepresentation, unjust enrichment, quantum
meruit, and tortious interference with prospective
economic advantage, (2) an injunction to prevent the
defendant from further defaming or disparaging him,
and (3) "a full accounting of the operations at the
Moscow office and of defendant related to Russian
adoptions."Compl. ¶¶ 101-166; Rule 16(b) Statement
3.

> FN1. The Agreement between the parties,
> which is dated January 1, 2004, provides
> that the defendant would "cause" adoptive
> families to pay a fee in the amount of
> $16,500.00. Agreement ¶ 2(a) (Jan. 1,
> 2004). The Court presumes this fee
> benefited the defendant, notwithstanding the
> fact that the fee was to be made payable to a
> different name, *i.e.,* Alexander Sukharev. *Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*2** This is not the first jurisdiction where the plaintiff filed suit, however. The plaintiff originally filed a lawsuit against the defendant in the United States District Court for the District of Maryland, asserting what appear to be the very same claims advanced in the present case. *Fasolyak v. The Cradle Society, Inc.,* No. 06-CV-00622-AW, slip op. at 4 (D. Md. June 14, 2006). On June 15, 2006, Judge Alexander Williams, Jr. issued a Revised Memorandum Opinion in the Maryland case granting the defendant's Motion to Dismiss for lack of personal jurisdiction and indicating the court's intent to transfer the case to the Northern District of Illinois. *Id.* at 1. Judge Williams determined that the contract's place of performance was Russia, the fact that the defendant sent letters, e-mails, and made telephone calls to the plaintiff in Maryland did not establish substantial contacts sufficient to exercise personal jurisdiction over the defendant, the plaintiff failed to prove "to a sufficient degree" that the defendant was ever in Maryland, the acts that caused the alleged injuries occurred in Russia, "the technical fact that Maryland served as the place of contracting is not a sufficient contact ... to have personal jurisdiction over the [d]efendant," and the other factors outlined in *Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985), favored jurisdiction in Russia and weighed against the exercise of personal jurisdiction by the court in Maryland. Judge Williams ultimately concluded that "although a choice of law provision is not a part of the contacts analysis from *International Shoe* or *Burger King,* having a choice of law provision weighs in favor of giving jurisdiction over a case to the forum specified by the contract. Here, the parties have stipulated that the contract should be governed by the law of the state of Illinois, so Illinois would be a more appropriate forum to litigate this dispute."*Fasolyak,* No. 06-CV-00622-AW, at 12.At the plaintiff's request, however, the court eventually dismissed the case rather than transfer it. Meanwhile, the defendant reportedly filed a lawsuit against the plaintiff in an Illinois state circuit court alleging that the plaintiff failed to perform the contract as promised. Pl.'s Mem. of Law In Opp'n to Def .'s Mot. to Dismiss 7-8 [hereinafter "Pl.'s Opp'n Br. ----"].

The case subsequently found its way to this Court on June 21, 2006, when the plaintiff essentially refiled his Complaint in this jurisdiction. The defendant responded to the instant lawsuit in the same fashion that it responded to the previous one filed in Maryland-the defendant moved for dismissal on the ground that, like the federal district court in Maryland, this Court lacks personal jurisdiction over the defendant because the defendant "is a foreign corporation organized under the laws of Illinois, its principal place of business is in the State of Illinois, and the Defendant does not have sufficient minimum contacts with the District of Columbia to establish personal jurisdiction."Def.'s Mot. to Dismiss 1. While the defendant's motion to dismiss was pending before this Court, the plaintiff secured two subpoenas from the United States District Court for the Northern District of Illinois compelling witnesses to appear for depositions and produce specified documents. These subpoenas were the subject of the defendant's pending Motion for Protective Order, which seeks an order from the Court prohibiting all discovery. Def.'s Mot. for Protective Order 3. The plaintiff countered by filing a Motion to Compel Discovery and Alternative Motion to Compel Rule 26(f) Conference and Motion for Emergency Hearing, which, as is self evident, seeks an order compelling the defendant to engage in discovery. Pl.'s Mem. of P. & A. in Supp. of Mot. to Compel 1.

## DISCUSSION

### I. The Defendant's Motion To Dismiss

**\*3** Because the question of personal jurisdiction is a threshold inquiry the resolution of which will, *ipso facto,* determine the outcome of the other pending discovery motions, the Court will address that issue first, as indeed it must given that "[j]urisdiction to resolve cases on the merits requires both authority over the category of claim in suit (subject-matter jurisdiction) and authority over the parties (personal jurisdiction), so that the court's decision will bind them."[FN2]*Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 577 (1999). The plaintiff bears the burden of establishing a factual basis for exercising personal jurisdiction over the non-resident defendant. *Mwani v. Bin Laden,* 417 F.3d 1, 7 (D.C.Cir.2005); *Crane v. New York Zoological Soc'y,* 894 F.2d 454, 456 (D.C.Cir.1990)."In determining whether such a basis exists, factual discrepancies appearing in the record must be resolved in favor of the plaintiff."*Crane,* 894 F.2d at 456. Because no evidentiary hearing was held, the plaintiff may carry his burden by making a *prima facie* showing that personal jurisdiction exists.

Slip Copy                                                                                                                                    Page 3
Slip Copy, 2007 WL 2071644 (D.D.C.)
**(Cite as: 2007 WL 2071644 (D.D.C.))**

*Edmond v. United States Postal Serv. Gen. Counsel,* 949 F.2d 415, 424 (D.C .Cir.1991); *Reuber v. United States,* 750 F.2d 1039, 1052 (D.C.Cir .1984). This *prima facie* showing must be premised on specific facts, however, and cannot be based on mere conclusory allegations.*GTE New Media Servs. Inc. v. BellSouth Corp.,* 199 F.3d 1343, 1349 (D.C.Cir.2000).

> FN2. Subject matter jurisdiction is not at issue in this case.

The plaintiff avers that the Court may exercise general jurisdiction over the non-resident defendant pursuant to D.C.Code § 13-422 and specific jurisdiction pursuant to D.C.Code § 13-423, which is the District of Columbia's long-arm statute.[FN3]Compl. ¶ 3. In addition, in his opposition brief filed in response to the defendant's Motion to Dismiss, the plaintiff argues that the Court also may exercise personal jurisdiction over the defendant because the defendant "is doing business here," which presumably is a reference to D.C.Code § 13-334(a), a statute that appears to involve only service of process but courts have construed to confer general jurisdiction.[FN4]Pl.'s Opp'n Br. 10; *El-Fadl v. Central Bank of Jordan,* 75 F.3d 668, 673 n. 7 (D.C.Cir.1996) (noting that the District of Columbia Court of Appeals ("D.C. Court of appeals") has construed § 13-334(a) to " 'confer[ ] jurisdiction upon trial courts here over foreign corporations doing substantial business in the District of Columbia, even though the claim arose from a transaction which occurred elsewhere, and hence, outside the scope of the long-arm statute' " (quoting *Guevara v. Reed,* 598 A.2d 1157, 1159 (D.C.1991))). The Court will address in turn each of the plaintiff's proffered bases for exercising personal jurisdiction.

> FN3. The Court's exercise of personal jurisdiction over the defendant in this diversity case "turns on local (state) law, here, District of Columbia law."*Crane,* 814 F.2d at 762. The Constitution, however, acts as a restraint on the scope of personal jurisdiction authorized by District of Columbia law. *Id.*"Due process sets the outer boundary; the local law may be coextensive with due process, or it may be more restrictive than the constitutional limit."*Id.*

> FN4. The Court makes this presumption based on the fact that the plaintiff cited *Gorman v. Ameritrade Holding Corp.,* 293 F.3d 506 (D.C.Cir.2002), which is a case analyzing general jurisdiction pursuant to D.C.Code § 13-334(a). Pl.'s Opp'n Br. 10.

A. *D.C.Code § 13-422*

Any argument that this Court may exercise general personal jurisdiction over the defendant pursuant to D.C.Code § 13-422 is easily resolved. The statute provides that "[a] District of Columbia court may exercise personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the District of Columbia as to any claim for relief."D.C.Code § 13-422. *Accord El-Fadl,* 75 F.3d at 671-72. A review of the plaintiff's Complaint and Memorandum of Law In Opposition to Defendant's Motion to Dismiss reveals no facts showing that the defendant is organized under the laws of the District of Columbia or maintains its principal place of business here. To the contrary, the plaintiff's Complaint and Memorandum of Law both concede that the defendant is organized under the laws of the state of Illinois and has its principal office there. Compl. ¶ 2; Pl.'s Opp'n Br. 1. Furthermore, the plaintiff makes no mention of D.C.Code § 13-422 in its brief opposing the defendant's Motion to Dismiss, stating instead that "[t]he Court's jurisdiction is predicated ... on the District of Columbia long-arm statute," which is D.C.Code § 13-423. As mentioned above, the plaintiff's only argument in favor of exercising general personal jurisdiction is premised on the assertion that the defendant "does business" in the District of Columbia, which refers to D.C.Code § 13-334(a) and not D.C.Code § 13-422. So it appears the plaintiff has abandoned any claim that the Court may exercise general personal jurisdiction over the defendant pursuant D .C.Code § 13-422.[FN5]

> FN5. Even if the plaintiff were to challenge the notion that he abandoned asserting general personal jurisdiction pursuant to D.C.Code § 13-422, the D.C. Circuit's decision in *El-Fadl* suggests that jurisdiction under that statute is inappropriate when the defendant is organized under the laws of another jurisdiction and maintains its

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 4
Slip Copy, 2007 WL 2071644 (D.D.C.)
**(Cite as: 2007 WL 2071644 (D.D.C.))**

principal place of business in that other jurisdiction. 75 F.3d at 672 n. 6 (affirming "the district court's holding that it lacked jurisdiction under § 13-422 because the record shows that Petra Bank is organized under the laws of Jordan and maintains its principal place of business there").

B. *D.C.Code § 13-423*

**\*4** The plaintiff next invokes two provisions of D.C.Code § 13-423 that he asserts authorize exercising specific personal jurisdiction over the defendant in this case, namely § 13-423(a)(1), which permits personal jurisdiction over a defendant "transacting any business in the District of Columbia," and § 13-423(a)(3), which permits personal jurisdiction over a defendant "causing tortious injury in the District of Columbia by an act or omission in the District of Columbia."[FN6]D.C.Code § 13-423; Pl.'s Opp'n Br. 1, 4; Compl. ¶ 3. As the plaintiff recognizes, *see* Pl.'s Opp'n Br. 4, when personal jurisdiction is asserted under either of these two sections of the statute, the claims for relief must arise from the very acts that establish jurisdiction. D.C.Code § 13-423(b) ("When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.").

> **FN6.** The plaintiff inexplicably failed to identify exactly which provision(s) of D.C.Code § 13-423 relating to tort injuries he is relying on to assert personal jurisdiction. Because he claimed in his opposition brief that the "defendant's action in the District of Columbia caused harm to the plaintiff," the Court presumes that the plaintiff is asserting jurisdiction in accordance with D.C.Code § 13-423(a)(3) and will address the matter accordingly. Pl.'s Opp'n Br. 9-10 (stating that his "tort claims for negligent and intentional misrepresentation are based on the actions of Cradle Society in the District of Columbia").

To find that personal jurisdiction exists over a non-resident defendant in accordance with either of the asserted provisions of D.C.Code § 13-423 "a court must engage in a two-part inquiry: A court must first examine whether jurisdiction is applicable under the

... long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process."*GTE New Media Servs.,* 199 F.3d at 1347. The United States Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit") has recognized that "Section (a)(1)'s 'transacting any business' clause generally has been interpreted to be coextensive with the Constitution's due process requirements" whereas "Section (a)(4) has been construed more narrowly...."[FN7]*Id.*Moreover, "[e]ven when the literal terms of the long-arm statute have been satisfied, a plaintiff must still show that the exercise of personal jurisdiction is within the permissible bounds of the Due Process Clause."*Id.* It is established beyond peradventure that "due process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)).

> **FN7.** Because D.C.Code § 13-423(a)(1) is coextensive with the Due Process Clause the Court's analysis merges into a "single inquiry" that asks whether the defendant established minimum contacts with the forum.*GTE New Media Servs.,* 199 F.3d at 1347.

To support his claim that the defendant "transacted business" in the District of Columbia sufficient to warrant exercising specific personal jurisdiction pursuant to D.C.Code § 13-423(a)(1) the plaintiff submitted a sworn affidavit in which he states that he met with the defendant's officers and employees in the District of Columbia on numerous occasions to discuss the contract and the parties' business relationship (Pl.'s Opp'n Br. Ex. 1 at ¶¶ 5-7, 14-17 [hereinafter "Fasolyak Aff. ¶ ----"] ),[FN8] he and one of the defendant's officers met with the defendant's attorney at the attorney's office in the District of Columbia (Fasolyak Aff. ¶ 8), he and his agents visited the Embassy of the Russian Federation and the Russian Consulate in the District of Columbia to "perform activities" and meet with embassy officials to secure accreditation, visas, or other documentation necessary for the defendant to comply with official

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2071644 (D.D.C.)
**(Cite as: 2007 WL 2071644 (D.D.C.))**

adoption procedures or otherwise travel to the Russian Federation (Fasolyak Aff. ¶¶ 9-10, 18-22), he met Russian Federation officials in the District of Columbia to discuss the defendant's business (Fasolyak Aff. ¶¶ 11-12), and he helped arrange a United States senator's visit to the Russian Federation (Fasolyak Aff. ¶ 13). These factual allegations are consistent with those made in the plaintiff's Complaint. Compl. ¶¶ 14-26, 33, 35-36, 47, 50-51, 57, 93.

> FN8. Although the affidavit attached as Exhibit 1 to the plaintiff's opposition brief contains a case caption for the lawsuit filed in Maryland, it is the Court's understanding that this particular affidavit was filed for the first time in this case.

**\*5** The defendant elected not to counter the plaintiff's assertions of fact with its own affidavit but relied instead on the arguments raised in its legal briefs supporting the Motion to Dismiss, which generally declare that the parties' contract anticipated performance only in the Russian Federation (Def.'s Mot. to Dismiss 4; Def.'s Reply Br. 2, -3), the defendant never engaged in any activities in the District of Columbia sufficient to subject it to personal jurisdiction (Def.'s Mot. to Dismiss 4), none of the alleged injuries arose from contacts the defendant had with the District of Columbia (*id.*), the United States District Court for the District of Maryland already determined that the contract was performed in Russia and the federal court in Illinois should have jurisdiction (*id.;*Def.'s Reply Br. 2), "the defendant's duties and alleged wrongdoing were related to actions in Russia" (Def.'s Mot. to Dismiss 2, 4), and, generally, that the defendant "was not advertising or selling anything in Washington D.C." (Def.'s Reply Br. 4). The defendant further argues that the plaintiff's allegation that the parties' contract required him to process adoption applications at the Embassy of the Russian Federation "is blatantly false." Def.'s Reply Br. 2.

Whatever might be said about the defendant's contacts with the District of Columbia, it strikes the Court that traditional notions of fair play and substantial justice counsel against exercising specific personal jurisdiction pursuant to D.C.Code § 13-423(a)(1) under the particular circumstances presented here. "In judging minimum contacts, a

court properly focuses on 'the relationship among the defendant, the forum, and the litigation,' " *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775 (1984) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204 (1977)), and considers whether the defendant purposely availed itself of the privilege of conducting activities in the forum such that it could anticipate being haled into court there, *Burger King Corp.,* 471 U.S. 462, 474-75 (1985). "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King Corp.,* 471 U.S. at 475 (internal quotations and citations omitted).

The Court notes from the outset that, with the exception of nebulous meetings with the plaintiff that are alleged to have taken place in the District of Columbia, *see* Discussion *infra,* the only "contacts" the defendant itself had with this forum are imputed from the plaintiff's unilateral activities at the Embassy of the Russian Federation and the Russian Consulate for the purpose of securing required accreditation, providing required governmental documentation regarding Russian adoptions, and obtaining visas for travel, or the contacts relate to meetings the plaintiff alone had with Russian Federation officials. *See* Fasolyak Aff. ¶¶ 9-13, 18-22. District of Columbia law, however, precludes plaintiffs from "rely[ing] on [their] own activities, rather than those of a defendant, to establish the requisite minimal contacts for personal jurisdiction."*Environmental Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.,* 355 A.2d 808, 812 (D.C.1976) (en banc) ("The mere fact that a nonresident has retained the professional services of a District of Columbia firm, thereby setting into motion the resident party's own activities within this jurisdiction, does not constitute an invocation by the nonresident of the benefits and protections of the District's laws.").*See also Helicopteros Nationales de Colombia, S.A. v. Hall,* 466 U.S. 408, 417 (stating that the "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction").*Accord Burger King Corp.,* 471 U.S. at 475 ("Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State.").

**\*6** The plaintiff nevertheless contends that the decisions in _Helmer v. Doletskaya,_ 393 F.3d 201 (D.C.Cir.2004), _Ulico Cas. Co. v. Fleet Nat'l Bank,_ 257 F.Supp.2d 142 (D.D.C.2003), and _Burger King Corp., supra,_ compel the conclusion that exercising personal jurisdiction is appropriate when the contract is substantially performed in the District of Columbia by either the plaintiff or the defendant. Pl.'s Opp'n Br. 5-6. These cases do not support that proposition. Each of the cited cases hinged to a great deal on the fact that they involved claims advanced by forum residents regarding contracts that had a substantial connection to the forum. The decision in _Helmer_ involved a contract between a _resident_ plaintiff and non-resident defendant for repayment of a credit card, which the court determined had a substantial connection to the District of Columbia "[b]ecause the contract was formed in the District of Columbia, the corpus of the contract involved credit cards issued to a District of Columbia resident and registered with a District of Columbia address, and the parties contemplated future repeated contacts with the District of Columbia as a condition of performance...."393 F.3d at 206. Similarly, in _Ulico Cas. Co .,_ our colleague on this Court expressly cited the District's substantial interest in providing a convenient forum to address _its citizens'_ wrongs as a basis for exercising specific personal jurisdiction over a nonresident corporation that entered into a banking contract with a resident corporation. 257 F.Supp.2d at 975. The same can be said of the Supreme Court's decision in _Burger King Corp.,_ which involved claims for breach of a franchise agreement between _resident_ and non-resident corporate parties where the non-resident defendant had no significant presence in the forum but was found to have deliberately negotiated with the resident plaintiff for the franchise, "entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts" with the plaintiff in the disputed forum, and voluntarily accepted "the long-term and exacting regulation of his business" by the resident plaintiff. 471 U.S. at 479-80. In contrast, the contract in this case, which anticipates performance in the Russian Federation,[FN9] has no substantial connection to the District of Columbia and was executed by non-resident parties. Thus, the policies served by the decisions in the cited cases lose their force when, as is the case here, both parties to the dispute are nonresidents, the contract contemplates no

performance in the District of Columbia, and the defendant engaged in no act directed at District citizens or acted pursuant to a contract that anticipated future consequences here. _See Helmer,_ 393 F.3d at 205 (indicating that "a court must evaluate the 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing' to determine whether the defendant 'purposefully established minimum contacts within the forum'" (quoting _Burger King Corp.,_ 471 U.S. at 479)).

> FN9. This Court is inclined to agree with our sister court in Maryland that the contract anticipates performance of its obligations primarily in the Russian Federation. _See Fasolyak,_ No. 06-CV-00622-AW, slip op. at 7-8.The contract makes no mention of any work to be performed specifically at the Embassy of the Russian Federation or generally in the District of Columbia, albeit the plaintiff's duties are broadly defined to encompass the provision of "advice and coordination to The Cradle with respect to _all_ activities in the Russian Federation which are necessary to achieve the placement of children from the Russian Federation with adoptive parents residing in the United States."Compl. Ex. 1 (emphasis added). The contract expressly states, however, that the plaintiff shall support the program "within the Russian Federation," assist in identifying staff "in the Russian Federation" to perform program functions, advise the defendant about "practices and procedures required by the Government of the Russian Federation" and "with respect to all actions necessary to maintain the accreditation of The Cradle by the Russian Federation," ensure that "all actions are taken in Russia which are necessary to complete adoptions under Russian law and regulations," and ensure the program "operates in compliance with all applicable Russian laws and regulations."_Id._ Accordingly, the Court finds unpersuasive the plaintiff's assertion that "substantial performance" took place in this forum, particularly since the affidavit the plaintiff submitted in the prior litigation indicates that he performed "a significant portion" of the contract's requirement to set up,

promote, manage and coordinate the defendant's Russian Program, as well as to monitor and supervise work on the defendant's adoption cases, in Maryland. Def.'s Reply Br. Ex. A ¶ 11.

**\*7** At this juncture it is worthwhile to point out that, although the defendant's business involves placing children from the Russian Federation with adoptive families in the United States, the plaintiff made no allegation that any adoptions performed by the defendant involve residents of the District of Columbia. Nor has the plaintiff alleged that the defendant solicits adoptive families or otherwise markets its services in the District of Columbia, whether by telephone calls into the District, advertising in publications that circulate in the District, or via an internet site used by District residents. *See, e.g., id.* at 476 (noting that "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted"). Indeed, according to the plaintiff, the only contacts the defendant itself had with the District of Columbia involved meetings the defendant's officers and employees attended with the plaintiff, who is a resident of Maryland and runs a consulting business in Maryland. Fasolyak Aff. ¶ 2. *See also Keeton,* 465 U.S. at 780 (acknowledging that a plaintiff's residence "may well play an important role in determining the propriety of entertaining a suit against the defendant in the forum" but "lack of residence will not defeat jurisdiction established on the basis of defendant's contacts"). The plaintiff offered no indication that the decision to hold meetings in the District of Columbia related in any way to business the defendant conducts here, versus the location being a mere fortuitous convenience (the plaintiff resides in Potomac, Maryland, which is a suburb of the District of Columbia).[FN10] The plaintiff's allegations with respect to the District of Columbia meetings are conclusory and offer only generalized time frames with no explanation about what the meetings entailed other than nondescript and self-serving statements that the discussions involved "the business" of the defendant, "performance of the Agreement," or were "to advance the purpose of the Contract."Fasolyak Aff. ¶ 5, 7, 14-15; Compl. ¶ 23; Pl.'s Opp'n Br. 9. A common sense approach dictates that the defendant could not have anticipated being

haled into court in the District of Columbia when it engaged in no commerce or other activities directed at District of Columbia residents [FN11] and merely attended meetings here with another non-resident. Particularly when those meetings related to business conducted in the Russian Federation pursuant to a contract that our sister court already determined was formed in Maryland, involved performance in the Russian Federation the consequences of which would be felt in Russia,[FN12] and that by stipulation was governed by Illinois law.*Fasolyak,* No. 06-CV-00622-AW, slip op. at 7-12.

> FN10. The plaintiff acknowledged that meetings also were held in Maryland. Fasolyak Aff. ¶ 7.

> FN11. The D.C. Court of Appeals has stated that "[a] critical inquiry is whether [the defendant] 'has purposefully directed its activities at residents of the forum.' " *Holder v. Haarmann & Reimer Corp.,* 779 A.2d 264, 269-70 (D.C.2001) (quoting *Shoppers Food Warehouse v. Moreno,* 746 A.2d 320, 331 (D.C.2000)).

> FN12. The D.C. Court of Appeals has emphasized that "the 'transacting any business' provision embraces those contractual activities of a nonresident defendant which cause a consequence here ."*Mouzavires v. Baxter,* 434 A.2d 988, 992 (D.C.1981) (per curium). No

This Court also concurs with our sister court in Maryland with regard to the significance of the choice-of-law provision. In *Burger King Corp.,* the Supreme Court admonished the lower court for failing to give "sufficient weight" to the choice-of-law provisions in the parties' franchise agreement. The Supreme Court stated that a choice-of-law provision was not sufficient on its own to confer jurisdiction but nonetheless "reinforced" the defendant's "deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there."471 U.S. at 481-82. It seems to this Court that the same logic also would apply inversely in this case to reinforce the Court's conclusion that the non-resident defendant did not purposely avail itself of the privilege of conducting activities in the District of Columbia such that it could anticipate

being haled into court here.

**\*8** The Court also remains unconvinced that it may exercise specific personal jurisdiction over the defendant pursuant to <u>D.C.Code § 13-423(a)(3)</u>, which, as mentioned previously, permits personal jurisdiction over a defendant who causes tortious injury in the District of Columbia by an act or omission that also occurred in the District of Columbia. <u>D.C.Code § 13-423(a)(4)</u>. As a threshold matter, the plaintiff is unable to make out a *prima facie* case that jurisdiction exists under this section of the statute because he failed to identify any tortious act or injury that occurred in the District of Columbia. At best, the plaintiff argues in his opposition brief that the defendant represented to him that if he secured re-accreditation the defendant would pay him fees for every Russian adoption the defendant processed. Pl.'s Opp'n Br. 10. But the plaintiff never asserted any facts showing that the misrepresentation was made in the District of Columbia, for example during one of the meetings he claims he had with the defendant's officers and employees. The plaintiff's citations to his Complaint are to no avail-none of the paragraphs he cited state any facts demonstrating how the misrepresentation came about, whether via a telephone call, meeting, electronic mail, or some other form of communication. Compl. ¶¶ 48-55. More to the point, the plaintiff failed to aver a single fact in his Complaint indicating where the alleged misrepresentation occurred. As a consequence, the Court has no factual basis to support the exercise of jurisdiction over defendant based on tortious acts occurring in the District of Columbia. The same observations apply to the plaintiff's assertions about tortious injury-at no time has the plaintiff asserted any fact to support his contention that he was injured in the District of Columbia by any act committed by the defendant. At their essence, the plaintiff's claims of tortious acts and injuries are revealed to be bare conclusory allegations. As a result, the plaintiff has failed to allege specific facts sufficient to meet his burden of establishing a *prima facie* case for the exercise of personal jurisdiction under this statute. <u>*GTE New Media Servs.*, 199 F.3d at 1349</u> (holding that "conclusory statements and intimations" were not enough to establish personal jurisdiction).

C. <u>*D.C.Code § 13-334*</u>

The plaintiff's final argument asserts that the Court may exercise general personal jurisdiction over the defendant pursuant to <u>D.C.Code § 13-334</u>, which has been construed by the courts to authorize general personal jurisdiction over non-resident defendants if the defendant is "doing business" in the District of Columbia, regardless of whether the actual claims arise from the defendant's contacts with the District. *See, e.g., <u>Gorman v. Ameritrade Holding Corp.</u>, 293 F.3d 506, 509 (D.C.Cir.2002)*. The D.C. Court of Appeals has held that the scope of jurisdiction under <u>D.C.Code § 13-334</u> is coextensive with the Due Process Clause. <u>*Id.* at 510</u>."For general jurisdiction, the Due Process Clause requires that the defendant have 'continuous and systematic general business contacts' with the forum."<u>*El-Fadl*, 75 F.3d at 675</u>. Given that this is a more rigorous standard than the "minimum contacts" necessary to establish specific personal jurisdiction, which the Court has found lacking in this case, it logically follows that the same contacts that were insufficient to support the exercise of specific jurisdiction cannot suffice to support the exercise of general jurisdiction.

**\*9** To recapitulate, the facts presented to the Court indicate that the defendant is involved in the business of facilitating the adoption of Russian children by parents in the United States. No facts were alleged, however, to show that the defendant provides adoption services to District of Columbia residents or markets any of its services here. The plaintiff alleged that the defendant met with him multiple times in the District of Columbia, but the plaintiff offered no specific facts to tie those meetings to business the defendant conducts here versus business conducted in Russia or elsewhere. Nor did the plaintiff show that the meeting with the defendant's counsel was in any way meaningful for the purpose of the Court's analysis. The plaintiff also omitted any facts demonstrating that those meetings were systematic and not occasional. So, with regard to the contacts the defendant itself had in the District of Columbia, the Court finds that they fall far short of the standard for exercising specific personal jurisdiction.

As was the case in the prior analysis, the remaining factual allegations advanced by the plaintiff involve his own acts and conduct in the District of Columbia, such as meeting with Russian Federation officials and conducting activities at the Embassy of the Russian Federation and the Russian Consulate. The Court is

disinclined to agree that such acts demonstrate continuous and systematic business contacts with the District of Columbia in light of controlling precedent recognizing that general jurisdiction is inappropriate when a defendant's presence in this particular forum is necessitated by virtue of the fact that this is the only place where federal agencies, embassies, and other such instrumentalities are located. *See Fandel v. Arabian Am. Oil Co., 345 F.2d 87, 88-89 (D.C.Cir.1965).*

In *Fandel,* the D.C. Circuit considered whether it would be appropriate to exercise general personal jurisdiction over a Delaware oil-production corporation based on the fact that it maintained an office in the District of Columbia for diplomatic and intelligence relationships with government and private agencies interested in Middle East affairs. *Id.* at 88.Distinguishing the activities performed by the corporation's District office from those of a company "whose agents in Washington are seeking contracts, either with our own Government or with other governments represented in Washington," the D.C. Circuit ultimately concluded that the corporation's presence was "of a kind we think this court has heretofore regarded as falling outside the range of Congressional contemplation of the scope of 'doing business' as that phrase is used in 13 D.C.Code § 334."*Id.* at 89.The D.C. Circuit cited a number of cases that it observed "constitute a recognition that Washington presents many business organizations with special needs for a continuous and ponderable physical presence there, which needs are not those customarily associated with strictly commercial operations; and that the purpose of Congress was not to make that presence in every case a base for the assertion of personal jurisdiction."*Id.*

**\*10** This same reasoning applies to the defendant's alleged presence in the District of Columbia, which is premised on the plaintiff's activities at the Embassy of the Russian Federation and Russian Consulate for the purpose of complying with Russian legal requirements [FN13] that could be accomplished only at those facilities [FN14] and appear not to be for the purpose of soliciting business on behalf of the defendant. Fasolyak Aff. ¶¶ 9-12, 18-22. Thus, this Court is disposed to agree with our colleague that "it would not comport with due process for this Court to exercise general jurisdiction over [the defendant] because of its contacts with foreign embassies, as the

District of Columbia is the only district in the country where these embassies are located."[FN15]*AGS Int'l Servs. S.A. v. Newmont USA Ltd., 346 F.Supp.2d 64, 76 (D.D.C.2004)* (J. Walton). In a similar vein, the plaintiff's contacts with a United States senator are subject to the "government contacts" exception to the exercise of personal jurisdiction, which provides that contacts with federal agencies and instrumentalities located in the District of Columbia "will not give rise to personal jurisdiction."*United States v. Ferrara, 54 F.3d 825, 831 (D.C.Cir.1995).*

> FN13. The plaintiff stated that he "had to make visits to and perform activities at the Embassy of the Russian Federation in Washington, D.C. and to meet with officials of the Russian government" to assist the defendant to obtain the accreditation required to conduct adoptions in Russia. Fasolyak Aff. ¶ 9. The plaintiff also stated that a Russian visa was required for adoptive parents and the defendant's employees to travel to the Russian Federation so he "made frequent trips to the Russian Consulate to meet-in Washington, D.C.-with Russian consular officers and process the required documents."*Id.* at ¶ 18-20.In addition, the plaintiff further stated that each Russian child must be registered at the Russian Consulate as a matter of Russian law, so he and his agents "traveled to and from Washington, D.C. to obtain and submit the required documents, to meet with Russian consular officers, and to perform the required registrations."*Id .* ¶ 21.

> FN14. This reasoning also likely applies to the plaintiff's meetings with Russian government officials, which the Court assumes from context probably were treated as something akin to lobbying efforts. Because the plaintiff's allegations regarding those meetings were conclusory and failed to provide specific facts identifying their purpose, they are untenable to demonstrate continuous or systematic business contacts consistent with Due Process.

> FN15. The plaintiff stated in his affidavit that the Russian Consulate with territorial jurisdiction over Illinois is located in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

District of Columbia, so the same reasoning applies to the defendant's activities at that institution as well. Fasolyak Aff. ¶ 18.

## II. The Plaintiff's Motion For Jurisdictional Discovery

The plaintiff requested leave to take jurisdictional discovery in the event the Court "considers the allegations and evidence submitted insufficient."Pl.'s Opp'n Br. 11. It is the rule in this circuit that "if a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified."*GTE New Media Servs.,* 199 F.3d at 1351. A plaintiff must, however, "have at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant."*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC,* 148 F.3d 1080, 1090 (D.C.Cir.1998). Thus, it is not error to deny jurisdictional discovery when the record indicates there is nothing to be gained from the effort. *See Goodman Holdings v. Rafidain Bank,* 26 F.3d 1143, 1147 (D.C.Cir.1994) ("[W]e do not see what facts additional discovery could produce that would affect our jurisdictional analysis above and therefore conclude the district court did not abuse its discretion in dismissing the action when it did.").*Accord Natural Res. Def. Council v. Pena,* 147 F.3d 1012, (D.C.Cir.1998) (agreeing that jurisdictional discovery should be permitted "if allegations indicate its likely utility").

Unlike the cases in this circuit where plaintiffs made specific and nonspeculative allegations demonstrating that jurisdictional discovery might in fact lead to evidence supporting the exercise of personal jurisdiction, *see, e.g., Edmond,* 949 F.2d at 425-26, the plaintiff in this case offered nothing to support his request. He simply tacked on a one-sentence motion for discovery at the conclusion of his opposition brief without any explication about what he thought discovery might disclose with regard to likely contacts the defendant had with the District of Columbia or what information he thought might be gained from jurisdictional discovery that could possibly assist the Court in its analysis. The Court is loathe to subject a defendant to the costs and burdens of discovery, no matter how narrowly tailored, based on a plaintiff's naked assertion of entitlement. This is particularly so when, as is the case here, the

jurisdictional facts already asserted have been conclusory and premised in large part on the plaintiff's unilateral acts rather than the defendant's purposeful contacts. Because the plaintiff made no showing whatsoever that jurisdictional discovery is warranted, the Court will deny the motion.

## III. The Pending Discovery Motions

**\*11** The Court's determination that it lacks personal jurisdiction over the defendant obviates the need for any ruling on the merits of the pending discovery motions.

## IV. Whether Transfer Pursuant To 28 U.S.C. § 1631 Is In The Interests Of Justice

28 U.S.C. § 1631 authorizes intercourt transfer when an originating court finds that it lacks jurisdiction and the interests of justice warrant such a result. 28 U.S.C. § 1631. "There are three elements to a section 1631 transfer: (1) there must be a lack of jurisdiction in the district court; (2) the transfer must be in the interest of justice; and (3) the transfer can be made only to a court in which the action could have been brought at the time it was filed or noticed."*Ukiah Adventist Hosp. v. FTC,* 981 F.2d 543, 549 (D.C.Cir.1992) (internal citations omitted). This Court has determined that it lacks personal jurisdiction over the defendant and, without expressing any opinion about the merits of the plaintiff's claims, the Court finds that the interests of justice warrant transfer so the plaintiff may proceed with his claims in an appropriate forum where he may be heard. The diversity of the parties and the defendant's status as a corporation organized under the laws of the State of Illinois, with its principal place of business there, suggest that the United States District Court for the Northern District of Illinois properly may exercise personal jurisdiction over the defendant, and could have done so at the time the plaintiff originally filed his claims. In addition, the contract between the parties stipulates that Illinois law shall govern the agreement. Compl. Ex. 1. The Court therefore finds that the interests of justice warrant transferring this case to the United States District Court for the Northern District of Illinois in accordance with 28 U.S.C. § 1631.

## CONCLUSION

Slip Copy, 2007 WL 2071644 (D.D.C.)
**(Cite as: 2007 WL 2071644 (D.D.C.))**

For the foregoing reasons, the Court concludes that it lacks personal jurisdiction over the defendant but that transfer to the United States District Court for the Northern District of Illinois is in the interests of justice. Accordingly, this case will be transferred to the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1631. All other arguments not expressly considered are deemed to be without merit. An appropriate order consistent with this Memorandum Opinion will follow.

D.D.C.,2007.
Fasolyak v. The Cradle Society, Inc.
Slip Copy, 2007 WL 2071644 (D.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Slip Copy                                                                                                    Page 1
Slip Copy, 2007 WL 1954416 (D.D.C.)
**(Cite as: 2007 WL 1954416 (D.D.C.))**

Schutter v. Herskowitz
D.D.C.,2007.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
Stephen SCHUTTER, Plaintiff,
v.
David HERSKOWITZ, et al., Defendants.
**Civil Action No. 06-1846(RMC).**

July 5, 2007.

James M. Loots, James M. Loots PC, Washington, DC, for Plaintiff.

*MEMORANDUM OPINION*

ROSEMARY M. COLLYER, United States District Judge.
**\*1** Pending before the Court are motions to dismiss filed by Defendants David Herskowitz and Phillip Banks. Both argue that the Court lacks personal jurisdiction over them and that venue in the District of Columbia is improper. Plaintiff Stephen Schutter opposes the motions and has submitted affidavits in which he purports to provide evidence that demonstrates minimum contacts between Messrs. Herskowitz and Banks and the District of Columbia. The Court finds that Mr. Schutter has failed to make a prima facie showing that Defendants have the minimum contacts with the District of Columbia necessary to support personal jurisdiction. The Court further finds that it is in the interests of justice to transfer this case to the Eastern District of Pennsylvania. Thus, the motions will be granted in part and the case will be transferred.

**I. FACTUAL BACKGROUND**

Mr. Schutter resides in the District of Columbia. At some point in late 2005, he became involved in negotiations to purchase a youth hostel located in Philadelphia, Pennsylvania. Mr. Herskowitz, who lives in Vermont, owned the hostel; Mr. Banks, who lives and works in Pennsylvania, is a real estate broker who represented Mr. Schutter in the negotiations to purchase it. There is no evidence in the record regarding who initiated the negotiations

between Mr. Schutter and Mr. Herskowitz. There is a similar absence of evidence regarding who solicited the agency relationship between Mr. Schutter and Mr. Banks. In any event, in December 2005 Mr. Schutter and Mr. Herskowitz executed a purchase agreement (the "Agreement") under which Mr. Herskowitz promised to sell the hostel to Mr. Schutter for $1.6 million. All negotiations among the three parties were by telephone and written correspondence; neither Mr. Herskowitz nor Mr. Banks traveled to the District of Columbia in connection with the transaction. Mr. Schutter executed the Agreement in Washington, D.C ., and Mr. Herskowitz executed the Agreement in Pennsylvania.[FN1]

> **FN1.** Mr. Herskowitz's sworn affidavit states that he executed the contract in Pennsylvania. Herskowitz Aff. ¶ 3. His brief in support of his motion to dismiss, however, states that he executed the contract in Vermont, although it cites the paragraph of the affidavit which states that he signed it in Pennsylvania. *See* Herskowitz Mem. of P. & A. In Supp. of Mot. to Dismiss at 1. The Court assumes that the affidavit is correct and that the contradictory statement in the brief is a scrivener's error. In either case, there is no dispute that Mr. Herskowitz executed the Agreement outside the District of Columbia.

Under the terms of the Agreement, Mr. Schutter paid $100,000 of the purchase price up front, which Mr. Banks deposited into an escrow account at Bryn Mawr Trust Co., a financial services institution located in Pennsylvania. Although the details are sketchy, at some point Mr. Schutter learned that the hostel had a maximum occupancy of 52 beds, which was contrary to representations made by Mr. Herskowitz during negotiations that the occupancy was 70 beds. Based on this alleged misrepresentation, the parties agreed that the Agreement would be terminated and the $100,000 in escrow would be returned to Mr. Schutter. Mr. Schutter contends that despite promises to do so, neither Mr. Banks nor Mr. Herskowitz has returned the $100,000.

Mr. Schutter filed this action on October 27, 2006.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 2
Slip Copy, 2007 WL 1954416 (D.D.C.)
**(Cite as: 2007 WL 1954416 (D.D.C.))**

He asserts claims for breach of contract, fraudulent inducement to contract, breach of fiduciary duty, unjust enrichment, and fraud and misrepresentation.[FN2] Mr. Herskowitz moved to dismiss on November 11, 2006, and on December 11, 2006, Mr. Banks did the same. The motions are now fully briefed and ripe for decision.

> FN2. Subject matter jurisdiction is based on diversity of citizenship because Mr. Schutter and Defendants are residents of different states and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a). Mr. Herskowitz challenges subject matter jurisdiction based on an arbitration clause in the Agreement but, because the Court concludes that it lacks personal jurisdiction over Defendants, it need not address that argument.

## II. LEGAL STANDARDS

### A. Rule 12(b)(2)

**\*2** On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing a factual basis for the court's exercise of personal jurisdiction over the defendant. *Crane v. N.Y. Zoological Soc'y,* 894 F.2d 454, 456 (D.C.Cir.1990). The plaintiff must allege specific acts connecting the defendant with the forum. *Second Amendment Found. v. U.S. Conference of Mayors,* 274 F.3d 521, 524 (D.C.Cir.2001). Bare allegations and conclusory statements are insufficient. *See id.*

In determining whether a factual basis for personal jurisdiction exists, the court should resolve factual discrepancies in the record in favor of the plaintiff. *Crane,* 894 F.2d at 456. The court need not treat all the plaintiff's allegations as true, however. *United States v. Philip Morris Inc.,* 116 F.Supp.2d 116, 120 n. 4 (D.D.C.2000). Instead, the court "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *Id.*

### B. Rule 12(b)(3)

Under Federal Rule of Civil Procedure 12(b)(3), a defendant may, at the lawsuit's outset, test whether the plaintiff "has brought the case in a venue that the law deems appropriate." *Modaressi v.. Vedadi,* 441 F.Supp.2d 51, 53 (D.D.C.2006). "If the plaintiff's chosen forum is an improper venue under applicable statutes, or is otherwise inconvenient, the Court may dismiss the action or transfer the case to a district where venue would be proper or more convenient." *Id.* (citing 28 U.S.C. § 1406 (providing for dismissal or transfer when venue is defective) and 28 U.S.C. § 1404 (allowing a district to transfer venue "for the convenience of the parties and witnesses")). "Because it is the plaintiff's obligation to institute the action in a permissible forum, the plaintiff usually bears the burden of establishing that venue is proper." *Freeman v. Fallin,* 254 F.Supp.2d 52, 56 (D.D.C.2003); *see also* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1352 (2d ed.1987) (noting that placing the burden on the plaintiff "seems correct inasmuch as it is plaintiff's obligation to institute his action in a permissible forum, both in terms of jurisdiction and venue.").

## III. ANALYSIS

### A. Personal Jurisdiction

Both Mr. Herskowitz and Mr. Banks argue that dismissal under Rule 12(b)(2) is warranted because they are not subject to personal jurisdiction in the District of Columbia. It is well settled that the District of Columbia's long-arm statute, D.C.Code § 13-423(a)(1), " 'is as far-reaching as due process allows, meaning that only minimum contacts with the District are necessary to sustain jurisdiction here.' " *Mwani v. bin Laden,* 417 F.3d 1, 9 (D.C.Cir.2005) (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC,* 148 F.3d 1080, 1089 (D.C.Cir.1998)). Whether a defendant has established "minimum contacts" with the District of Columbia turns on whether the exercise of jurisdiction would "offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (internal quotation marks omitted). These minimum contacts must be grounded in "some act by which the defendant purposefully avails [himself] of the privilege of conducting activities with the forum state, thus invoking the benefits and protections of its laws." *Asahi Metal Indus. v.Super. Ct. of Cal.,* 480 U.S. 102, 109 (1988). Stated differently, "the defendant's conduct and connection with the forum State [must be] such that he should reasonably

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

anticipate being haled into court there." _World-Wide Volkswagen Corp. v. Woodson,_ 444 U.S. 286, 297 (1980). Generally, a plaintiff may not rely only on his own activity within the forum to establish the existence of the defendant's minimum contacts. _See Hanson v. Denckla,_ 357 U.S. 235, 253 (1958).

**\*3** "[W]ith respect to interstate contractual obligations," such as those at issue in this case, the Supreme Court has "emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanction in the other State for the consequences of their activities." _Burger King Corp. v. Rudzewicz,_ 471 U.S. 462, 473 (1985) (internal quotation marks omitted). This standard demands that an out-of-state resident do more than simply enter into a contract with a resident of the forum state. _Helmer v. Doletskaya,_ 393 F.3d 201, 206 (D.C.Cir.2004) ("The Supreme Court has held that a contract with a resident of a forum does not by itself establish minimum contacts with the forum.") (citing _Burger King,_ 471 U.S. at 478). Only if a non-resident "enters into a contract that has a 'substantial connection' with the forum" will he be found to have minimum contacts with the forum:

Because a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction, a court must evaluate the prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing to determine whether the defendant purposefully established minimum contacts within the forum.

_Helmer,_ 393 F.3d at 205 (internal quotation marks omitted).

Thus, the questions here are whether the Agreement and other business relationships between Messrs. Herskowitz and Banks and Mr. Schutter had a "substantial connection" with the District of Columbia, or whether Mr. Herskowitz or Mr. Banks otherwise purposefully availed himself of conducting business in the District.

_1. Mr. Herskowitz_

In response to Mr. Herskowitz's challenge to the Court's jurisdiction, Mr. Schutter states that "[d]uring the fourth quarter of 2005, [he] negotiated with Mr. Herskowitz for the purchase of a youth hostel ... located in Philadelphia, Pennsylvania. The negotiations resulted in an Agreement dated December 2, 2005."Schutter Aff. in Opp'n to Herskowitz ¶ 2. He further states that the negotiations he "communicated frequently with Mr. Herskowitz from [his] Washington DC residence," Mr. Herskowitz called him at his District of Columbia residence, and Mr. Herskowitz knew that he lived in the District of Columbia. _Id._ ¶ 3. Finally, Mr. Schutter asserts that he received and executed the Agreement at his District of Columbia residence, tendered payment pursuant to the Agreement from the District of Columbia, and suffered damages from the breach of the Agreement in the District of Columbia. _Id._ ¶¶ 4-7.Mr. Schutter does not indicate who initiated the negotiations, how many times he talked to Mr. Herskowitz during the negotiations, or if he and Mr. Herskowitz ever met in person.

Mr. Schutter has fallen short of meeting his burden of demonstrating that the Court has jurisdiction. The Supreme Court and D.C. Circuit have been clear that a contract with a resident of the forum is not by itself sufficient to establish minimum contacts; the contract must have a "substantial connection" with the forum, which depends upon a realistic analysis of the parties' business relationship. _See Burger King,_ 471 U.S. at 479. Mr. Schutter asserts that he negotiated by phone with Mr. Herskowitz while he was at his home in the District of Columbia, and that those negotiations led to a contract for the purchase of a hostel in Pennsylvania. Although Mr. Schutter was in the District of Columbia during the negotiations, there is no indication that Mr. Herskowitz "reached out" to the District of Columbia to establish "continuing relationships and obligations" with a District resident. _Id._ at 473.Moreover, the Agreement dealt exclusively with business and property interests in Pennsylvania; thus, the Agreement's intended future consequences were limited to that State, not the District of Columbia. In addition, the Agreement contained an arbitration clause and a choice-of-law provision, both of which indicated that Pennsylvania law governed the Agreement and any disputes arising from it. _See, e.g., S.E.C. v. Overseas Mgmt., Ltd.,_ No. 04-302, 2005 WL 3627141, at \*6 (D.D.C. Jan. 7, 2005) ("While agreements to submit to a particular jurisdiction for resolution of disputes may not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 4
Slip Copy, 2007 WL 1954416 (D.D.C.)
**(Cite as: 2007 WL 1954416 (D.D.C.))**

conclusively establish personal jurisdiction, it is nevertheless one factor relevant in an evaluation of the contract in question.") (internal citation omitted). On these facts, the Court cannot find that the Agreement had a "substantial connection" with the District of Columbia such that Mr. Herskowitz purposefully availed himself of conducting business here. *Cf. Helmer,* 393 F.3d at 183-84 (holding that contract between D.C. resident and Muscovite to purchase apartment in Moscow had no substantial connection to the District).

**\*4** The facts of this case are not appreciably different than those presented in *Gibbons & Co., Inc. v. Roskamp Inst.,* No. 06-720, 2006 WL 2506646 (D.D.C. Aug. 28, 2006). In *Gibbons,* the plaintiff-Gibbons & Co., a D.C. corporation-entered into a contract with a Roskamp, a Florida company, in which Gibbons agreed to lobby Congress on Roskamp's behalf. *Id.* at *1. During the course of dealing between the parties, they exchanged between 50 and 75 emails and more than 75 telephone calls; in addition, representatives of Roskamp traveled to the District to meet with Gibbons and Congressional officials. *Id.* The relationship eventually soured, and Gibbons sued Roskamp in this Court for breach of contract. *Id.* The Court held that Gibbons had failed to establish that Roskamp had minimum contacts with the District of Columbia. *Id.* at *3. First, the Court reasoned that Gibbons had relied primarily on its own activities in the District, which is insufficient to establish Roskamp's minimum contacts: "[A][p]laintiff's unilateral activities, even if performed with the goal of ultimately benefitting the defendant, do not satisfy the requirement that [the] defendant itself have some minimum contact with the District."*Id.* Second, the emails and telephone communications were "incidental to the contract," and "the mere fact that [Roskamp] allegedly retained [Gibbons's] professional services, which set into motion [Gibbons's] activities within the District, does not without more constitute an invocation by [Roskamp] of the benefits and protections of the District's laws."*Id.; see also FC Inv. Group LC v. IFX Mkts., Ltd.,* 479 F.Supp.2d 30, 39 (D.D.C.2007) (holding that the defendant's "regular" telephone calls to the District did not satisfy the "transacting business" requirement of the D.C. long-arm statute); *Far West Capital, Inc. v. Towne,* 46 F.3d 1071, 1075-77 (10th Cir.1995) (holding that periodic telephone calls and faxes between Nevada and Oregon residents and Utah company in the course of contract

negotiations were insufficient to establish minimum contacts with Utah).

Here, the record reveals that Mr. Herskowitz had even less contact with the District of Columbia than did the defendant in *Gibbons.*A few telephone calls and some unilateral conduct by Mr. Schutter within the District are simply not enough to establish that Mr. Herskowitz purposefully availed himself of the privilege of conducting activities in the District of Columbia. The Court therefore lacks personal jurisdiction over Mr. Herskowitz.

*2. Mr. Banks*

With respect to Mr. Banks, the evidence is similarly lean. Mr. Schutter submitted an affidavit in which he states that in 2005 he was "introduced to Mr. Philip Banks, who represented ... that he could assist in the procurement of financing and in drafting and negotiating a contract with Mr. David Herskowitz for the purchase of a youth hostel located in Philadelphia, Pennsylvania. The negotiations resulted in an Agreement ... which was drafted by Mr. Banks for the signature of both parties."Schutter Aff. in Opp'n to Banks ¶ 2. He further states that Mr. Banks represented that he had substantial business contacts in the District of Columbia and provided Mr. Schutter with a list of those contacts. *Id.* ¶ 3. Although it is somewhat unclear, Mr. Schutter also avers that Mr. Banks had a "Washington DC telephone number," presumably meaning a number with a "202" area code, and that most of the telephone conversations he had with Mr. Banks occurred on Mr. Banks's "local" telephone number. *Id.* ¶ 4. Mr. Schutter also states that he received and executed the Agreement in Washington, D.C., that he tendered payment pursuant to the Agreement from Washington, D.C., and that he suffered damages from the breach of the Agreement in Washington, D.C. *Id.* ¶¶ 5-9.Mr. Banks, who is proceeding *pro se,* does not specifically refute these facts; he states only that he "has not done business within the District of Columbia with reference to this matter."Banks's Mot. to Dismiss ¶ 15.

**\*5** First, it is important to note that Mr. Banks was not a party to the Agreement. Thus, Mr. Schutter's statements that he received and executed the Agreement and made the down payment in the District of Columbia are not relevant to the minimum contacts analysis as to Mr. Banks. What is relevant

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 5
Slip Copy, 2007 WL 1954416 (D.D.C.)
**(Cite as: 2007 WL 1954416 (D.D.C.))**

the arrangement and course of dealing between Mr. Banks and Mr. Schutter. On that issue, the record is sparse. All Mr. Schutter says is that he "was introduced" to Mr. Banks; he does not say who introduced him to Mr. Banks, or whether Mr. Banks solicited his business or otherwise purposefully reached out to the District of Columbia in order to establish the relationship between them. Further, the arrangement itself-that Mr. Banks would represent Mr. Schutter in a real estate transaction in which both the property and seller were located outside the District of Columbia-evidences no substantial connection with the District. Moreover, there is almost nothing in the record indicating what Mr. Banks actually did in connection with that transaction. The Agreement, which Mr. Banks "drafted," Schutter Aff. ¶ 2, appears to be nothing more than a form contract. Mr. Banks received Mr. Schutter's down payment and placed it into an escrow account, but those acts occurred in Pennsylvania. *See id.* ¶ 8; Agreement ¶ 3(B). Thus, Mr. Schutter fails to adduce evidence sufficient to show that Mr. Banks had minimum contacts with the District of Columbia in connection with the events underlying his claims. *See, e.g., FC Inv. Group,* 479 F.Supp.2d at 39.

Indeed, Mr. Schutter's affidavit seems to be aimed more at establishing that Mr. Banks is subject to general jurisdiction in the District of Columbia. Under the general jurisdiction doctrine, "a court may exercise personal jurisdiction over a non-resident defendant when that non-resident defendant has engaged in 'continuous and systematic' general business contacts in the forum." *Id.* at 36. Mr. Schutter states that Mr. Banks represented that he "regularly assisted businesses and individuals in the District with real estate transactions and provided [Mr. Schutter] with business contacts listing local District of Columbia telephone numbers," Schutter Aff. ¶ 3; he also states that he "believed [Mr. Banks] to have significant business relationships in the District of Columbia," and that Mr. Banks had a "local" telephone number, *id.* ¶ 5. These vague, uncorroborated statements are, however, insufficient to establish that Mr. Banks has "continuous and systematic" business contacts with the District apart from the transaction at issue in this case. *See Atlantigas Corp. v. Nisource, Inc.,* 290 F.Supp.2d 34, 42 (D.D.C.2003) ("In order to meet its burden, plaintiff must allege specific facts on which personal jurisdiction can be based; it cannot rely on conclusory allegations."). Although Mr. Schutter's

affidavit claims that Mr. Banks has significant business dealings in the District, the Court does not assign the affidavit serious weight because Mr. Schutter provides no specifics and no documentary or other contemporaneous evidence, such as the alleged list of D.C. contacts. *See id.*("When considering personal jurisdiction, the Court need not treat all of the plaintiff's allegations as true. Instead, the court may receive and weigh affidavits and other relevant matter to assist in determining the jurisdictional facts.") (internal quotation marks omitted). The Court simply cannot find that it has general jurisdiction over Mr. Banks based on nothing more than Mr. Schutter's sweeping assertion that Mr. Banks regularly conducts business in the District of Columbia.

**B. Venue**

**\*6** In addition to seeking dismissal based on lack of personal jurisdiction, both Defendants also argue that venue in the District of Columbia is not proper. Even though the Court has concluded that it lacks personal jurisdiction over Messrs. Herskowitz and Banks, it may nonetheless transfer venue if it is in the interests of justice to do so. *See, e.g., Cameron v. Thornburgh,* 983 F.2d 253, 257 (D.C.Cir.1993) ("[W]e may transfer the case even though it is likely that we do not have personal jurisdiction over appellees") (citing *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 466 (1962)). The Court finds that it is in the interests of justice to transfer this action, and therefore will transfer the case to the Eastern District of Pennsylvania.[FN3]

> FN3. Although Defendants moved only to dismiss for improper venue, not to transfer venue, the Court may consider transfer *sua sponte. See, e.g., Schreiber v. Kohn,* 434 F.Supp.2d 1, 2-3 (D.D.C.2006) (transferring case *sua sponte* under 28 U.S.C. § 1404(a)).

There are two statutory provisions allowing district courts to transfer venue: 28 U.S.C. § 1404(a) and 28 U.S.C. § 1406(a). The former Section governs the transfer of so-called "convenience" cases-that is, cases in which venue is proper in the original court but the court decides that transfer is warranted for the "convenience of the parties and witnesses." The latter Section controls in cases where venue is improper in the original court but, rather than dismissing the action, the court decides to transfer to a district in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 6
Slip Copy, 2007 WL 1954416 (D.D.C.)
**(Cite as: 2007 WL 1954416 (D.D.C.))**

which venue is proper. Despite its lack of personal jurisdiction, this Court may transfer venue under either Section 1404(a) or Section 1406(a).*See In re Vitamins Antitrust Litig.,* 270 F.Supp.2d 15, 37 (D.D.C.2003).

On the current record, the Court concludes that transfer to the Eastern District of Pennsylvania is warranted under either Section 1404(a) or Section 1406(a). Under Section 1404(a), a court may transfer venue when two requirements are met: (1) the proposed transferee district is one in which the action might have been brought originally; and (2) the court decides, in the exercise of its discretion, that the transfer is warranted. *See DeLoach v. Phillip Morris Cos.,* 132 F.Supp.2d 22, 24-25 (D.D.C.2000). In deciding whether transfer is warranted, courts should consider the convenience of the parties and witnesses, as well as the "interests of justice." *See* 28 U.S.C. § 1404(a). Similarly, under Section 1406(a), a court may transfer venue when it is in "the interest of justice." That decision is within the district court's discretion. *Davis v. Am. Soc'y of Civil Eng'rs,* 290 F.Supp.2d 116, 120 (D .D.C.2003). Generally, the interests of justice favor transfer rather than dismissal. *Id.* Before transferring under Section 1406(a), the court must ensure that "venue is proper and that the defendants are subject to personal jurisdiction in the transferee forum."*Id.*

It is clear on the facts in the record that this case could have been brought in the Eastern District of Pennsylvania. The property that is the subject of the Agreement is located in that District and is owned by Mr. Herskowitz, who held the property out for sale. Mr. Banks, who represented Mr. Schutter in the negotiations, was operating from his offices within that District. And the $100,000 down payment that Defendants are allegedly withholding from Mr. Schutter was deposited in an escrow account located in that District. Thus, venue in that District would be proper under 28 U.S.C. § 1391(a)(2), which allows, in a case based on diversity of citizenship, venue in any judicial district where "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated."Moreover, because Mr. Banks lives in that District, and because Mr. Herskowtiz owns property there and contracted to sell that property to Mr. Schutter, it is almost certain that both Defendants have minimum contacts with

that jurisdiction such that they would be subject to personal jurisdiction there.

**\*7** In deciding whether transfer under Section 1404(a) is warranted, courts should balance the public and private interests at stake, including but not limited to:

(1) plaintiffs' privilege of choosing the forum; (2) defendant's preferred forum; (3) location where the claim arose; (4) convenience of the parties; (5) convenience of witnesses, but only to the extent that witnesses may be unavailable for trial in one of the fora; and (6) ease of access to sources of proof. Public interest considerations include: (1) the transferee's familiarity with the governing law; (2) the relative congestion of the courts of the transferor and potential transferee; and (3) the local interest in deciding local controversies at home.

*Lentz v. Eli Lily & Co.,* 464 F.Supp.2d 35, 37 (D.D.C.2006).

The majority of these factors weigh in favor of transfer. Obviously Messrs. Herskowitz and Banks believe that this case should not be heard in the District of Columbia, and it would be more convenient for both to have the case in Philadelphia since it is close to Mr. Banks's residence and Mr. Herskowitz has business interests there. Moreover, because the property that is the subject of the Agreement is located in Philadelphia, and because Mr. Schutter's claims are based in part on alleged misrepresentations about the physical characteristics of the hostel, access to sources of proof favors venue in the Eastern District of Pennsylvania. With respect to the public factors, Mr. Schutter's contract claims will be governed by Pennsylvania law, which is more familiar to the District Court in the Eastern District of Pennsylvania than it is to this Court. And although this dispute is somewhat interstate in nature, it is "local" to the Eastern District of Pennsylvania in the sense that the real property and business that are the heart of this action are located in that District. *See Kawamoto v. CB Richard Ellis, Inc.,* 225 F.Supp.2d 1209, 1212 (D.Haw.2002) (holding, in real estate contract action, that the jurisdiction in which the property was located had a substantial local interest in resolving the dispute). And, perhaps most importantly, both Mr. Herskowitz and Mr. Banks would be subject to personal jurisdiction in that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 7
Slip Copy, 2007 WL 1954416 (D.D.C.)
**(Cite as: 2007 WL 1954416 (D.D.C.))**

venue. Thus, the interests of justice favor transfer to the Eastern District of Pennsylvania.

## IV. CONCLUSION

Mr. Schutter fails to present evidence that either Mr. Herskowitz or Mr. Banks had minimum contacts with the District of Columbia. As a result, the Court lacks personal jurisdiction over them. The Court further concludes that transferring this action to the Eastern District of Pennsylvania is in the interests of justice. Thus, Defendants' motions will be granted in part and the case will be transferred to the Eastern District of Pennsylvania. A memorializing order accompanies this Memorandum Opinion.

D.D.C.,2007.
Schutter v. Herskowitz
Slip Copy, 2007 WL 1954416 (D.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JALAL ASKANDER ANTRANICK,<br><br>                                        Plaintiff,<br><br>              -against-<br><br>RESEARCH TRIANGLE INSTITUTE,<br>INTERNATIONAL and UNITY RESOURCES<br>GROUP, L.L.C.<br><br>                                        Defendants. | Civil Case No. 1:08-cv-00595 (PLF)<br><br><br>Hon. Paul L. Friedman |

## DECLARATION OF THOMAS E. BUTLER

THOMAS E. BUTLER hereby declares, under penalty of perjury, as follows:

1.  I am a member of the law firm of Chadbourne & Parke LLP, attorneys for Defendant Unity Resources Group Pte., Ltd., sued herein as Unity Resources Group, L.L.C. ("Unity") in the above-referenced action, based in the firm's New York office.  I make this declaration on the basis of personal knowledge, in support of Unity's motion, pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, to dismiss the complaint in this action (the "Complaint") for lack of personal jurisdiction.

2.  A copy of the Complaint is attached hereto as Exhibit A.

3.  A copy of a printout of the electronic docket sheet in this action, obtained from PACER, is attached hereto as Exhibit B.

4.  A copy of the Clerk's Certificate of Mailing, which was filed on or about April 22, 2008 in this action is attached hereto as Exhibit C.

5.  A copy of Plaintiff's Return of Service, filed July 8, 2008, is attached hereto as Exhibit D.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on July 9, 2008.

_____
Thomas E. Butler

# EXHIBIT A

**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

**FILED**

APR - 8 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

|  |  |
|---|---|
| Jalal Askander Antranick<br>745 Eldorado Blvd # 2324<br>Broomfield, CO 80021<br><br>Plaintiff,<br><br>v.<br><br>Research Triangle Institute, International<br>3040 Cornwallis Road<br>PO Box 12194<br>Research Triangle Park, NC 27709-2194<br><br>and<br><br>Unity Resources Group, L.L.C.<br>AL Murooj Hotel and Suites, Office No. 7<br>PO Box 117546<br>Dubai, United Arab Emirates<br><br>Defendants. | Case: 1:08-cv-00595<br>Assigned To : Friedman, Paul L.<br>Assign. Date : 4/8/2008<br>Description: PI/Malpractice<br><br>**Jury Trial Demanded**<br><br>JURY ACTION |

**COMPLAINT**

**I. NATURE OF THE ACTION**

1.      Genevia Jalal Antranick was a passenger in a car traveling through the Karada neighborhood of Baghdad.   On October 9, 2007, at about 1:45 P.M., as the 1990 Oldsmobile in which she was riding crossed a busy intersection, she was shot through the head and neck by employees of Defendant Unity Resources Group, L.L.C. (hereinafter "URG")  Ms. Antranick died as a result of the injuries.

2.      Unity Resources Group is a private security contractor with a contract to provide security services to Defendant Research Triangle Institute, International.  (herineafter

"RTI") At the time of Ms. Antranick's death, the URG employees who shot her had just dropped off an employee of RTI and were returning to their base of operations.

3.       The URG employees were riding in a convoy of four armored vehicles.  On information and belief, they were masked and wore khaki uniforms.  As the Oldsmobile crossed the intersection, one URG employee fired an automatic weapon from a gun portal in the back of the last armored vehicle.  Another leaned out of a door and did the same. Approximately forty bullets were fired into the car by the URG employees, from a distance of about seventy-five to one hundred yards.

4.       The driver of the car, Marani Awanis Manook, was also shot through the head and other parts of her body, and also died as a result of this incident.  Two other people, riding in the back seat, were injured by bullets and glass shards, but survived.

5.       Ms. Manook, Ms. Antranick, and the other two passengers were unarmed and posed no threat whatsoever to Defendants.  They were returning home from church at the time of the incident.

6.       As a passenger in the car, Ms. Antranick had no control over it whatsoever.  At a distance of 75 or 100 yards, she could not possibly have harmed Defendants or their agents.  On information and belief, a video camera mounted in an RTI armored vehicle shows that no warnings were given before the attack.

7.       An Iraqi policeman at the scene stated that the armored convoy sped off "like gangsters" after the shooting, leaving Ms. Antranick and Ms. Manook to die.  The URG employees did not call an ambulance or otherwise try to rescue or assist the people they had just shot.  It is unknown whether Ms. Antranick could have survived if medical attention had promptly arrived.

8.    This is not the first time URG employees have killed defenseless people in Baghdad. Last year, URG employees killed 70-year-old professor Kays Juma when he failed to stop at a security checkpoint. On or about June 24, 2007, Defendants' agents shot another civilian in the Karada neighborhood. On information and belief, numerous other incidents have occurred which have not been reported in the press. Defendants failed to take the remedial steps necessary to prevent a recurrence of the unjustified violence and excessive use of force. Reasonable discovery is likely to produce evidence of other killings and injuries, and of Defendants' failure to take remedial measures.

9.    Reasonable discovery is also likely to produce evidence that Defendants have not reported all of these incidents to a Reconstruction Operations Center (hereinafter "ROC") of the U.S. Department of Defense. The ROC's are set up for this purpose, and many Private Military Contractors (hereinafter "PMC's") voluntarily report.

10.    Defendants have created and fostered a culture of lawlessness among their employees and agents, encouraging them to act in Defendants' financial interests at the expense of innocent human life. Defendants have earned huge profits from the war in Iraq.

11.    Plaintiff brings this action against Defendants URG and RTI for both legal and equitable relief. The case is brought under the Alien Tort Claims Act (ATCA), the Torture Victim Protection Act (TVPA) and state tort law, and seeks to remedy and prevent the callous murder of innocent people living in Baghdad. The Defendants are war profiteers, knowingly engaged in an ongoing campaign of terror against the inhabitants of the city.

## II. JURISDICTION AND VENUE

12.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, based on the ATCA and the TVPA, 28 U.S.C. § 1350, for the alleged violations of international human rights law.  Supplemental jurisdiction exists over the state law causes of action pursuant to 28 U.S.C. § 1367.

13.    This Court also has diversity jurisdiction over Defendant RTI pursuant to 28 U.S.C. § 1332 (a)(2).  Plaintiff Jalal Askander Antranick is Genevia Jalal Antranick's father.  He is the executor of her estate and her sole legal heir.  Jalal Askander Antranick is a domicile of Colorado and a U.S. permanent resident.  Defendant RTI is a domicile of North Carolina.  Defendant URG is incorporated in Singapore and headquartered in Dubai, UAE.  On information and belief, URG's owners are citizens and domiciles of Australia. The amount in dispute between Plaintiff and each defendant exceeds $75,000.

14.    This court has personal jurisdiction over Defendants.  Defendants have minimum contacts with the District of Columbia and have purposely availed themselves of this court's jurisdiction.  The causes of action set forth herein arise from contacts between the United States Agency for International Development (hereinafter "USAID") and Defendant RTI, which contracts with USAID to provide governance services for Iraq. USAID is located in the District of Columbia.  Reasonable discovery as to contract negotiation and formation is likely to show that the parties to this contract anticipated being haled into court in Washington, D.C.

15.    Defendant RTI maintains an office in Washington D.C., located at One Metro Center, 701 13th St. NW, Washington, D.C., 20005.  Reasonable discovery is likely to

4

show that this office is used by RTI to manage its business dealings with USAID, and the U.S. government in general.

16.     According to press reports, on March 4, 2003, USAID invited three companies to bid on the contract for "local governance" in Iraq. Only RTI submitted a proposal. On March 26, 2003, USAID and RTI established a cost-plus-fixed-fee contract to create 180 local and provincial governments in Iraq and promote Iraqi civic participation in the political process. The contract, which is the largest in RTI's history, was worth $168 million for the first year alone.

17.     The 44-page contract, which gives RTI access to classified information, requires the company to "design, establish and support interim representative bodies that are culturally acceptable, transparent and accountable." RTI is also required to increase the participation in local government by Iraqi women and ethnic and religious minorities. The company has the authority to grant contracts to Iraqi and foreign non-governmental organizations such as URG. RTI's work in Iraq is political in nature, and all work done under the USAID-RTI contract is in furtherance of political objectives.

18.     USAID's inspector general conducted an audit of the procurement process of RTI's contract. The inspector general concluded that USAID had not complied with federal regulations in the award process. According to the inspector general, USAID developed RTI's contract to "justify spending the available funding of approximately $150 million within one year" instead of fitting the contract to the needs of the Iraqi people. Although the USAID-RTI contract is invalid for this reason, conduct pursuant to it is relevant for purposes of establishing jurisdiction.

19.    RTI is also a subcontractor with Creative Associates International Inc., on the USAID education project titled Revitalization of Iraqi Schools and Stabilization of Education. This is an additional contact showing RTI's continuous and systematic business dealings in the District of Columbia. Reasonable discovery is likely to show that RTI has other USAID contracts as well.

20.    Further contacts between Defendant RTI and the forum can be found in the numerous, ongoing interconnections among RTI's corporate executives and the U.S. government. President and Chief Executive Oficer Victoria Haynes serves on the advisory boards of three U.S. government labs: Pacific Northwest Laboratory, Los Alamos National Laboratory and the Sandia Engineering Research Foundation. Aaron S. Williams, a former high-ranking official at USAID, joined RTI in January 2003 in a newly created position: Vice President of International Business Development. Williams is also a high-ranking member of the U.S. Senior Foreign Service, a small group of tenured foreign service officers, as well as a member of the Council on Foreign Relations. Chief of Staff Lon E. Maggart is a retired U.S. Army commander who commanded the 1st Brigade, 1st Infantry Division, during the 1991 Gulf War. These individuals and others have numerous contacts with the forum related to Defendant RTI's contract with USAID.

21.    Defendant URG is a subcontractor which provides security services to RTI, which are necessary for RTI to fulfill its obligations under the USAID contract. Reasonable discovery is likely to show that as a subcontractor to the RTI-USAID contract, URG is in privity with RTI, and was also on notice of being haled into court in Washington, D.C.

But for RTI's contract with USAID, and the subcontract to URG, the October 9th, 2007 shooting incident would not have occurred.

22.    Defendants continuously and systematically solicit new business of United States Agency for International Development as well as other USAID contractors.

23.    Defendant URG advertises on its website that it is a "U.S. Federal Government Central Contractor Registered." See www.unityresourcesgroup.com.   Defendant URG advertises on the website of the U.S. Commercial Service (BuyUSA.gov), and is an active member of the International Peace Operations Association (www.ipoa.gov) and the Private Security Company Association of Iraq (www.pscai.org), both of which continuously and systematically solicit business from the U.S. government on their behalf.   On its website, URG says that Neil Marshall is their "Americas" contact.   On information and belief, URG does no business in the Americas other than as a USAID subcontractor.   Reasonable discovery is likely to show that Mr. Marshall and other URG executives travel to Washington, DC to facilitate their business with the US government.

24.    URG is only permitted to operate in Iraq because of its relationship with the U.S. government as a subcontractor.   Its registration as a "U.S. Federal Government Contractor Registered" and its license to operate in Iraq provide independent bases for personal jurisdiction.  Further contact with the forum may be found in the fact that URG employs former U.S. military personnel in its ranks.  On  information and belief, the individual who killed Ms. Antranick is a US citizen employed by URG.

25.    Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b)(2), (c) and (d).  The contract between USAID and Defendants RTI and its subcontractor URG was a substantial event giving rise to this claim.

26.    For venue purposes, all corporate defendants "reside" in the District of Columbia, are subject to personal jurisdiction in the District of Columbia, and have systematic and continuous contacts with the District of Columbia.  Therefore venue also lies pursuant to 28 U.S.C. §1391(b)(1), (c) and (d).

27.    No adequate forum exists for this case in Iraq.  Under Coalition Prvosional Authority Order Number 17, Private Security Contractors are immune from Iraqi legal process.

28.    The ends of justice are served by the exercise of jurisdiction of a U.S. court.  The U.S. government has a strong interest in controlling the behavior of USAID contractors and their subcontractors in Iraq.  Although the incident giving rise to this claim occurred in Baghdad, and some witnesses live there and speak Arabic, it is unlikely there will be a serious dispute over the details of what occurred.  The dispute will be about whether the corporate defendants are liable.  The vast majority of the evidence and discovery materials in this case will be in English.

29.    All parties have English-speaking attorneys with offices in Washington, D.C.

### III. PARTIES

#### Plaintiff

30.    The Plaintiff, Jalal Askander Antranick, is Genevia Jalal Antranick's father.  He is a domicile of Colorado, living at 745 Eldorado Blvd. #2324, Broomfield, CO, 80021.  Mr. Askander was born in Iraq, maintains his Iraqi citizenship, and is a U.S. permanent resident.  He has resided in the U.S. since 2005.

8

31.     Probate proceedings were held in Baghdad on November 1, 2007. Jalal Askander Antranick is the executor of Genevia Jalal Antranick's estate and her sole legal heir. This estate has no property located in the District of Columbia.

32.     The deceased, Genevia Jalal Antranick, was an Iraqi citizen living Baghdad, Iraq at the time of her death. Although she had the opportunity to immigrate to the United States, she chose to remain in Iraq to continue her humanitarian work there.

### Defendants

33.     Defendant Research Triangle Institute, International (RTI) is incorporated in North Carolina with its principal place of business at 3040 Cornwallis Road, PO Box 12194, Research Triangle Park, NC 27709-2194. RTI also maintains an office at One Metro Center, 701 13th St. NW, Washington, D.C., 20005.

34.     Defendant URG is incorporated in Singapore and headquartered in Dubai, United Arab Emirates. On information and belief, URG is a closely held corporation whose owners are citizens and domiciles of Australia. URG maintains an office at Al Murooj Rotana Hotel and Suites, Office No. 7, P.O. Box 117546, Dubai, United Arab Emirates. See Declaration of Kerry Powdrill, Docket Entry # 15-3 in case 08-cv-0096 (PLF).

## IV. BACKGROUND FACTS CONCERNING THE LAWLESSNESS OF PRIVATE SECURITY CONRACTORS IN BAGHDAD

35.     Human rights organizations express their concerns over the lack of accountability for security contractors in Iraq and the aggressive tactics used by many contractors as a normal part of convoy protection. According to a January, 2008 report of Human Rights First, "[c]onvoys often speed down the wrong side of the road, use gunfire as warnings, and fire on civilian vehicles in response to perceived threats. Contractors often say that

they were acting 'defensively.' Their aggressive approach and resort to violent force deeply alienates the local population and ultimately undermines the U.S. military mission. The U.S. government has fallen short of acting upon its legal responsibilities to challenge violations of the international human rights and humanitarian law, which itself quite likely exacerbates and promotes more abuse by contractors." See "Private Security Contractors at War: Ending the Culture of Impunity," Human Rights First (formerly Lawyers Committee on Human Rights), (January 2008) p. 8.

36.    Although Blackwater, U.S.A. has attracted most of the attention to the issue of private security contractor accountability, information available from many other sources shows that these issues extend far beyond one company and one incident, but rather reveal a pervasive problem of lack of accountability for the contractor community at large. Id., p 9.

37.    In a number of cases, contractors and former contractors have themselves spoken out about what they said was the indiscriminate use of force. In February 2004, four former Custer Battles security contractors told NBC News they resigned because fellow contractors "terrorized civilians, shooting indiscriminately as they ran for cover, smashing into and shooting up cars." Id., p. 9, quoting Lisa Meyers and the NBC News Investigative Unit, "U.S. Contractors in Iraq Allege Abuses," NBC News, February 17, 2005.

38.    A former Coalition Provisional Authority (CPA) advisor with experience traveling under both military and contractor escorts described contractor escorts as single-mindedly committed to their particular assignments, and either oblivious to or uninterested in the downside of abusive action. In contrast to military escorts, contractors

focus only on the contract. "What they told me was, 'Our mission is to protect the principal at all costs. If that means pissing off the Iraqis, too bad.'" Id., p. 10, quoting Steve Fainaru, "Where Military Rules Don't Apply: Blackwater's Security Force in Iraq Given Wide Latitude by State Dept.," *Washington Post*, September 20, 2007.

39.    In July 2005, U.S. Army Brigadier General Karl Horst, deputy commander of the 3rd Infantry Division, with responsibility for security in and around Baghdad, spoke to the press about abusive security contractors: "These guys run loose in this country and do stupid stuff. There's no authority over them, so you can't come down on them hard when they escalate force. ... They shoot people, and someone else has to deal with the aftermath. It happens all over the place." Id., p. 10, quoting Jonathan Finer, "Security Contractors in Iraq Under Scrutiny After Shootings," *Washington Post*, September 10, 2005.

40.    Other military commanders have expressed longstanding concerns regarding both the difficulties posed to the regular military by contractor abuses and the mission impact of their methods: "I personally was concerned about any of the civilians running around on the battlefield during my time there," said retired Army Col. Teddy Spain, who commanded a military police brigade in Baghdad. "My main concern was their lack of accountability when things went wrong." Id., p. 10, quoting Sudarsan Raghavan and Thomas E. Ricks, "Private Security Puts Diplomats, Military at Odds: Contractors in Iraq Fuel Debate," *Washington Post*, September 26, 2007.

41.    If a member of the U.S. military deployed to Iraq or Afghanistan is accused of a serious crime, the military has a substantial criminal justice establishment deployed and present in-country to investigate and conduct courts-martial of cases considered worthy

for prosecution. With contractors, however, there is no systematic investigation or prosecution, with the exception of incidents of the highest political profile, which invariably result in late, uncoordinated and ad hoc responses by relevant agencies. Even in these cases, however, investigations by U.S. military or civilian authorities have practically never resulted in prosecutions. The United States, as a sending state, has both the obligation and the capacity to hold its private contractors accountable for crimes overseas. Id., p. 20.

42.    Human Rights First concludes that "[b]oth U.S. military and civilian agencies that contract with and use [Private Security Contractors, or PSC's] (including subcontractors at any level) must develop and provide access to mechanisms to provide just compensation for wrongful deaths, injuries, or damages caused by PSCs in their employ, founded on principles of transparency, consistency, and fairness.

43.    No such mechanisms exist. Defendants have neither compensated the estate of Ms. Antranick, nor accepted responsibility for their wrongful and criminal acts.

## V. DEFENDANTS' VIOLATIONS OF LAW

44.    Defendants' actions violate, and Plaintiff's causes of action arise from, the following laws, agreements, conventions, resolutions and treaties, which constitute specific examples of the applicable law of nations or customary international law:

    (a)    Alien Tort Claims Act, 28 U.S.C. § 1350;

    (b)    Torture Victim Protection Act, 28 U.S.C. § 1350;

    (c)    Common law of the United States of America;

    (d)    United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

(e)    Universal Declaration of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948);

(f)    International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

(g)    Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984)(ratified 10/28/98);

(h)    Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

(i)    Vienna Declaration and Programme of Action (World Conference on Human Rights, 1993);

(j)    Article 3 of the Geneva Conventions; and

(k)    Statutes and common law of the District of Columbia, North Carolina, and Colorado, including but not limited to, wrongful death, negligence, and recklessness.

## VII.  CAUSES OF ACTION

45.    With respect to all of the causes of action described below, the harm to Plaintiff was caused by the acts or omissions of Defendants.

46.    As regards state law claims, until the choice of laws issues are briefed, it would be premature to cite specific laws of the District of Colombia, North Carolina or Colorado. Instead, the elements of wrongful death, negligence, assault and battery, and negligent infliction of emotional distress are pled herein for these states.

13

<u>Agency and Vicarious Liability</u>

47.    In committing the conduct alleged herein, the persons who killed Ms. Antranick were acting under the supervision of Defendants and/or as Defendants' agents, and/or were acting within the course and scope of the security duties for which they were retained with the advance knowledge, acquiescence and/or subsequent ratification of Defendants.    Each Defendant acquiesced in the conduct of the others, as alleged herein, and in the conduct of the persons who killed Ms. Antranick.

48.    With regard to war crimes, Defendants had command responsibility for the people who committed the crimes.

<u>Aiding and Abetting</u>

49.    Defendants aided and abetted the murder of Ms. Antranick by providing substantial assistance to the people who killed her, in the form of money, weapons, instructions, encouragement, and assurances of impunity and/or indemnification.

50.    Defendants had reason to know and/or did know the nature and scope of the conduct alleged herein, as well as conduct carried out through the use and benefit of the funding, equipment and other resources provided by Defendants.  With this knowledge or probable knowledge, Defendants provided and continue to provide this funding, equipment and other resources to the persons responsible for the damages alleged herein. Defendants had actual notice of other similar incidents committed by URG employees. Defendants were also on notice of a similar incident involving the murder of eleven innocent Iraqis just four weeks before, by personnel of another security contractor, Blackwater USA, yet failed to take steps to prevent similar incidents by their own agents and employees.

### Joint and Several Liability

51.     Defendants are jointly and severally liable for the death of Ms. Antranick because they knowingly or negligently contributed to her injury by their several acts, which operated concurrently as the proximate cause of all of the injuries.  The separate and independent acts of the codefendants concurred, commingled and combined to produce indivisible injuries for which damages are sought, so that in effect the damages suffered are rendered inseparable.

52.     All of the Defendants have committed negligent or wrongful acts as alleged herein.  Responsibility for Ms. Antranick's death cannot be apportioned with reasonable certainty among the Defendants.  Each joint tortfeasor is equally liable for the judgment, regardless of their relative degree of responsibility.

### Joint Venturers

53.     Defendants acted in a joint venture or joint enterprise and had a community or joint interest in the undertaking.  They combined their property, skill, and knowledge to carry out the undertaking; each shared in the control of its development; each anticipated receiving substantial profits therefrom; and each cooperated with the others in the development of the joint undertaking.  Each Defendant ratified the acts of the others.

54.     Defendants had a common duty to Ms. Antranick, participated in the joint creation of negligent risk, and shared control of the risk.  Defendants had actual knowledge of the risks, collected and shared this knowledge as a group, and made joint or cooperative decisions on the basis of the known risks.  Defendants acted in concert, and their parallel behavior supports an inference of tacit agreement or cooperation.

<u>Civil Conspiracy</u>

55.    Defendants agreed and conspired to commit the wrongful acts alleged herein, as evidenced by their acts and omissions in response to previous incidents of death, injury, and the use of excessive force by their employees or agents in Baghdad. .

56.    Defendants' overt acts in furtherance of the conspiracy include hiring and employing individuals with questionable backgrounds, failure to investigate incidents of excessive force and report them to relevant authorities, failure to punish the individuals involved in this and in other incidents, and failure to enforce its own rules regarding warnings to be given before deadly force is used.

## **First Cause of Action**

### **The Alien Tort Claims Act, 28 U.S.C. § 1350, for War Crimes, Against All Defendants**

57.    Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

58.    Defendants committed violations of international law and war crimes against Genevia Jalal Antranick, causing injury to Plaintiff. These violations and war crimes include murder, directing an attack on civilians, and / or summary execution.

59.    Defendants provided financial support, arms, and other substantial assistance that contributed to the ability of those agents and/or employees to kill Ms. Antranick.

60.    Defendants were aware of the 2006 murder of professor Kays Juma, and other incidents of the use of excessive force by URG employees. Defendants were also aware of another incident involving the murder of eleven innocent Iraqi civilians just four weeks before, by personnel of another security contractor, Blackwater, U.S.A. However,

16

while having the requisite control to do so, Defendants failed to correct the behavior of their employees and/or agents, or to otherwise protect the lives of innocent inhabitants of Baghdad, such as Ms. Antranick.

61.    Defendants' employees and/or agents were operating under color of law, and, so acting, murdered or summarily executed Genevia Jalal Antranick, or directed an attack on her.    Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and took place during a period of armed conflict.    This misconduct caused grave and forseeable injuries to Plaintiff.

62.    The acts described herein are actionable under the ATCA, and, if such a showing is required, were done with the complicity of state actors.    Private security forces are licensed and openly operate under the laws of Iraq, and are assisted by U.S. and Iraqi government and military officials.

63.    In engaging in joint action and/or a conspiracy with such state government officials, Defendants acted under color of law in violating each of the applicable laws, agreements, conventions, resolutions and treaties listed in ¶ 44, supra.    Further, the Government of Iraq fails to enact laws that would prevent or remedy the violations alleged herein.

64.    The murder of Ms. Antranick was committed in the course of a civil conflict for political purposes.    RTI's work in Iraq is political in nature, and the death of Ms. Antranick occurred in furtherance and within the scope of these activities.    URG and RTI have the additional motive of presenting a tough image to the Iraqi public, and a policy to "shoot first, ask questions later" deters attacks on them.    Since Ms. Antranick was an innocent civilian, her murder in this fashion was a war crime.

17

65.     URG realizes additional benefits from this kind of behavior.  By fostering a culture of lawlessness among their employees and/or agents, they acquire a reputation for ruthlessness which enhances their image as effective security contractors.  URG's clients may feel safer knowing they have ruthless bodyguards.  However, their acts violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in ¶ 44, supra.

66.     Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in ¶ 44, supra, resulted in the death of Genevia Jalal Antranick.

## Second Cause of Action

### The Torture Victim Protection Act, 28 U.S.C. § 1350
### For Extrajudicial Killing, Against All Defendants.

67.     Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

68.     Defendants engaged in acts and omissions intentionally and tortiously causing their employees and/or agents to murder Genevia Jalal Antranick.  Specifically, as is alleged above, the Defendants' employees and/or agents were operating under color of law, and, so acting, murdered or summarily executed, or directed an attack on Genevia Jalal Antranick, in violation of the TVPA.  Further, through their employees and/or agents, the Defendants knowingly aided and abetted the murder of Genevia Jalal Antranick by providing instructions and rules of engagement, financial support, arms, and

other substantial assistance that contributed to the ability of their employees and/or agents to murder Genevia Jalal Antranick.

69.     The acts described herein are actionable under the TVPA, and, if such a showing is required, were done with the complicity of state actors. Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in ¶ 44, <u>supra</u>, resulted in the deaths of Genevia Jalal Antranick.

### <u>Third Cause of Action</u>

### <u>Wrongful Death, Against All Defendants.</u>

70.     Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

71.     Defendants committed, or acted in concert to commit, or Defendants' employees or agents committed, acts that constitute wrongful death under the laws of the District of Colombia, North Carolina, and Colorado, that caused the death of Genevia Jalal Antranick.

72.     Defendants provided the individuals who shot Ms. Antranick with work instructions and/or rules of engagement to these individuals. Reasonable discovery is likely to show that these instructions either were not followed, or were inadequate.

73.     Defendants had a duty of reasonable care towards Genevia Jalal Antranick to ensure that neither they nor their agents engaged in conduct leading to or likely to lead to foreseeable harm, injury or death, as described herein. In engaging in the conduct alleged herein, Defendants and/or their agents have not acted as ordinarily prudent and careful

persons would act in similar circumstances. Defendants failed to use due care to protect Genevia Jalal Antranick from foreseeable injury, harm, and death.

74.     Defendants' actions and omissions were a direct and substantial cause of the death of Genevia Jalal Antranick.  Defendants failed to use due care to protect innocent civilians such as Ms. Antranick from injury and harm, breaching this duty, causing, and proximately causing her wrongful death, as well as the emotional suffering of her father and other members of her family.

75.     The death of Ms. Antranick was reasonably forseeable.  Defendants were aware of the 2006 murder of professor Kays Juma by URG employees and of other incidents of excessive force by URG personnel.  Defendants were also aware of a similar incident involving the murder of eleven innocent Iraqis just four weeks before, by personnel of another security contractor, Blackwater, USA.  However, while having the requisite control to do so, Defendants failed to correct the behavior of their employees and/or agents, or to otherwise protect the lives of innocent inhabitants of Baghdad, such as Genevia Jalal Antranick.

## Fourth Cause of Action

### Negligent Hiring and Supervision, Against All Defendants.

76.     Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein, including but not limited to the elements of negligence in the wrongful death count supra.

77.     Defendants were also negligent in hiring and supervising their agents and employees.

78.     Defendants and/or their agents selected, hired, retained and/or contracted with persons who were unfit, incompetent or otherwise dangerous.  Defendants had a duty to Genevia Jalal Antranick to take reasonable care to ensure that these and/or agents were not unfit, incompetent or otherwise dangerous to Genevia Jalal Antranick.  Defendants' conduct constitutes negligent hiring and supervision and is actionable under the laws of the District of Columbia, North Carolina, and Colorado.

79.     Despite actual or constructive knowledge of the violent characteristics of these individuals, Defendants hired, retained, and/or contracted with them. At the time that Defendants selected, hired, retained and/or contracted with these employees and/or agents, and at all other relevant times, Defendants knew or reasonably should have known that they were unfit, incompetent, and/or dangerous, and that, as a result, would intentionally and/or negligently violate, did violate and would continue to harm persons such as Genevia Jalal Antranick, as alleged herein.  Defendants failed to exercise reasonable care in selecting, hiring, retaining and contracting for the security personnel whom Defendants and/or their agents retained to perform this work.  Defendants breached their duty to Genevia Jalal Antranick, who suffered death as a result.  This harm was caused by resources, property, funding and/or equipment under Defendants' control.

80.     Defendants also had a duty to instruct their employees and/or agents as to rules of engagement which comport with their duty to protect the lives of innocent civilians such as Genevia Jalal Antranick.  At all relevant times, Defendants and/or their agents, had the power, ability, authority and duty to stop engaging in the conduct described herein and to intervene to prevent or prohibit such conduct.

81.    Defendants exercised control over the operative details of the actions taken by their employees and/or agents, including control over the resources, property, funding and/or equipment used to injure and harm Genevia Jalal Antranick, as well as the rules of engagement under which they operated.    Defendants also had the authority to supervise, prohibit, control, and/or regulate their employees and/or agents so as to prevent these acts and omissions from occurring.    Defendants also had the ability to suspend the duties of their employees and/or agents until such time as the tortious conduct alleged herein was stopped and/or prevented.    Reasonable discovery is likely to show that the persons who killed Ms. Antranick did not follow instructions given to them, were never disciplined, and continue to operate in the same way in Iraq.

82.    Defendants knew, or reasonably should have known, that their employees and/or agents would create a risk of harm and actually harm or otherwise violate Genevia Jalal Antranick's rights, and that, as a direct and proximate result of those violations, persons such as Genevia Jalal Antranick would suffer injuries as alleged herein.    Defendants knew, or reasonably should have known, that unless they intervened to protect persons such as Genevia Jalal Antranick and properly supervise, prohibit, control and/or regulate the conduct described herein, their agents and/or employees would perceive their acts and omissions as being ratified and condoned.

83.    Defendants failed to exercise due care by failing to supervise, prohibit, control or regulate their agents and/or employees.    Defendants breached their duty to Genevia Jalal Antranick, who suffered harm and injury as a result, including harm and injury caused by resources, property, funding and/or equipment under Defendants' control.

84.     As a direct and proximate result of Defendants' negligent selection, hiring, retention and/or contracting, and negligent supervision of their employees and/or agents, Plaintiff has suffered and continues to suffer injuries entitling Plaintiff to damages in amounts to be proven at trial.

## Fifth Cause of Action

### Negligence in Failing to Rescue, Against All Defendants.

85.     Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

86.     After shooting Genevia Jalal Antranick, Defendants failed to call for assistance, thereby depriving Ms. Antranick of any chance she may have had of surviving the incident.   Instead, Defendants' agents or employees sped away from the scene "like gangsters" according to an Iraqi police witness.

87.     Defendants had a duty to rescue Ms. Antranick, since they created the risk that led to her death.  Defendants' agents or employees breached this duty by speeding away from the scene and not calling for medical assistance.  Defendants had the ability to call for assistance, even as they sped away from the scene.  A reasonable person would have called an ambulance.

88.     The lack of immediate medical attention was a substantial factor in Ms. Antranick's death.  It reduced her chance of living and was of a character naturally leading to her death.

## Sixth Cause of Action

### Assault and Battery, on Behalf of
### All Plaintiffs Against All Defendants.

89.     Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

90.     Defendants and/or their agents caused Genevia Jalal Antranick to imminently fear and/or apprehend harmful, offensive and/or unlawful contact.  Defendants acted with the intent to threaten and harm and did actually threaten and harm Genevia Jalal Antranick. Defendants' commissions and omissions, as alleged herein, demonstrated that Defendants had an imminent ability and intent to subject Genevia Jalal Antranick to an intentional, offensive and harmful contact.  Defendants knew or should have known that Genevia Jalal Antranick would regard such intentional and harmful contact as offensive.  Ms. Antranick did not consent to this conduct. The acts described herein constitute assault, actionable under the laws of the District of Columbia, North Carolina, and Colorado.

91.     Defendants and/or their agents committed intentional knowing, and/or reckless acts which resulted in harmful or offensive contact with the body of Ms. Antranick.  Ms. Antranick did not consent to the contact.  Defendants acted with the intent to cause injury and actually did cause injury, damage, and loss of life to Ms. Antranick as alleged herein. The acts described herein constitute battery, actionable under the laws of the laws of the District of Columbia, North Carolina, and Colorado.

## Seventh Cause of Action

### Negligent Infliction of Emotional Distress, on Behalf of
### All Plaintiffs Against All Defendants.

92.    Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

93.    Defendants negligently inflicted emotional distress on Plaintiff.

94.    Defendants negligence directly and forseeably harmed Plaintiff.

95.    Defendants engaged in outrageous and extreme acts with reckless disregard for the probability of causing Plaintiff severe emotional distress and did in fact cause Plaintiff to suffer severe emotional distress.

## **Damages**

96.    Plaintiff seeks compensatory and punitive damages in amounts to be ascertained at trial.  It further seeks equitable relief to prevent further human rights violations.

97.    Ms. Antranick's family has been forced to suffer, and continues to suffer, severe psychological harm as a result of her murder.  Plaintiff also seeks damages for pecuniary loss resulting from loss of society, comfort, attention, services and support.

## **VIII. DEMAND FOR JURY TRIAL**

98.    Plaintiffs demand a trial by jury on all issues so triable.

## **IX. PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the Court to:

(a)    enter judgment in favor of Plaintiff on all counts of the Complaint;

(b)    declare that Defendants have violated Genevia Jalal Antranick's human rights and the laws of the District of Columbia and the United States, as set forth herein;

(c)    award Plaintiff compensatory and punitive damages;

25

(d)     grant Plaintiff equitable relief, permanently enjoining Defendants from further

engaging in human rights abuses against other inhabitants of Baghdad;

(e)     award Plaintiff the costs of suit including reasonable attorneys' fees;

(f)     award Plaintiff such other and further relief as the Court deems just under the

circumstances.

Respectfully submitted this eighth day of April, 2008.

Paul Wolf
D.C. Bar 480285
PO Box 11244
Washington, D.C. 20008-1244
Tel. (202) 674-9653
paulwolf@icdc.com

*B*
*08-595*
*PLF*

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

**I (a) PLAINTIFFS**

Jalal Askander Antranick

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF *Broomfield*
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS**

Research Triangle Institute *Durham*

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Paul Wolf
PO Box 11244     (202) 674 9653
Washington DC 20008

Case: 1:08-cv-00595
Assigned To : Friedman, Paul L.
Assign. Date : 4/8/2008
Description: PI/Malpractice

*43*
*16*

*JURY ACTION*

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**☐ A. Antitrust**

☐ 410 Antitrust

**☒ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☒ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

O

| ☐ G. *Habeas Corpus/ 2255*<br>☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ H. *Employment Discrimination*<br>☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ I. *FOIA/PRIVACY ACT*<br>☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ J. *Student Loan*<br>☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| ☐ K. *Labor/ERISA (non-employment)*<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ L. *Other Civil Rights (non-employment)*<br>☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ M. *Contract*<br>☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ N. *Three-Judge Court*<br>☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☐ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ Multi district Litigation   ☐ 7 Appeal to District Judge from Mag. Judge

**VI.** CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 USC §1350 Alien Tort Claims Act for war crimes

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 | **DEMAND $** $50,000,000. | Check YES only if demanded in complaint JURY DEMAND: ☒ YES   ☐ NO |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    ☒ YES    ☐ NO    If yes, please complete related case form.

DATE 4/8/08    SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# EXHIBIT B

JURY, TYPE-B

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:08-cv-00595-PLF

ANTRANICK v. RESEARCH TRIANGLE INSTITUTE,
INTERNATIONAL et al
Assigned to: Judge Paul L. Friedman
Demand: $50,000,000
 Case: 1:08-cv-00096-PLF
Cause: 28:1331 Fed. Question: Personal Injury

Date Filed: 04/08/2008
Jury Demand: None
Nature of Suit: 360 P.I.: Other
Jurisdiction: Federal Question

**Plaintiff**

**JALAL ASKANDER ANTRANICK**    represented by    **Paul David Wolf**
PO Box 11244
Washington, DC 20008-1244
(202) 674-9653
Fax: (202) 364-6188
Email: paulwolf@icdc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**RESEARCH TRIANGLE**    represented by    **Eric W. Bloom**
**INSTITUTE, INTERNATIONAL**
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006
(202) 282-5000
Fax: (202) 371-5950
Email: ebloom@winston.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITY RESOURCES GROUP,**    represented by    **Robert A. Schwinger**
**L.L.C.**
CHADBOURNE & PARKE, LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 408-5100
Email: rschwinger@chadbourne.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William S D'Amico**
CHADBOURNE & PARKE LLP
1200 New Hampshire Avenue, NW
Washington, DC 20036
(202) 974-5616
Fax: (202) 974-6716
Email: wdamico@chadbourne.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/08/2008 | 1 | COMPLAINT against RESEARCH TRIANGLE INSTITUTE, INTERNATIONAL, UNITY RESOURCES GROUP, L.L.C. ( Filing fee $ 350, receipt number 4616011501) filed by JALAL ASKANDER ANTRANICK. (Attachments: # 1 Civil Cover Sheet)(td, ) (Entered: 04/09/2008) |
| 04/08/2008 | | SUMMONS Not Issued as to RESEARCH TRIANGLE INSTITUTE, INTERNATIONAL, UNITY RESOURCES GROUP, L.L.C. (td, ) (Entered: 04/09/2008) |
| 04/08/2008 | 2 | NOTICE OF RELATED CASE by JALAL ASKANDER ANTRANICK. Case related to Case No. 08-96 PLF. (td, ) (Entered: 04/09/2008) |
| 04/21/2008 | | Summons (3) Issued as to RESEARCH TRIANGLE INSTITUTE, INTERNATIONAL, UNITY RESOURCES GROUP, L.L.C.. (served twice) (td, ) (Entered: 04/21/2008) |
| 04/22/2008 | 3 | REQUEST for the Clerk from Attorney Paul Wolf to effect service of one copy of the summons and complaint upon UNITY RESOURCES GROUP, L.L.C. by registered mail, return receipt requested, pursuant to FRCP 4(f)(2)(C)(ii). (td, ) (Entered: 04/22/2008) |
| 04/22/2008 | 4 | CERTIFICATE OF CLERK of mailing one copy of the summons and complaint on 4/22/08 upon UNITY RESOURCES GROUP, L.L.C. Al Murooj Hotel & Suites Office No. 7, P.O. Box 117546, Dubai, United Arab Emirates by registered mail, return receipt requested pursuant to FRCP 4(f)(2)(C)(ii). (td, ) (Entered: 04/22/2008) |
| 05/19/2008 | 5 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. RESEARCH TRIANGLE INSTITUTE, INTERNATIONAL served on 5/13/2008, answer due 6/2/2008 (Wolf, Paul) (Entered: 05/19/2008) |
| 05/22/2008 | 6 | Unopposed MOTION for Extension of Time to File Answer *, Move or Otherwise Plead* by RESEARCH TRIANGLE INSTITUTE, INTERNATIONAL (Attachments: # 1 Text of Proposed Order)(Bloom, Eric) (Entered: 05/22/2008) |
| 05/23/2008 | 7 | NOTICE of Appearance by Robert A. Schwinger on behalf of UNITY RESOURCES GROUP, L.L.C. (Schwinger, Robert) (Entered: 05/23/2008) |
| 05/23/2008 | | MINUTE ORDER granting 6 Motion for Extension of Time to Answer. Defendants shall have until July 10, 2008 to move, answer, or otherwise plead |

| | | in response to the complaint, and plaintiff Jalal Askander Antranick shall have until August 11, 2008 to reply to or oppose defendants' motions or answers. Signed by Judge Paul L. Friedman on 5/23/08. (lcplf2) (Entered: 05/23/2008) |
|---|---|---|
| 05/23/2008 | | Set/Reset Deadlines: Answer due by 7/10/2008. Plaintiff to reply or oppose defendants' motions or answers by 8/11/2008. (mm) (Entered: 05/27/2008) |
| 05/28/2008 | 8 | NOTICE of Appearance by William S D'Amico on behalf of UNITY RESOURCES GROUP, L.L.C. (D'Amico, William) (Entered: 05/28/2008) |
| 07/08/2008 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITY RESOURCES GROUP, L.L.C. served on 7/7/2008, answer due 7/28/2008 (Wolf, Paul) (Entered: 07/08/2008) |
| 07/08/2008 | 10 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Eric W. Bloom, :Firm- Winston & Strawn LLP, :Address- 1700 K Street, NW, Washington, DC 20006. Phone No. - 202-282-5000. Fax No. - 202-282-5100 by RESEARCH TRIANGLE INSTITUTE, INTERNATIONAL (Attachments: # 1 Declaration of Mark A. Ash, # 2 Declaration of Sarah E. Saucedo, # 3 Text of Proposed Order)(Bloom, Eric) (Entered: 07/08/2008) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/10/2008 11:44:02 | | |
| **PACER Login:** | cp0002 | **Client Code:** | 18576.010 |
| **Description:** | Docket Report | **Search Criteria:** | 1:08-cv-00595-PLF |
| **Billable Pages:** | 2 | **Cost:** | 0.16 |

EXHIBIT C

CO 939
Rev. 7/06

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JALAL ASKANDER ANTRANICK
_____
Plaintiff(s)

vs.

Civil Action No.: 08-595 PLF
_____

RESEARCH TRIANGLE INSTITUTE, INTERNATIONAL, ET AL.,
_____
Defendant(s)

## CERTIFICATE OF MAILING

I hereby certify under penalty of perjury, that on the 22 nd day of _____April_____, 20 08 ,
I mailed:

1. ☒  One copy of the summons and complaint      by registered mail, return receipt requested      , to the
individual of the foreign state, pursuant to the provisions of FRCP 4(f)(2)(C)(ii).

2. ☐  One copy of the summons, complaint and notice of suit      , together with a translation of each into the
official language of the foreign state, by registered mail, return receipt requested      , to the head of the
ministry of foreign affairs, pursuant to the provisions of 28 U.S.C. § 1608(a)(3).

3. ☐  Two copies of the summons, complaint and notice of suit      , together with a translation of each into
the official language of the foreign state, by certified mail, return receipt requested      , to the U.S.
Department of State, Office of Policy Review and Interagency Liaison, Overseas Citizens Services,
2100 Pennsylvania Avenue, NW, Fourth Floor, Washington, DC 20520, ATTN: Director of Overseas
Citizens Services, pursuant to the provisions of 28 U.S.C. § 1608(a)(4).

4. ☐  One copy of the summons and complaint      , together with a translation of each into the official
language of the foreign state, by registered mail, return receipt requested      , to the agency or
instrumentality of the foreign state, pursuant to the provisions of 28 U.S.C. § 1608(b)(3)(B).

NANCY MAYER-WHITTINGTON, CLERK

By: _____/s/ Tawana Davis_____
Deputy Clerk

# EXHIBIT D

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | 7/7/08 |

| NAME OF SERVER *(PRINT)* | TITLE |
|---|---|
| William Thomas | Independent Contractor |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable **age and** discretion then residing therein.

Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

☒ Other (specify): *Gave 2 copies of Summons and Complaint to Office of Apartment of Consumer and Regulatory Affairs Business and Professional License Administration Corporation Division 941 North Capital St NE, Washington, DC 20002 - for defendant Unity Resources Group*

### STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $150.00 |
|---|---|---|

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on  22-07-08          *William T. Thomas*
         Date                        Signature of Server

3226-9 R St. S.E #13   Wash. D.C
         Address of Server              20032

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

★ ★ ★ **GOVERNMENT**
OF THE
**DISTRICT OF COLUMBIA**

Department of Consumer and Regulatory Affairs
Business and Professional License Administration
Corporation Division
941 North Capitol St. N.E.
Washington, D.C. 20002

BRA 29 (REV 09/02)

## Billing Voucher

Charge To:

**JALAL ASKANDER ANTRANICK VS. RESEARCH TRIANGLE INSTITUTE, INTERNATIONAL**

Office Use Only

| | | | 3222 |
|---|---|---|---|
| Charge For:  **SERVICE OF PROCESS** | QTY:  1 | $ 15.00 | |
| | | $ .00 | |
| | | $ .00 | |
| | | $ .00 | |
| Date **7/7/2008**  *mch* | PAY THIS AMOUNT PAYABLE TO THE D.C. TREASURER | $ 15.00 | Total |

```
Office of Finance
  and Treasury
Date:  7/7/2008 11:46 AM
Office: 941NCap   Term:DFJPOLB1
Batch: 25   Batch Date:07/07/08
Cashier:ncap04
Trans #:54

DCRA            Rcpt: 0028257
Comment/Document:
      Payment Total:     $15.00
Payment Distribution:
  2117  CR0-3222-6013 CORPORAT   $15.00
                 CA Tendered:$20.00
                 CA Tendered:($5.00)

  Thank you for your payment.
      Have a nice day!
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JALAL ASKANDER ANTRANICK,<br><br>                          Plaintiff,<br><br>        -against-<br><br>RESEARCH TRIANGLE INSTITUTE,<br>INTERNATIONAL and UNITY RESOURCES<br>GROUP, L.L.C.<br><br>                          Defendants. | Civil Case No. 1:08-cv-00595 (PLF)<br><br><br>Hon. Paul L. Friedman |

## DECLARATION OF PATRICK GAUL

PATRICK GAUL hereby declares, under penalty of perjury under the laws of the United States of America, as follows:

1.      I am the Financial Controller for Defendant Unity Resources Group Pte. Ltd., sued herein as Unity Resources Group, L.L.C. ("Unity"), and am based at Unity's offices in Dubai, United Arab Emirates. I make this Declaration on the basis of my personal knowledge, in support of Unity's motion to dismiss the complaint in this action (the "Complaint") for lack of personal jurisdiction.

2.      Unity is a corporation that is organized under the laws of Singapore, and has its principal offices in Dubai, United Arab Emirates.

3.      The contract documents pursuant to which Unity provides certain security services to Defendant RTI International ("RTI") in Iraq were executed by Unity in Dubai.

4.    Unity is not a party to the contract between RTI and the United States Agency for International Development ("USAID"). All of Unity's contacts with RTI were with RTI's office in North Carolina and Unity was never aware of where the RTI-USAID contract was signed.

5.    Unity is a member of the International Peace Operations Association (the "IPOA") and the Private Security Company Association of Iraq. By virtue of being a member of these trade associations, Unity is listed on their websites and in the IPOA journal. However, neither organization solicits business on behalf of Unity or any other individual member companies.

6.    Unity is registered as a U.S. Federal Government Central Contractor because any organization that may at some point wish to do business with the federal government must first be registered with the Central Contractor Registry. Such registration merely indicates that the registrant understands the U.S. federal government contracting system and has an awareness of the requirements that this entails. The contract that Unity has with RTI has nothing whatsoever to do with the Registry.

7.    Unity is licensed to do business in Iraq by the Iraqi Ministry of Trade and the Iraqi Ministry of the Interior, and by no governmental authorities of any other country.

8.    I have seen the Complaint, which is dated April 8, 2008, and which alleges that Unity says on its website that "Neil Marshall is their Americas contact." The "Americas" is of course simply a general reference to all of North and South America. When the Complaint in

2

this action was filed, Unity did not have any employee established as a "point of contact" in the District of Columbia.

9.    The Complaint further alleges that Mr. Marshall and other Unity executives "travel to Washington, DC to facilitate their business with the US government." No Unity executive, Mr. Marshall or otherwise, travels regularly to the District of Columbia to facilitate any business, let alone business with the United States government. In fact, prior to the filing of the Complaint, Unity executives had made only approximately a dozen trips through the District of Columbia (including trips where D.C. was used merely as a transit hub) in connection with business and client relations activities.

10.    David Rolfes is a part-time Unity independent contractor who, in the time since the Complaint was filed, has occasionally utilized non-private office space in the District of Columbia that Unity rents by the hour. Mr. Rolfes has never filled out a U.S. Form W-4 with respect to Unity or received a U.S. Form W-2 from Unity for U.S. income tax purposes. In fact, Unity does not even have a U.S. Tax I.D. Number.

11.    During 2007, Mr. Rolfes was involved in the generation of no more than approximately $200,000 in business, compared to Unity's overall revenue of approximately $57,000,000.00.

12.    Unity maintains no bank accounts in the District of Columbia or elsewhere in the United States.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on July 9, 2008.

_____
Patrick Gaul

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JALAL ASKANDER ANTRANICK,<br><br>                                    Plaintiff,<br><br>          -against-<br><br>RESEARCH TRIANGLE INSTITUTE,<br>INTERNATIONAL and UNITY RESOURCES<br>GROUP, L.L.C.<br><br>                                    Defendants. | Civil Case No. 1:08-cv-00595 (PLF)<br><br><br>Hon. Paul L. Friedman |

## <u>DECLARATION OF DAVID ROLFES</u>

DAVID ROLFES hereby declares, under penalty of perjury under the laws of the United States of America, as follows:

1.      I am an independent contractor who has performed certain services under a contract with Defendant Unity Resources Group Pte. Ltd., sued herein as Unity Resources Group, L.L.C. ("Unity"). I make this Declaration on the basis of my personal knowledge, in support of Unity's motion to dismiss the complaint in this action (the "Complaint") for lack of personal jurisdiction.

2.      I am not an employee of Unity. Since July 20, 2007, I have performed certain services for Unity as an independent contractor. In fact, I have never filled out a U.S. Form W-4 with respect to Unity or received a U.S. Form W-2 from Unity for U.S. income tax purposes. I file my tax returns as a self-employed person.

3.    I am paid a fixed monthly fee by Unity, and am eligible, pursuant to my contract, for bonuses based upon the business that I help to generate.

4.    I reside in the State of Maryland.

5.    The bulk of the time that I spend performing services for Unity is devoted to soliciting new business, which I do both within the District of Columbia and elsewhere. In addition, I spend a small portion of my time on client relations and client support activities. I have broad discretion with regard to how to perform my solicitation and business development efforts. In 2007, I was involved in the generation of no more than approximately $200,000 in business. To my knowledge, Unity has never received any payments or performed any security services in the District.

6.    Before the Complaint in this lawsuit was filed on April 8, 2008, Unity had entered into an arrangement with a company called Preferred Offices, whereby Unity is entitled to a fixed number of hours a month of use of non-private office space (the "Preferred Space") in the District of Columbia. Unity previously had leased dedicated space from Preferred Offices, but that arrangement ended before this lawsuit was filed. No Unity files or equipment are currently kept in the Preferred Space. I have only been to the Preferred Space once or twice since the beginning of April, 2008. Unity still maintains the D.C. office space address and a telephone number that forwards calls to my cell phone.

2

I declare under penalty of perjury under the laws of the United States of America
that the forgoing is true and correct.

Executed on July 9, 2008.

David Rolfes

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

JALAL ASKANDER ANTRANICK,

                                     Plaintiff,

                  -against-

RESEARCH TRIANGLE GROUP
INTERNATIONAL and UNITY RESOURCES
GROUP, L.L.C.,

                               Defendants.

Civil Case No. 1:08-cv-00595 (PLF)

Hon. Paul L. Friedman

**ORDER GRANTING MOTION TO
DISMISS THE COMPLAINT AS TO
DEFENDANT UNITY RESOURCES GROUP PTE. LTD.**

WHEREAS, this matter having come to be heard on the Motion of Defendant

Unity Resources Group Pte. Ltd. ("Unity"), sued herein as Unity Resources Group,

L.L.C., To Dismiss The Complaint for lack of personal jurisdiction, pursuant to Rule

12(b)(2) of the Federal Rules of Civil Procedure; and

WHEREAS, all parties having had the opportunity to respond to Unity's

motion, and the Court having considered all the arguments of the parties and their

counsel;

IT IS HEREBY ORDERED that Unity's motion is granted, and the Complaint

is dismissed as to Unity pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure

on the ground that the Court lacks personal jurisdiction over Unity.

Dated:        _____, 2008

                                        _____

                                           Hon. Paul L. Friedman, U.S.D.J.