# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

_____
                                              )
**Jalal Askander**                            )
                                              )
    **Plaintiff,**              )
                                              )
      **v.**             )
                                              )
**Research Triangle Institute, International** )    **Civil Action No. 08-595 (PLF)**
                                              )
    **and**                    )
                                              )
**Unity Resources Group, L.L.C.**             )
                                              )
    **Defendants.**            )
_____)


## PLAINTIFF'S OPPOSITION TO DEFENDANT
## RESEARCH TRIANGLE INSTITUTE'S MOTION TO DISMISS


Paul Wolf
P.O. Box 11244
Washington, D.C. 20008-1244
Phone: (202) 674-9653
Fax: (202) 364-6188

*Attorney for Jalal Askander*


July 26, 2008

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ……………………………………………………… iv.

STATEMENT OF FACTS ……………………………………………….……… 1

SUMMARY OF ARGUMENT …………………….............................................. 2

STANDARD OF REVIEW …………………………………………….……… 3

ARGUMENT …………………………………………………………….……… 3

I.    THE PLAINTIFF IS THE EXECUTOR OF HIS DAUGHTER'S
      ESTATE, WHICH WAS ALREADY PROBATED IN IRAQ AND
      CONTAINS NO PROPERTY IN THE DISTRICT OF COLUMBIA. ….….. 3

II.   DEFENDANT RTI CAN BE HELD LIABLE FOR UNITY
      RESOURCE GROUP'S ACTS. ......……………………………………… 4

      A.    RTI is directly liable for its own negligence in hiring and
            supervising Unity Resources Group.…………………..................... 4

      B.    RTI is indirectly liable for URG's torts, due the nature of their
            relationship and the nature of RTI's activities in Iraq. ...................... 5

      C.    The <u>mens rea</u> for aiding and abetting is knowledge, not intent.……… 9

III.  PLAINTIFF'S FIRST CAUSE OF ACTION (ALIEN TORT
      STATUTE) SHOULD NOT BE DISMISSED. ……………………….….. 12

      A.    <u>Tel Oren</u> provides the methodology for evaluating Plaintiff's
            ATS claims. ..................................................................................... 12

      B.    State action may be imputed to RTI "under color of law." …....…… 14

      C.    International law attributes individual liability for war crimes,
            so state action need not be shown. …………...…………………..... 18

      D.    Plaintiff's claims of murder, directing an attack on civilians, and
            extrajudicial execution are "universal, specific, and obligatory"
            in international law, and therefore actionable under the ATS. .……. 23

IV.   PLAINTIFF'S SECOND CAUSE OF ACTION (TORTURE
      VICTIMS' PROTECTION ACT) SHOULD NOT BE DISMISSED. ….....… 28

A.      The TVPA applies to corporations. ……………………………....  28

B.      In the context of command responsibility and a pattern of
         indiscriminate brutality known to result in deaths, this
         incident rises to the level of an "extrajudicial killing." ...………....  33

V.      THIS CASE SHOULD NOT BE TRANSFERRED TO THE
         EASTERN DISTRICT OF NORTH CAROLINA. ………………………  34

CONCLUSION …………………………………………………………….....  37

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
     416 F.3d 1242 (11th Cir. 2005) ……………………………………………   30

\* *Beanal v. Freeport-McMoRan, Inc.*,
     969 F.Supp. 362 (E.D.La. 1997) …………………………………… 15-17, 29

*Beattie v. U.S.*,
     56 F.2d 91 (D.C. Cir. 1984) ......................................................................   35

*Bigio v. Coca-Cola*,
     239 F.3d 440 (2nd Cir. 2000) …………………………………………..   29

*Blum v. Yaretsky*,
     457 U.S. 991 (1982) ……………………………………………………   16

*Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n.*,
     531 U.S. 288 (2001) ……………………………………………………   15

*Burton v. Wilmington Parking Authority*,
     365 U.S. 715 (1961) ……………………………………………………   15

*Cabello v. Fernández Larios*,
     402 F.3d 1148 (11th Cir. 2005) …………………………………………   11

*Caribbean Broad. Sys., v. Cable & Wireless PLC*,
     148 F.3d 1080 (D.C. Cir. 1998) …………………………………….....   6

*Clinton v. New York*,
     524 U.S. 417 (1998) …………………………………………………..   32-33

*Conley v. Gibson*,
     355 U.S. 41 (1957) …………………………………………………….   3

*Daskalea v. D.C.*,
     227 F.3d 433 (D.C. Cir. 2000) …………………………………………   5

*DeLoach v. Philip Morris Co., Inc.*,
     32 F.Supp.2d 22 (D.D.C. 2000) ..................................................................   35

*Dennis v. Sparks,*
    449 U.S. 24 (1980) ……………………………………………… 15

*Doe v. Qi,*
    349 F.Supp.2d 1258 (N.D.Cal. 2004) …………………………………….. 27

*Doe v. Rafael Saravia,*
    348 F.Supp.2d 1112 (E.D.Cal. 2004) …………………………………… 27

*Doe I v. Exxon Mobil Corp.,*
    393 F. Supp. 2d 20 (D.D.C. 2005) …………………………………….... 30

*Doe I v. Unocal Corp.,*
    395 F.3d 932 (9th Cir. 2002) ……………………………………….. 11, 27

*Estate of Rodriquez v. Drummond Co., Inc.,*
    256 F.Supp.2d 1250 (N.D.Ala. 2003) …………………………………... 30

*Evans v. Newton,*
    382 U.S. 296 (1966) ……………………………………………… 16

* *Filartiga v. Peña Irala,*
    577 F.Supp. 869 (E.D.N.Y. 1984) …………………………………. 13, 14

*Flatow v. Islamic Republic of Iran,*
    999 F.Supp 1 (D.D.C. 1998) ……………………………………… 33

* *Forti v. Suarez Mason,*
    672 F.Supp. 1531 (N.D. Cal. 1987) …………………………………... 34

*Gallagher v. "Neil Young Freedom Concert,"*
    49 F.3d 1442 (10th Cir. 1995) …………………………………...... 15-17

*Gordon v. Phoenix Ins. Co.,*
    339 F.Supp. 241 (D.C.Mass. 1972) ................................................. 7

* *Haberstam v. Welch,*
    705 F.2d 472 (D.C. Cir. 1983) ………………….......................... 12

*Hilao v. Estate of Marcos,*
    103 F.3d 767 (9th Cir. 1996) ……………………………………… 34

*Hudgens v. N.L.R.B.,*
    424 U.S. 507 (1976) ……………………………………………... 16

*Ibrahim v. Titan Corp.*,
    391 F.Supp.2d 10 (D.D.C. 2005) ……………………………………….. 14

*In re Agent Orange Product Litigation*,
    373 F. Supp. 2d 7 (E.D.N.Y. 2005) …………………………………….. 30

*In re Estate of Marcos Human Rights Litigation*,
    94 F.3d 539 (9th Cir. 1996) ......................................................... 27

*In re Yamashita*,
    327 U.S. 1 (1946) …………………………………………………… 20, 24

*Jackson v. Metropolitan Edison Co.*,
    419 U.S. 345 (1974) ………………………………………………… 15

\* *Kadic v. Karadzic*,
    70 F.3d 232 (2nd Cir. 1995) ……………………………… 14, 18-20, 27, 34

*Marsh v. Alabama*,
    326 U.S. 501 (1946) ………………………………………………….. 16

*Metropolitan Life Ins. Co. v. Ward*,
    470 U.S. 869 (1985) …………………………………………........ 32

*Moose Lodge No. 107 v. Irvis*,
    407 U.S. 163 (1972) ………………………………………………….. 15

*Mujica v. Occidental Petroleum*,
    381 F. Supp. 2d 1164 (C.D. Cal. 2005) …………………………………… 30

*Parker v. District of Columbia*,
    850 F.2d 708 (D.C. Cir. 1988) …………………………………………… 5

*Paul v. Avril*,
    901 F.Supp. 330 (S.D.Fla.1994) ……………………………….......... 34

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    244 F. Supp. 2d 289  (S.D.N.Y. 2003) …………………………… 11, 28, 29

*Reiffen v. Microsoft Corporation*,
    04 F.Supp.2d 51 (D.D.C. 2000) ................................................... 35

*Rendell-Baker v. Kohn*,
    457 U.S. 830 (1982) ………………………………………………… 16

*Saleh v. Titan Corp.*,
    436 F.Supp.2d 55 (D.D.C. 2006) …………………………………………… 14

\* *Sanchez Espinoza v. Reagan*,
    770 F.2d 202 (D.C. Cir. 1985) …………………………………………… 13

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974) ……………………………………………………… 6

*Sims v. Jefferson Downs Racing Ass'n*,
    778 F.2d 1068 (5th Cir.1985) ……………………………………............ 15

*Sinaltrainal v. Coca-Cola*,
    256 F. Supp. 2d 1345 (S.D. Fl. 2003) …………………………………… 30

\* *Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) …………………………………………………… 24, 27

*Stapleton v. Butensky*,
    188 App.Div. 237, 177 N.Y.S. 18 (1919) ..................................................... 7

\* *Tel Oren v. Libyan Arabic Republic*,
    726 F.2d 774 (D.C. Cir. 1984) ………………………………… 13-14, 18

*The Paquete Habana*,
    175 U.S. 677 (1900) ……………………………………………………… 28

*U.S. v. Aimone*,
    715 F.2d 822 (3d Cir. 1983) ……………………………………………… 32

*U.S. v. Blinder*,
    10 F.3d 1468 (9 Cir. 1993) ……………………………………………… 32

*U.S. v. Cooper*,
    91 F. Supp. 2d 60 (D.D.C. 2000) ……………………………................... 32

*U.S. v. Middleton*,
    231 F.3d 1207 (9 Cir. 2000) ……………………………………………… 32

*U.S. v. Smith*,
    18 U.S. 153 (1820) ……………………………………………………... 23

*U.S. v. Thevis*,
    665 F.2d 616 (5th Cir. 1982) ……………………………………………... 32

*U.S. v. Turkette*,
    452 U.S. 576 (1981) ……………………………………………………… 32

*Williams v. United States*,
    396 F.3d 412 (D.C. Cir. 2005) …………………………………………… 15

*Wiwa v. Royal Dutch Petroleum Co.*,
    226 F.3d 88 (2nd Cir. 2000) ……………………………………………… 28

*Xuncax v. Gramajo*,
    886 F.Supp. 162 (D.Mass.1995) ……………………………………….... 27, 34

## FEDERAL STATUTES

10 U.S.C. § 950v (Military Commissions Statute) ................................................... 26

18 U.S.C. § 2441 (1996) (War Crimes Statute) …………………………… 9, 20, 26

18 U.S.C. 2331(4)(C) (1991) (Antiterrorism Statute) ............................................ 20

28 USC. § 1350 (Alien Tort Statute) …………………………………………… 14, 33

28 USC. § 1391 (venue) …………………………………………………………… 34

28 USC. § 1404 (transfer of venue) ...……………………………………………… 34-35

## STATE STATUTES

D.C. Code § 20-341(a) …………………………………………………………….. 3

## INTERNATIONAL AUTHORITIES

*Prosecutor v. Clément Kayishema and Obed Ruzindana*,
    ICTR Case No. ICTR-95-1-T, 21 May 1999 (Trial Chamber) ................. 21

*Prosecutor v. Jean-Paul Akayesu*,
    ICTR Case No. ICTR 96-4-A, 1 June 2001 (Appeals Chamber) .............. 21

*The Prosecutor v. Laurent Semanza*,
    ICTR Case No. ICTR-97-20-T, May 15, 2003 (Trial Chamber) .............. 22

*Prosecutor v. Furundzija*,
    ICTY Case No. IT-95-17/1-T (Trial Chamber Dec. 10, 1998) ………… 9-11

*Prosecutor v. Tadic*,
ICTY Case. No. IT-94-1-T (Trial Chamber May 7, 1997) ……………… 10

*Trial of Bruno Tesch and Two Others*,
reported in 1 LAW REPORTS OF TRIALS OF WAR CRIMINALS
93 (Brit. Mil. Ct. 1947) ...…………………………………………….. 10

*U.S. v. Friederich Flick*,
in 6 TRIALS OF WAR CRIMINALS BEFORE THE NUREMBERG
MILITARY TRIBUNALS UNDER CONTROL COUNCIL LAW
NO. 10, pp. 1217, 1222 (1947) ………………………………………… 10

* Convention Relative to the Protection of Civilian Persons in Time
of War, Aug. 12, 1949, 75 U.N.T.S. 287 [4th Geneva Convention] ….. 9, 20, 24, 25

Protocol Additional to the Geneva Conventions of 12 August 1949, and
Relating to the Protection of Victims of Non-International Armed Conflicts
(Protocol II), Adopted on 8 June 1977 ........................................................... 24, 26

Rome Statute of the International Criminal Court, United Nations Diplomatic
Conference of Plenipotentiaries on the Establishment of an International
Criminal Court, July 17, 1998, art. 25(3), U.N. Doc. A/ CONF.183/9 (1998) ..... 10

Statute of the International Criminal Tribunal for the Former Yugoslavia
(May 25, 1995) ........................................................................................ 9, 10, 23

Statute of the International Tribunal for Rwanda (Nov. 8, 1994) .............. 10, 21-23

## OTHER AUTHORITIES

Black's Law Dictionary (6th ed.1990) ……………………………………… 31, 32

Webster's Third New International Dictionary (1986) …………………………. 32

Restatement (Third) of Foreign Relations of the United States (1987) .. 14, 17-19, 24

U.S. Dept of State, *Treaties in Force* (2008) ……………………………………. 24

U.S. Army Basic Field Manual, Vol. VII, Part II, Rules for Land Warfare,
GPO (1934) ……………………………………………………………………… 26

Coalition Provisional Authority Order Number 17 ……………………………... 35

Breach of Neutrality, 1 Op. Att'y Gen. 57, 59 (1795) …………………………... 19

Prosser, Law of Torts (4th ed. 1971) ........................................................  8

Harper & James, The Law of Torts (1956) .............................................  8

Oppenheim's International Law, Ninth Edition, Sir Robert Jennings and Sir
Arthur Watts, eds., (1992) ……………………………………………....  24

Prosser, Joint Torts and Several Liability, 25 Calif.L.Rev. 413 (1937) .................  8

Posner, Oligopoly and the Antitrust Laws: A Suggested Approach,
21 Stan.L.Rev. 1562 (1969). ...................................................................  8

Michael J. Matheson, *The U.S. Position on the Relation of Customary
International Law to the 1977 Protocols Additional to the 1949 Geneva
Conventions*, 2 Am. U. J. int'l L. & Pol'y 419, 430-31 (1987) …………………...  24

"Private Security Contractors at War: Ending the Culture of Impunity,"
Human Rights First (January 2008). …………………………………………  21, 33

S. Rep. No. 102-249 (1991) …………………………………………………..  29, 31

137 Cong. Rec. S1369-01 …………………………………………………  31

F.R.C.P. 12 (g) & (h) ...............................................................................  35

## STATEMENT OF FACTS

Genevia Jalal Antranick, a passenger in a car in downtown Baghdad, was brutally murdered by Defendant Research Triangle Institute's ("RTI") security guards last year, as was the driver of the vehicle. Her father and sole legal heir, Jalal Askander, seeks to hold RTI, and its security company, Unity Resources Group ("URG"), liable for the incident in D.C. District Court. He alleges aiding and abetting violations of international law under the Alien Tort Statute ("ATS") and Torture Victim Protection Act ("TVPA"), and related state tort claims arising from the incident. Choice of laws has not yet been briefed.

The driver of the vehicle, Marani Awanis Manook, was also killed in the hail of machine gun fire. Ms. Manook's estate brought suit on February 8th of this year, making similar claims to those of Mr. Askander. (1:08-cv-00096 (PLF) Plaintiff Askander did not file the instant lawsuit until two months later. He was reluctant to file suit because his other daughter is still in Iraq, waiting for a U.S. visa, and fears retaliation. However, the Plaintiff desires to be heard on the same issues to be decided in the Manook case, and as motions to dismiss have already been briefed in that case, he could no longer wait to file. While the staggered starts may have helped Plaintiff avoid several minor disputes that arose in the Manook case over service of process and when to brief choice of laws, Defendant has also benefitted, as it has made substantially different arguments in the second go-around. Now that the cases are in sync, joinder and a consolidated briefing schedule are in order.

## SUMMARY OF ARGUMENT

Defendant RTI is liable for aiding and abetting in the murder of Plaintiff's daughter in Iraq because RTI was acting under color of state law in its work to reorganize the Iraqi government. Since RTI's work in Iraq is part of a broader counterinsurgency program, the murder of Plaintiff's daughter was closely related to the hostilities, and was a war crime.

RTI is also liable under the Torture Victim Protection Act. The TVPA applies to corporations because Congress intended it to have the broadest possible application. The death of Plaintiff's daughter is properly characterized as an "extrajudicial killing" within the meaning of the TVPA because it was part of a documented pattern of indiscriminate violence perpetrated by private military contractors against Iraqi civilians.

While the application of the laws of war in District Court may be unusual, Plaintiff's state law claims for wrongful death, negligent hiring and supervision, negligence in failing to rescue, and assault and battery are quite ordinary. Plaintiff has alleged facts sufficient to show an agency, employer/employee, or joint venture relationship between defendants RTI and Unity Resources Group, such that RTI is liable for URG's torts. And in any event, RTI cannot delegate its duties with respect to its activities in Iraq, which are inherently dangerous.

Finally, no good purpose would be served by forcing the Plaintiff to open a local estate, or by curtailing the Court's discretion to grant equitable or declaratory relief at this early juncture. Defendant has not met its burden to overcome Plaintiff's choice of forum, so neither should the case be transferred to North Carolina. Should the court find any of Plaintiff's claims to be "conclusionary", the proper remedy is an order for a more definite

statement, not dismissal of the case.  For these reasons, the Court should deny Defendant

RTI's Motion to Dismiss, Strike and Transfer Plaintiff's claims.

## STANDARD OF REVIEW

Defendant filed its Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (6).

In opposing a dismissal motion, Plaintiffs' allegations of fact must be taken as true, and

construed in the light most favorable to them.  See, e.g., Conley v. Gibson, 355 U.S. 41,

45-46 (1957).  Moreover, "[a] complaint should not be dismissed for failure to state a

claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support

of his claim ..." Id.  Accordingly, Defendant's attempts to argue for competing factual

inferences in the context of its own dismissal motion is improper. See, e.g., Shear v.

National Rifle Ass'n of America, 606 F.2d 1251, 1253 (D.C. Cir. 1979).

## ARGUMENT

**I.    The Plaintiff is the executor of his daughter's estate, which was already probated in Iraq and contains no property in the District of Columbia.**

Defendant seeks to dismiss this action because no estate was opened for the

decedent in the District of Columbia.  However, this is not required by D.C. law and

Defendant has not identified any purpose it would serve.  Section 20-341(a) of the D.C.

Code states that "a foreign personal representative is appointed to administer the estate of

a decedent not domiciled in the District of Columbia but which as property located here."

The decedent in this case, Genevia Jalal Antranick, had no property here when she died

and her estate has already been probated in Iraq.  Rather than requiring a local estate be

opened, the court should recognize the judgment of the Iraqi court.

Defendant argues that the instant litigation constitutes property, citing cases where pending legal claims have been held to constitute property for the purpose of probate proceedings. However, the cited cases refer to contemporaneous litigation. Defendant's theory that litigation occurring subsequent to probate proceedings requires the opening of another estate, because the new litigation itself constitutes property, appears to be a novel one. It is a collateral attack on the judgment of the Iraqi court.

Unless the Defendant has some basis to question the Iraqi proceedings, it would be wasteful and futile to open a local estate. Both the Plaintiff and his daughter Ms. Antranick were unmarried at the time of her death, and Ms. Antranick had no children. The Iraqi court found that no other heirs existed. The Defendant hasn't suggested that any error was made in the Iraqi proceedings or that any other legal heirs might exist.

Nevertheless, should the Court find that an estate must be opened in the District of Columbia, Plaintiff respectfully requests an order to this effect, rather than dismissing the action and forcing the Plaintiff to start all over again. The court has discretion to retain jurisdiction while an estate is opened, and it would be in the interest of judicial economy to do so.

## II.     RTI can be held liable for Unity Resource Group's acts.

### A.     RTI is directly liable for its own negligence in hiring and supervising Unity Resources Group.

Defendant RTI had its own duty to Ms. Antranick regarding its hiring and supervising of Unity Resources Group. It breached its duty, knew of the risk of harm it was creating, and this was the proximate cause of Ms. Antranick's death. Count Four of the Complaint, ¶¶ 76-84. Defendant does not try to argue otherwise.

Allegations have been made that Defendant RTI was on notice of other, similar incidents, including Unity Resources Group's murder of Professor Kays Juma and shooting of another individual on June 24, 2007, while in the employ of RTI. Complaint ¶ 8. Yet RTI failed to take remedial action. Failing to take appropriate measures once the violations became clear is itself a basis for liability. See, e.g., Parker v. District of Columbia, 850 F.2d 708, 712 (D.C. Cir. 1988); Daskalea v. D.C., 227 F.3d 433, 441 (D.C. Cir. 2000). This direct liability is in addition to any indirect liability Defendant RTI may have with regard to Defendant URG's hiring of its own employees.

**B.     RTI is indirectly liable for URG's torts due the nature of their relationship and the nature of RTI's activities in Iraq.**

Defendant RTI argues that it is not liable for Unity Resource Group's torts because a prime contractor is not liable for its subcontractor's negligence.[1] Def's Motion to Dismiss at 9. But the fact that Unity Resources Group was a subcontractor to RTI under a USAID contract is not dispositive of their relationship and does not absolve RTI of liability. Parties in a contractual relationship may still conspire, operate as joint venturers, or have an employer to employee / agent relationship, despite how it is labeled. This is why, in every count of Plaintiff's Complaint, he refers to Defendant's "agents and/or employees" or "agents or employees."

The RTI-URG relationship is one to be proven by facts ascertained in discovery and at trial. Plaintiff should be permitted to have discovery on the nature and scope of this relationship. This could be shown by written agreements, communications between

---

[1] Defendant does not address the issue of a prime contractor's liability for its subcontractor's intentional torts. Plaintiff has alleged a closer relationship, and notes that where an intentional tort occurs as a natural incident to the carrying out of an employer's business, or if any benefit may be found running to the employer, courts tend to hold the employer liable.

the parties, depositions, and other evidence of their working relationship. "After all, the issue presented by a motion to dismiss is 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" Caribbean Broad. Sys., v. Cable & Wireless PLC, 148 F.3d 1080, 1086 (D.C. Cir. 1998) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

The single most important factor in determining whether the parties are independent contractors is whether the principal has the right to control how the person performs their tasks. See, e.g., Community for Creative Non-Violence v. Reid, 490 U.S. 730 (1989). Plaintiff has alleged that RTI either provided, or agreed with URG on the rules of engagement and other security procedures to be used; it exercised control over the operative details of the actions taken by URG, including control over the resources, property, funding and equipment used; it had the authority to supervise, prohibit, control, and/or regulate URG so as to prevent this incident from occurring; and it certainly had the ability to suspend the duties of URG after the murder of Kays Juma and the other alleged shooting by URG, until corrective measures were taken.

The characterization of the relationship by the parties is signficant, but other factors to consider include the extent of URG's non-RTI business, the period of employment (a longer relationship between the parties pointing towards respondeat superior), the basis of compensation (whether in the cost-plus-fixed-fee contract, URG's hours are billed directly to USAID), whether RTI provided URG with the money to buy special weapons and vehicles for its work in Iraq, and the fact that URG was hired to perform an act in furtherance of RTI's business. Another fact to be ascertained is whether RTI's insurance covers URG's torts, which would tend to show the parties' own

understanding of their legal duties. Also, whether RTI listed URG employees in its phone directories, included URG personnel in its meetings, and so on, will be relevant. These are all discovery issues.

RTI and URG both had actual knowledge of the murder of Kays Juma and the shooting of the other individual on June 24, 2007 by URG while in RTI's employ, as well as the highly-publicized Blackwater incident just four weeks before. RTI and URG collected and shared this knowledge, and made joint and cooperative decisions, acting in concert to continue their business as usual, despite the prior incidents. Complaint at ¶¶ 53, 68, 72, 80-81. This allegation suffices to show either joint venture, enterprise liability, or civil conspiracy. Conspiracy requires an agreement, and in most states, either an overt act or omission. The failure of RTI and URG to take corrective measures after prior incidents is both evidence of an agreement and an overt omission.

Finally, even if their relationship is one of independent contractors, RTI cannot delegate its liability for acts that are of an inherently dangerous nature. Some activities are dangerous in spite of all reasonable care, and strict liability is imposed. See, e.g., Gordon v. Phoenix Ins. Co., 339 F.Supp. 241 (D.C.Mass. 1972) (blasting); Stapleton v. Butensky, 188 App.Div. 237, 177 N.Y.S. 18 (1919) (keeping dangerous animals). RTI's creation of new local governments in a country ravaged by war is inherently dangerous. If RTI's work wasn't inherently dangerous, its employees wouldn't need to travel in convoys of armored vehicles with guards with automatic weapons. And its guards wouldn't kill innocent people for fear of car bombs.

Joint liability has been traditionally imposed on multiple defendants who exercise collective control over a risk-creating activity. Joint or vicarious liability has also been

imposed on the most strategically placed participants in a risk-creating process, even though injuries are caused "directly" or partially by other participants under their general supervision.  Enterprise liability is also apparent in the long line of cases imposing joint and vicarious liability on owners, employers and manufacturers for breach of "non-delegable duties", or for miscarriage of "inherently dangerous activities" by their contractors, employees, and distributors. <u>See</u> Prosser, Law of Torts § 71 at 470-74 (4th ed. 1971) (collecting cases).

Plaintiff has alleged that each defendant has done something to cause the death of Plaintiff's daughter, although it cannot be demonstrated "that any one defendant was responsible for the entire injury or any specified part of it." 1 Harper & James, The Law of Torts § 10.1 at 708 (1956).  That is, both defendants have been negligent in hiring and supervising their employees, and both failed to take remedial measures after at least one prior homicide and a second shooting.  This parallel behavior also supports an inference of a tacit agreement or cooperation.  Such cooperation has the same effects as overt joint action, and is subject to joint liability, joint venturers, and civil conspiracy for the same reasons. Prosser, Joint Torts and Several Liability, 25 Calif.L.Rev. 413, 430 (1937); Posner, Oligopoly and the Antitrust Laws: A Suggested Approach, 21 Stan.L.Rev. 1562, 1576-78 (1969).

These secondary liability theories, including agency, <u>respondeat superior</u>, joint venturers, civil conspiracy, and joint and several liability, apply to the state tort claims made in Counts 3-7 of the Complaint (wrongful death, negligent hiring and supervision, negligence in failing to rescue, assault and battery, and negligent infliction of emotional

distress).  Indirect liability for violations of international law (Counts 1-2) is evaluated using standards in international criminal law.

### C.    The <u>Mens Rea</u> for Aiding and Abetting is Knowledge, Not Intent.

Aiding and abetting liability applies to criminal acts, which fall under the ATS and TVPA.  The acts committed in this case fit the definitions of murder, directing an attack on civilians, and summary execution, all of which are war crimes.[2]  Because they are criminal acts, courts apply criminal standards for accomplice liability, rather than civil concepts of agency, <u>respondeat superior</u>, and so on.  Like the definitions of the crimes themselves, the standards for accomplice liability originate in international law.

The <u>mens rea</u> requirement for aiding and abetting liability is knowledge, not intent.  The most frequently cited formulation of aiding and abetting liability comes from the proceedings of the International Criminal Tribunal for the former Yugoslavia (ICTY).  In <u>Prosecutor v. Furundzija</u>, the ICTY surveyed 50 years of international law, concluding that the customary law standard for aiding and abetting contains the following elements: the <u>actus reus</u> (required conduct) of practical assistance, encouragement, or moral support, which has a substantial effect on the perpetration of human rights crimes; and the <u>mens rea</u> (required mental state) of knowledge that one's acts would contribute to the commission of such abuses.[3]  Cases reviewed by the ICTY date back to the Nuremburg

---

[2] A war crime is any serious violation of the laws of war, as set forth in Common Article 3 of the Geneva Conventions.  War Crimes Act, 18 U.S.C. § 2441 (1996)

[3] <u>Prosecutor v. Furundzija</u>, ICTY Case No. IT-95-17/1-T (Trial Chamber Dec. 10, 1998), ¶¶ 191, 232-235, 243.  The standard was reiterated in <u>Prosecutor v. Blagojevic and Jokic</u>, ICTY Case No. IT-02-60 (Trial chamber Jan. 17, 2005) ¶ 726.  Note also that the Statutes of the International Criminal Court (ICC), the International Criminal Tribunal for the former Yugoslavia (ICTY), and the International Criminal Tribunal for Rwanda (ICTR) each impose liability on individual defendants for aiding and abetting the commission of a crime. Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, July 17, 1998, art. 25(3), U.N. Doc. A/ CONF.183/9 (1998); ICTY Statute at 7(1); ICTR at 6(1).

Tribunals.  In one Nuremberg case, corporate employees were convicted of aiding and abetting for selling poisonous gas to concentration camps with the knowledge that it would be used to commit mass murder, despite the fact that they had no control over the manner in which the gas was used.[4]  In another, a defendant was found liable for a slave labor program initiated and operated by the Nazis, after he ordered increased production with the awareness that slave labor would be used to meet the higher quotas, even though he did not "exert any influence or [take] any part in the formation, administration, or furtherance of the slave-labor program."[5]  The Nuremberg Tribunal established that he who "knowingly by his influence and money contributes to the support thereof must … be deemed to be, if not a principal, certainly an accessory to such crimes."[6]  Considering the Nuremberg precedents and decades of international law, the ICTY in Furundzija held that knowledge was the appropriate mens rea, expressly rejecting the idea that an aider and abettor must intend that the human rights abuse occur.[7]

U.S. courts consistently rely on the Furundzija formulation.  A detailed discussion of the elements of aiding and abetting liability under the ATS can be found in the Ninth Circuit's decision in Doe I v. Unocal Corp., 395 F.3d 932 (9th Cir. 2002).  The 9th Circuit adopted the Furundzija standard for aiding and abetting, finding that it reflected customary international law, and ruled that Unocal could be held liable for aiding and abetting the Burmese military, which had used slave labor to assist Unocal in building an

---

[4] Trial of Bruno Tesch and Two Others, reported in 1 LAW REPORTS OF TRIALS OF WAR CRIMINALS 93 (Brit. Mil. Ct. 1947).
[5] U.S. v. Friederich Flick, in 6 TRIALS OF WAR CRIMINALS BEFORE THE NUREMBERG MILITARY TRIBUNALS UNDER CONTROL COUNCIL LAW NO. 10, pp. 1217, 1222 (1947)
[6] Id.
[7] Furundzija, supra, ¶ 252; see also Prosecutor v. Tadic, ICTY Case. No. IT-94-1-T (Trial Chamber May 7, 1997) ¶¶ 691-692 (holding that the "accused will be found criminally culpable for any conduct where it is determined that he knowingly participated in the commission of an offence that violates international humanitarian law.")

oil pipeline.  <u>Unocal</u>, 395 F.3d. at 949.  The court found that "it is not necessary for the accomplice to share the <u>mens rea</u> of the perpetrator, in the sense of positive intention to commit the crime"; "it is not even necessary that the aider and abettor knows the precise nature of the crime that the principal intends to commit"; rather, if the accused "is aware that one of a number of crimes will probably be committed, and one of those crimes is in fact committed, he has intended to facilitate the commission of that crime, and is guilty as an aider and abettor."  <u>Id</u>. at 950-951.

Another formulation can be found in <u>Cabello v. Fernández Larios</u>, 402 F.3d 1148 (11th Cir., 2005).  In order to find Fernández indirectly liable for aiding and abetting, the plaintiffs needed to prove "active participation" by a preponderance of the evidence.  In assessing "active participation," the jury was instructed to consider if (1) one or more of the wrongful acts that comprised the claim were committed; (2) the defendant substantially assisted someone who personally committed or caused one or more of the wrongful acts that comprised the claim; and (3) that the defenant knew that his actions would assist in the illegal or wrongful activity at the time he provided the assistance. <u>Cabello</u> 402 F.3d at 1157.

At the District Court level, frequently cited cases include <u>Presbyterian Church of Sudan v. Talisman Energy, Inc.</u>, 244 F. Supp. 2d 289, 324 (S.D.N.Y. 2003) ("Some knowledge that the assistance will facilitate the crime is necessary.") and <u>Mehinovic v. Vuckovic</u>, 198 F.Supp.2d 1322, 1355 n. 67 (N.D.Ga. 2002) (aider and abettor need not "share the same wrongful intent as the principal.  Rather, it is sufficient that the accomplice knows that his or her actions will assist the perpetrator in the commission of the crime").

This is also the law in the D.C. Circuit with respect to municipal crimes. Aiding and abetting does not require specific intent: it requires knowledge. Haberstam v. Welch, 705 F.2d 472, 477-478 (D.C. Cir. 1983) (imposed liability due to years of general assistance to a burglar, and liability for murder that occurred in the course of a burglary because "it was a natural and foreseeable consequence of the activity Hamilton [undertook]").

Defendant RTI was on notice of prior incidents by URG personnel in its employ, including the murder of Professor Kays Juma at a security checkpoint in Baghdad last year, and another civilian shot by URG in the same Karada neighborhood on June 24, 2007, as well as the highly publicized Blackwater incident just a few weeks before. Yet RTI took no remedial action to prevent further killings and continued to provide substantial assistance to URG in the form of money and direction, knowing that these killings and shootings would probably continue. They were natural and foreseeable consequences of the activities URG undertook. This satisfies any requirement there may be that the required mental state must be contemporaneous with the crime committed.

**III.    Plaintiff's first cause of action (Alien Tort Statute) should not be dismissed.**

**A.    Tel Oren provides the methodology for evaluating Plaintiff's ATS claims.**

In this Circuit, the precedent ATS cases are Sanchez Espinoza v. Reagan, 770 F.2d 202 (D.C. Cir. 1985), and Tel Oren v. Libyan Arabic Republic, 726 F.2d 774 (D.C. Cir. 1984). In Sanchez Espinoza, Nicaraguan victims sued several U.S. officials for torts resulting from America's provision of weapons to an insurgent group known as the

Contras. Then-Judge Antonin Scalia didn't leave the Court much to work with when he held that "we conclude that this also does not reach private, non-state conduct of this sort for the reasons stated by Judge Edwards in Tel-Oren v. Libyan Arab Republic, 726 F.2d at 791-96 (Edwards, J., concurring)."[8] Sanchez Espinoza at 207.

Judge Edwards' 22 page analysis in Tel Oren, cited by Judge Scalia, begins by distinguishing purely private conduct from conduct occuring under color of state law:

> Confusion arises because the term "individual liability" denotes two distinct forms of liability. The first, now well-implanted in the law of nations, refers to individuals acting under color of state law. … The second, currently less-established meaning addresses the responsibility of individuals acting separate from any state's authority or direction. … That the defendant in Filartiga was an official, not the state itself, placed him squarely within the first meaning. In contrast, in the case before us, the second formulation of individual liability is at issue.

Tel Oren, 726 F.2d at 793. (citing Filartiga v. Peña Irala, 577 F.Supp. 869 (E.D.N.Y. 1984) Judge Edwards first inquired whether an "under color of law" analysis was applicable, and concluded it was not. Under the facts of Tel Oren, the Palestinian Liberation Organization was not acting under color of any state law when it tortured various people in Israel.[9] A few pages later, Judge Edwards explains that even when not acting under color of state law, private entities may violate the law of nations if they commit a crime to which the law of nations attributes individual responsibility:

---

[8] Sanchez Espinoza was not really about private conduct. The thrust of the case was sovereign immunity. Plaintiffs also alleged that the conduct was outside scope of the U.S. officials' employment - hence the cursory dismissal of this claim by Judge Scalia.

[9] Although claims were brought for both torture and "murder amounting to summary execution," Judge Edwards only considered the torture claim in his lengthy opinion. He reasoned that "by definition, summary execution is 'murder conducted in uniform,' as opposed to lawful, state-imposed violence, Blum & Steinhardt, supra, at 95, and would be inapplicable here." Tel Oren 726 F.2d at 791 n 20. This tiny footnote was not the "holding" for which this opinion is cited, and its vagueness unfortunately clouds Judge Edwards' cogent analysis of the torture claim. From the opinion, it's not clear to what extent the "murder amounting to summary execution" claim was briefed by the litigants. It seems likely they framed their case primarily as a torture case because that was the successful theory in Filartiga.

> Even in the truly private arena there is support for the concept of individual responsibility. Inferences from case law suggest that courts over the years have toyed with the notion of truly individual liability both under section 1350 and more generally. Section 1350 case law, unfortunately, is sparse. … It is worthwhile to consider, therefore, whether torture today is among the handful of crimes to which the law of nations attributes individual responsibility. Definitions of torture set out in international documents suggest it is not.

Tel Oren, 726 F.2d at 795. Because he found no state action could be imputed under color of law, Judge Edwards looked to U.S. case law, and then to international law to determine whether the law of nations attributed individual responsibility for the crime he considered in his case, which was torture.[10] This is precisely the analysis Plaintiff asks this Court to use.

**B.     State action may be imputed to RTI "under color of law."**

First, the Court should evaluate whether state action can be imputed to RTI through the same "under color of law" analysis applicable to claims asserted under 42 U.S.C. § 1983. Kadic, 70 F.3d at 245; Forti v Suarez-Mason, 672 F.Supp 1531, 1545 (ND Cal. 1987); Restatement (Third) of Foreign Relations Law of the United States § 207, note 4. As the Supreme Court has held in the § 1983 context, "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n., 531 U.S. 288, 295 (2001); accord Williams v. United States, 396 F.3d 412, 415 (D.C. Cir. 2005). Both private individuals and private entities can be state actors and can be held liable under § 1983. Sims v. Jefferson Downs Racing Ass'n, 778 F.2d 1068, 1076 (5th Cir.1985). Section

---

[10] Defendant cites to Saleh v. Titan Corp., 436 F.Supp.2d 55 (D.D.C. 2006), and Ibrahim v. Titan, 391 F.Supp 2d 10 (D.D.C. 2005). These are also torture cases, and were analyzed the same way as Tel Oren. The instant case is a murder case.

1983 applies to all persons, including corporations.  Likewise, a corporation found to be a state actor can be held responsible under the ATS for human rights abuses which violate international customary law.  Beanal, 969 F.Supp. at 376.

The extensive litigation under § 1983 has produced numerous cases interpreting the "under color of state law" requirement, much of which can be applied to ATS and TVPA cases.[11]   In Gallagher v. "Neil Young Freedom Concert", 49 F.3d 1442, 1450 (10th Cir. 1995), the Tenth Circuit Court of Appeals summarized the relevant tests, based on Supreme Court precedents:

> The Court has taken a flexible approach to the state action doctrine, applying a variety of tests to the facts of each case. [1] In some instances, the Court has considered whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.[12] [2] The Court has also inquired whether the state has so far insinuated itself into a position of interdependence with the private party, that there is a symbiotic relationship between them.[13] [3] In addition the Court has held that if a private party is a willful participant in joint activity with the State or its agents then state action is present.[14] [4] Finally the Court has ruled that a private entity, that exercises powers traditionally exclusively reserved to the State is engaged in state action.[15]

49 F.3d at 1447 (internal citations footnoted).  Following the terminology used in Beanal, Plaintiff refers to these four tests as (1) the nexus test, (2) the symbiotic relationship test, (3) the joint action test, and (4) the public function test.

There can be little doubt that creating and funding 180 local and provincial governments (Complaint at ¶ 16-17) is a public function.  Here we are concerned with

---

[11] See Sheldon H. Nahmod, Civil Rights and Civil Liberties Litigation: The Law of Section 1983 (3rd Ed. 1991).  According to Professor Nahmod, private parties act under color of state law when they maintain an interdependent or symbiotic relationship with the state; when the state requires, encourages, or is significantly involved in nominally private conduct; when the private party exercises functions traditionally performed by the state; or when the private party conspires with state officials.  Id.

[12] citing Jackson v. Metropolitan Edison Co., 419 U.S. 345, 349 (1974)

[13] citing Burton v. Wilmington Parking Authority, 365 U.S. 715, 725 (1961); Moose Lodge No. 107 v. Irvis, 407 U.S. 163 (1972).

[14] citing Dennis v. Sparks, 449 U.S. 24, 27 (1980)

[15] citing Jackson, 419 U.S. at 352 (1974).

15

whether RTI, not URG, acted under color of state law.  Among those activities which satisfy the public function test are the operation of a company-owned town, Hudgens v. N.L.R.B., 424 U.S. 507, 516 (1976); Marsh v. Alabama, 326 U.S. 501, 505-09 (1946), and the management of a city park, Evans v. Newton, 382 U.S. 296, 298-302 (1966). The line is drawn at nursing home care, Blum v. Yaretsky, 457 U.S. 991, 1011-12 (1982) and education of children, Rendell-Baker v. Kohn, 457 U.S. 830, 842, (1982), which fall short of being public functions.  Surely, creating local and provincial governments must be a public function, if those governments are to have any legitimacy.

       The nexus test also points to state action.  Under the nexus test, there must be a sufficiently close nexus between the government and the challenged conduct such that the conduct may fairly be treated as that of the State itself.  Gallagher 49 F.3d at 1448. Enforcement of government policies is sufficient to show state action under this test.  For exampe, in D'Amario v. Providence Civic Center Authority, 783 F.2d 1 (1st Cir.1986), a private concert promoter and a municipally-owned company were found to be state actors who abridged plaintiff's First Amendment rights.  Civic center employees enforced a so-called "no camera" rule at the publicly-operated Providence Civic Center.  Although the "no camera" policy stemmed from a contractual agreement between two private parties, the enforcement of state policy by the civic center employees constituted state action under the nexus test.  D'Amario, 783 F.2d at 3.  Here we have a USAID contractor re-designing the government of Iraq and funding political organizations to support the new government structure.  This is a much stronger government nexus than helping the Providence Civic Center enforce its rules.

Plaintiff may also argue that RTI is a "willful participant in joint action with the State or its agents" in reorganizing the Iraqi government under the auspices of USAID, Dennis, 449 U.S. at 27, or that its access to classified information and cost-plus-fixed-fee relationship with the US government indicate a symbiotic relationship with the U.S. government. (Complaint at ¶ 16-17). Any of the "under color of law" tests would work.

Besides the tests enumerated in Gallagher and applied in Beanal, the court should consider all of the circumstances surrounding the alleged conduct, as suggested in the Restatement of Foreign Relations, which specifically applies to ATS, rather than § 1983 claims:

> In determining whether an act was within the authority of an official or an official body, or was done under color of such authority, (clause (c)), one must consider all the circumstances, including whether the affected parties reasonably considered the action to be official, whether the action was for public purpose or for private gain, and whether the persons acting wore official uniforms or used official equipment.

Restatement § 207, comment d. According to its USAID contract, RTI is in Iraq to perform a core government function and serve a public purpose - to design, establish and support "interim representative bodies." Complaint at ¶ 17. RTI was hired to create 180 local and provincial governments in Iraq, and make grants to Iraqi and foreign non-governmental organizations. Complaint at ¶ 16. Objectively, RTI must have considered creating local and provincial governments to have been official acts - how could any private entity establish or create a government?[16] In addition, the individuals who killed Ms. Antranick wore khaki uniforms, fired automatic weapons, and were riding in

---

[16] It is immaterial whether RTI was acting under color of U.S. or Iraqi law, as either would suffice. A debate over the extent of U.S. influence in Iraqi lawmaking and governance would serve no purpose. Defendant mentions in passing the Act of State and Political Question doctrines. These are broad areas of law which defendant has not briefed, and would present similar issues regardless of whether RTI acted under color of U.S. or Iraqi law.

armored vehicles with gun portals.  Complaint at ¶ 3.  The relevant circumstances of the Restatement all point to state action.  They also sound very much like the under color of law tests of § 1983.

Perhaps the best reason not to dismiss Plaintiff's claim on the basis of state action, though, is that Plaintiff has made credible allegations of state action and has not yet had discovery of the relationship between RTI and USAID.  <u>Conley v. Gibson</u>, 355 U.S. at 45-46. ("[a] complaint should not be dismissed for failure to state a claim unless it appears <u>beyond doubt</u> that the plaintiff can prove no set of facts in support of his claim ...") (emphasis added)

### C.    International law attributes individual liability for war crimes, so state action need not be shown.

Following the methodology of <u>Tel Oren</u>, if the Court were to find that the Defendant did not act under color of any state law, it should then inquire whether state action need even be shown for the alleged claims.  The leading case on state action, also cited by Defendant, is <u>Kadic v. Karadzic</u>, 70 F.3d 232 (2nd Cir. 1995).  The <u>Kadic</u> court examined two state action issues: first, "whether some violations of the law of nations may be remedied when committed by those not acting under the authority of a state," <u>Kadic</u> at 236, and second, "whether genocide, war crimes, and crimes against humanity are among the violations that do not require state action."  <u>Id</u>.  The court reviewed a "substantial body of law" in order to hold that "certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals." <u>Id</u>. at 239.

The <u>Kadic</u> court also noted that the Executive Branch had recognized the ATS as an available remedy against private individuals.  As early as 1795, Attorney General Bradford had approved of an ATS remedy in reference to the plunder of British property by American citizens off the coast of Sierra Leone.  <u>Id</u>. (<u>citing</u> Breach of Neutrality, 1 Op. Att'y Gen. 57, 59 (1795))  And in <u>Kadic</u> itself, the then-current administration, in a Statement of Interest addressed to the court, asserted that private persons could be liable under the ATS for "acts of genocide, war crimes, and other violations of international humanitarian law."  <u>Id</u>. at 239-40.  The court also noted that the Restatement declares that "'[i]ndividuals may be held liable for offenses against international law, such as piracy, war crimes, and genocide.'"  <u>Id</u>. at 240 (citing the Restatement).

The Restatement distinguishes between international law violations that are actionable when committed by a state, Restatement § 702, and those that are of "universal concern."  <u>Id</u>. at § 404.  Violations of "universal concern" include piracy, genocide, war crimes, slave trade, hijacking of aircraft, and "perhaps certain acts of terrorism..."  <u>Kadic</u> at 240 (citing Retatement at  § 404).  The inclusion of piracy and aircraft hijacking in the Restatement demonstrates, the court said, that "offenses of 'universal concern' include those capable of being committed by non-state actors," <u>Id</u>. at 240, and that international law authorizes states to apply civil remedies like the ATS.  <u>Id</u>.

The <u>Kadic</u> court held that war crimes are actionable against private actors under the ATS.  <u>Id</u>. at 243.  It cited the Supreme Court as support for the assertion that such atrocities are recognized as violations under international law, which imposes an affirmative duty upon commanders to prevent them. <u>Id</u>. at 242 (citing <u>In re Yamashita</u>, 327 U.S. 1, 14-16 (1946))  The court found that under common Article 3 of the Geneva

Conventions, the parties to a conflict who are obligated to abide the Convention's requirements of the law of war include "insurgent military groups."[17] Id. at 243. The court concluded that the "liability of private individuals for committing war crimes has been recognized since World War I and was confirmed at Nuremberg after World War II." Id. In the instant case, the question is whether private military contractors, and those who aid and abet them, are also liable.[18]

Defendant RTI argues that the nexus between RTI's work and the conflict in Iraq is too tenuous, and that not every crime committed in a war qualifies as a war crime. Def's Motion to Dismiss at ¶¶ 23-30. The Defendant cites to the War Crimes Act, 18 U.S.C. § 2441 (1996), and the Antiterrorism Act, 18 U.S.C. 2331(4)(C) (1991) which use the terms "in the course of" and "in the context of and in association with" an armed conflict to define this nexus. This case falls within those definitions due to the nature of RTI's work. However, Plaintiff has alleged not only that RTI's work is a component of a broader counterinsurgency effort, but has also alleged that the incident itself fits into a widespread pattern of human rights violations by private military contractors operating in Iraq. Complaint at ¶¶ 35-43, quoting from "Private Security Contractors at War: Ending the Culture of Impunity," Human Rights First (January 2008). The allegation is not legally insufficient and the claim should not be dismissed.

The nexus between an alleged crime and the conflict is a common issue to resolve in war crimes trials. The International Criminal Tribunal for Rwanda (ICTR) has held that it is highly fact dependent. See The Prosecutor v. Clément Kayishema and Obed

---

[17] Article 3 clearly applies to non-state actors, since it is included in the 4th Geneva Convention, and at least one of the parties to a non-international conflict must, by definition, be a party other than the state.

[18] Even terrorists and insurgents are bound by the laws of war. Defendant appears to argue that mercenaries are not.

Ruzindana, Case No. ICTR-95-1-T, Judgement, 21 May 1999 (Trial Chamber), para. 190 ("[T]he term 'nexus' should not be understood as something vague and indefinite. A direct connection between the alleged crimes ... and the armed conflict should be established factually. No test, therefore, can be defined in abstracto. It is for the Trial Chamber, on a case-by-case basis, to adjudge on the facts submitted as to whether a nexus existed."); The Prosecutor v. Jean-Paul Akayesu, Case No. ICTR 96-4-A, 1 June 2001 (Appeals Chamber), para. 425-445 ("This nexus between violations and the armed conflict implies that, in most cases, the perpetrator of the crime will probably have a special relationship with one party to the conflict. However, such a relationship is not a condition precedent to the application of common Article 3 and, hence of Article 4 of the Statute.").

In this case, we are not concerned with a bar fight or the murder of a jealous lover. This was not an ordinary crime that happened to occur in the midst of a war. A convoy of armed vehicles fired automatic weapons into a car, killing two innocent civilians. The Defendant can argue self-defense, but not in this Motion to Dismiss. The question at hand is whether RTI's work as a USAID contractor in re-designing the Iraqi government, and URG's work as a private security contractor are connected closely enough to the hostilities that these organizations must obey the laws of war. The re-designing of the Iraqi government, and the funding of political groups to support the new structure, is a component of a broader counterinsurgency campaign. If the new government of Iraq were stable, U.S. forces, and their civic-action counterparts, could leave. The fact that RTI and its agents consider themselves to be car bomb targets shows their own recognition of their role.

The ICTR also provides guidance on how murder is defined in international tribunals. The elements of murder under Article 4(a) of the ITCR Statute are: "(a) [t]he victim is dead; (b) [t]he death resulted from an unlawful act or omission of the Accused or a subordinate; (c) [a]t the time of the killing the Accused or a subordinate had the intention to kill or inflict grievous bodily harm on the deceased having known that such bodily harm is likely to cause the victim's death, and is reckless as to whether or not death ensures." See The Prosecutor v. Laurent Semanza, ICTR-97-20-T, May 15, 2003 (Trial Chamber), para. 373 ("Murder under Article 4 refers to the intentional killing of another which need not be accompanied by a showing of premeditation.")

As discussed supra in § II C with regard to aiding and abetting liability, ATS cases blend concepts of international criminal culpability with domestic private law tort liability. Consequently, private individuals who could be found guilty of international crimes may additionally have private actions asserted against them in tort. The elimination of the "just following orders" defense under international criminal law has resulted in the elimination of the state action requirement for war crimes allegations under the ATS. The ATS itself refers only to the "law of nations" which includes both public law and private law, and the Supreme Court has explicitly referred to "the works of jurists, writing professedly on public law" as a source by which to ascertain the law of nations; United States v. Smith, 18 U.S. 153, 160-61 (1820) (emphasis added). Criminal law is, after all, a subdivision of public law.

Oppenheim notes that, while formerly states alone were the subjects of international law, international responsibility now also involves consideration of the

position of individuals and of international organisations.[19] The Rome Statute of the International Criminal Court[20] establishes personal criminal liability for genocide, crimes against humanity, war crimes and the crime of aggression. This liability is enforced by the new International Criminal Court. Likewise, the statutes for the ITCY and ITCR specifically provide for individual criminal liability.[21] This is a change from the historic notion that it is the state, and only the state, which is responsible for the unlawful acts of its citizens, including the unauthorized acts of its officials. State responsibility harkens back to Grotian times, when all persons, for purposes of international law, were chattels of the state and injury to a person was cognizeable only as an injury to the person's state. In those circumstances, too, it followed that the wrongs committed by persons should, similarly, have been charged against their state. International law has evolved to a recognition of persons as subjects, and not objects. It is now recognized that crimes are committed not by governments but by the individuals in them.

     **D.**    **Plaintiff's claims of murder, directing an attack on civilians, and extrajudicial execution are "universal, specific, and obligatory" in international law, and therefore actionable under the ATS.**

RTI argues that the Supreme Court's admonition in <u>Sosa v. Alvarez-Machain</u>, 542 U.S. 692 (2004), that courts should be cautious in defining "new and debatable violations of the law of nations" and recognize that "the door is still ajar, subject to vigilant doorkeeping, and thus open to a narrow class of international norms today."   <u>See</u> Defs. Mem. at 19, citing <u>Sosa</u> 542 U.S. at 728-729.   The Defendant tries to create the

---

[19] Oppenheim's International Law, Ninth Edition, Sir Robert Jennings and Sir Arthur Watts, eds., p. 500, para. 45 (1992).
[20] Entered into force July 1,2002, art. 5 (1).
[21] Article 7(1) of the ICTY Statute, and Article 6(1) of the ICTR Statute impose individual criminal responsibility on anyone who "planned, instigated, ordered, committed or otherwise aided or abetted in the planning, preparation or execution of" one of the crimes enumerated in the Statutes.

impression that there is an issue of whether Plaintiff's claims for murder, directing an attack on civilians, and extrajudicial killing can be recognized under the ATS.  While Sosa did urge restraint in recognizing new causes of action, 542 U.S. at 725, there is no doubt that murder, directing attacks on civilians, and extrajudicial killing are universally-recognized international norms actionable under the ATS.

The laws of war are among the most widely recognized norms of international law.[22]  The minimum rules governing all armed conflicts are set forth in common Article 3 of the four Geneva Conventions.  Its norms protecting civilians are, without doubt, customary international law.[23]  These rules have also been incorporated into domestic laws around the world.[24]  Therefore they are "universal, obligatory and definable" international human rights norms, and actionable under the ATS.  Forti, 672 F.Supp. at 1540.  The language of common Article 3 is repeated verbatim in each of the four Geneva Conventions, including the 4th Convention, which protects civilians in time of war:

Article 3

In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions:

1. Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed hors de combat by sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria.

---

[22] The four Geneva Conventions, for example, have been ratified by 180 nations, including the United States.  U.S. Dept of State, Treaties in Force, 398-399 (1994).  The Convention applicable in this case is the Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 75 U.N.T.S. 287 [Fourth Geneva Convention].

[23] See, e.g., Michael J. Matheson, The U.S. Position on the Relation of Customary International Law to the 1977 Protocols Additional to the 1949 Geneva Conventions, 2 Am. U. J. int'l L. & Pol'y 419, 430-31 (1987) (common article 3 is a part of generally accepted customary law).

[24] See Restatement (Third) of Foreign Relations of the United States § 702 (1987)

To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:

(a) Violence to life and person, **in particular murder of all kinds**, mutilation, cruel treatment and torture;

(b) Taking of hostages;

(c) Outrages upon personal dignity, in particular humiliating and degrading treatment;

(d) The passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 75 U.N.T.S. 287.[25]  (emphasis added)  Prominently mentioned in the list of prohibited activities is "in particular murder of all kinds..."  Extrajudicial executions are specifically prohibited by Article 3(d)

U.S. law also attributes individual liability for these acts.  As a matter of Federal law, conduct violating common Article 3 constitutes a war crime.  War Crimes Act, 18 U.S.C. § 2441(C)(1)(3) (1996).  Non-military personnel can commit war crimes, and can be punished for doing so.  Id.  Department of Defense Regulations expressly require contractors to notify their U.S. citizen employees that they are potentially subject to criminal prosecution under the War Crimes Act for violations of the laws of war.  48 C.F.R. Sec 252.255-7040(e)(2)(ii)  The Military Commissions Statute provides that a person who "intentionally kills one or more protected persons shall be punished by death or such other punishment as a military commission under this chapter may direct."  10 U.S.C. § 950v(b)(1).  These provisions reflect not only the Congressional view that

---

[25] The U.S. ratified the 4th Geneva Convention on Feb. 8, 1955.  Iraq ratified it on Feb. 14, 1956.  The cited section is generally referred to as the "grave breaches" section, and conduct falling into one of these categories constitutes a "grave breach" of the Conventions.

private actors who kill civilians during an armed conflict are guilty of war crimes, but also the gravity of the claim at issue in this case.  The civilian perpetrator of this crime could be subject to the death penalty.

Attacking civilians is a kind of murder, and is specifically prohibited in U.S. and international law.  The Military Commissions Statute defines "attacking civilians" and "murder of protected persons" as war crimes triable by military commission without regard to whether they are committed by private actors or government officials. "Attacking civilians" is defined as "intentionally engag[ing] in an attack upon a civilian population as such, or individual civilians not taking active part in the hostilities, and is punishable by death if the victim dies."  10 U.S.C. § 950v(b)(2).  Although codified fairly recently, this is not a new concept.  See U.S. Army Basic Field Manual, Vol. VII, Part II, Rules for Land Warfare, § 352 GPO (1934) (defining "firing on undefended localities" as a war crime); Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), Adopted on 8 June 1977, Art. 13 § 2 ("The civilian population as such, as well as individual civilians, shall not be the object of attack.").

Conduct which violates jus cogens - norms of international law that are so fundamental and universally recognized that they are binding on nations even if the nations do not agree to them - also constitutes a violation of the law of nations giving rise to jurisdiction under ATS.   Doe I v. Unocal Corp., 395 F.3d 932 (9th Cir.,2002) (allegations of murder, rape, torture, and forced labor constituted jus cogens violations actionable under ATS); Doe v. Rafael Saravia, 348 F.Supp.2d 1112 (E.D.Cal.,2004). However, any violation of a specific, universal, and obligatory international norm is

actionable, whether it is <u>jus cogens</u> or not.   <u>Doe I v. Unocal Corp.</u>, 395 F.3d 932 (C.A.9.Cal.,2002)

ATS cases have gone forward on all three of the theories used by Plaintiff.   Early cases of the modern ATS era, such as <u>Kadic v. Karadzic</u>, 70 F.3d 232 (2d Cir. 1995), demonstrated the universal acceptance of the prohibition of extrajudicial killing.   The Supreme Court cited the <u>Kadic</u> case, and the test it applied, with approval in <u>Sosa</u>, 542 U.S. at 763-64.   Further, the Supreme Court specifically included extrajudicial killing in the list of examples of the kinds of claims that were sufficiently, "universal, specific, and obligatory" to be actionable under the ATS.   <u>Id</u>. at 732.

Courts have also heard ATS cases for murder in the form of forced disappearance. <u>Forti v Suarez-Mason</u>, 672 F.Supp 1531 (ND Cal. 1987); <u>Xuncax v. Gramajo</u>, 886 F.Supp. 162 (D.Mass. 1995); <u>In re Estate of Marcos Human Rights Litigation</u>, 94 F.3d 539 (9th Cir. 1996).   Finally, <u>Doe v. Qi</u>, 349 F.Supp.2d 1258 (N.D.Cal. 2004), held that there is a customary international law norm against attacks on civilians as war crimes sufficient to support a cause of action under the ATS.

Defendant cites 18th century standards as if they were the law today.   Def's Motion to Dismiss ¶ 18.   The norms of international law that were universally-recognized in 1789, when the ATS was drafted, including violation of safe conducts, infringement of the rights of ambassadors, and piracy, have little to do with contemporary international law or any contemporary ATS cases.   The Court must evaluate status of international law at the time the lawsuit is brought to determine whether it alleges a violation of norms of international law.   <u>Presbyterian Church of Sudan v. Talisman Energy, Inc.</u>, 244 F.Supp.2d 289 (S.D.N.Y.,2003); <u>The Paquete Habana</u>, 175 U.S. 677, 700 (1900).

Thus, the need for caution, vigilance and gate-keeping have been resolved with respect to claims for murder, attacking civilians, and extrajudicial killing. Defendant's effort to sow doubt along these lines is completely misplaced. Once the question of whether there is an actionable claim is resolved, as it is here, this is just like any other case brought under a federal statute.

## IV.    Plaintiff's second cause of action (Torture Victim Protection Act) should not be dismissed.

### A.    The TVPA applies to corporations.

There is no distinction in ATS jurisprudence between corporations and natural persons. In numerous ATS cases, courts have treated corporations identically to individuals in terms of their international human rights obligations.[26] However, in this Circuit, the question whether the Torture Victim Protection Act applies to corporations has not been decided. The TVPA differs from the ATS in that it makes a specific reference to torture committed by "individuals." The TVPA explicitly provides jurisdiction for acts committed by individuals when acting under color of state law. The question, then, is what is meant by the term "individual" in the TVPA.

---

[26] See Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 104 (2nd Cir. 2000) (holding that the ATS "reaches the conduct of private parties provided that their conduct is undertaken under the color of state authority or violates a norm of international law that is recognized as extending to the conduct of private parties"); Iwanowa v. Ford Motor Co., 67 F. Supp. 2d 424, 445 (D.N.J. 1999) ("No logical reason exists for allowing private individuals and corporations to escape liability for universally condemned violations of international law merely because they were not acting under color of law."); Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289, 314 n.24 (S.D.N.Y. 2003) (upholding corporate liability "[i]n light of the fact that numerous courts have upheld [ATS] actions against corporate defendants" and the fact that "overwhelming precedent demonstrates that corporations are subject to jus cogens" human rights claims); Beanal v. Freeport-McMoRan, Inc., 969 F.Supp. 362 (E.D.La.,1997); see also Bigio v. Coca-Cola Co., 239 F.3d 440, 448 (2d Cir. 2000); Carmichael v. United Techs. Corp., 835 F.2d 109, 113-14 (5th Cir. 1988); Aguinda v. Texaco Corp., 303 F.3d 470 (2d Cir. 2002); Deutsch v. Turner Corp., 317 F.3d 1005 (9th Cir. 2003).

Plaintiff has already established in § III B, <u>supra</u>, the key element of a TVPA claim; that the wrongful action was done under color of state law. Further, while the Defendant does not mention it one way or the other, the legislative history of the TVPA makes clear that aiding and abetting liability is available for TVPA claims. For example, the Senate Report states that the Act will permit "lawsuits against persons who ordered, <u>abetted or assisted</u> in the torture" or extrajudicial killing. <u>See</u> S. Rep. No. 102-249, at 8-9 (1991) (emphasis added). Plaintiff is not aware of any court that has disagreed with this clear statement of the legislative history.

The issue whether a corporation is within the term "individual" as used in the TVPA is not definitively resolved. At the district court level, there are decisions going both ways.[27] The sole appellate court to face this issue squarely to date, the Fifth Circuit, declined to decide it. In <u>Beanal</u>, 197 F.3d at 169 (5th Cir. 1999), the court pointedly did not affirm the lower court's holding that the term "individual" as used in the TVPA does not include corporations. <u>See</u> 969 F. Supp. at 382. Even the district court acknowledged that the legislative history of the TVPA stated that "Congress purposefully chose the term ["individual"] so as to circumscribe foreign state liability under the Act," and that "Congress does not appear to have had the intent to exclude private corporations from liability under the TVPA." <u>Id</u>. at 382. The district court's conclusion that corporations cannot be sued under the TVPA was therefore contrary to its own conclusion regarding the legislative history. <u>See also</u> <u>Aldana</u>, 416 F.3d 1242 (11th Cir. 2005) (court allowed a TVPA claim to go forward against Del Monte, but the specific issue of whether a corporation was an individual was not raised).

---

[27] The argument which follows was also made in <u>Jane/Jone Does 1-144 v. Chiquita Brands, International, et. al.</u>, 1:07-cv-1048 (PLF). That case was joined with others in Multi District Litigation in the S.D.F.L. before this court could decide it. The issue remains undecided in this Circuit.

The lower courts are split on whether the term "individual" in the TVPA applies to corporations.  Two courts agreed that the TVPA includes corporations within the scope of individuals. See Estate of Rodriguez v. Drummond Co., 256 F. Supp. 2d 1250, 1266-1267 (N.D. Ala. 2003); Sinaltrainal v. Coca-Cola, 256 F. Supp. 2d 1345, 1358-1359 (S.D. Fl. 2003).   Other courts, with no definitive authority, and often with reluctance, have found the opposite. See, e.g., Doe I v. Exxon Mobil Corp., 393 F. Supp. 2d 20, 28 (D.D.C. 2005); In re Agent Orange Product Litigation, 373 F. Supp. 2d 7, 55-56 (E.D.N.Y. 2005); Mujica v. Occidental Petroleum, 381 F. Supp. 2d 1164, 1176 (C.D. Cal. 2005) . (appeal pending).[28]  Plaintiff agrees with Defendant that this open question can be resolved if traditional methods of statutory interpretation are employed.   However, the legislative history should also be interpreted to determine the scope of the TVPA's jurisdiction.

There is nothing in the structure or history of the TVPA that suggests that Congress intended to exclude corporations from liability.   On the contrary, Congress expressed a clear intent for the TVPA to be construed as broadly as possible to allow for the vindication of a broad range of human rights violations committed by a broad range of potential wrongdoers.  Senator Specter, the sponsor of the Senate bill, stated that "[t]he bill is limited to suits against persons who specifically ordered, abetted, or assisted in the torture."[29]  Moreover, the Senate Report's only reference to the term "individual" states that "the legislation uses the term to make crystal clear that foreign states or their entities cannot be sued under this bill under any circumstances." This clearly shows that the

---

[28] As Defendant points out, these decisions are based on the fact that the TVPA applies to acts by an "individual" who subjects another "individual" to torture, and corporations cannot be tortured.  The court may wish to consider whether this is really an expression of legislative intent to shield corporations from liability, or merely sloppy drafting.

[29] 137 Cong. Rec. S1369-01, 1991 WL 9635, at *1378 (emphasis added).

Senate was concerned with sovereign immunity issues,[30] rather than shielding corporations from liability. And, as Senator Kennedy stated in the TVPA legislative history, "we have an obligation to make our courts accessible to ... victims to the maximum extent that the Constitution allows to assure that torturers feel the full weight of international law." See 137 Cong. Rec. S1369-01, 1991 Westlaw 9635, at *1379. In other words, the TVPA and its terms should be read in the broadest, rather than more restrictive sense.

The term "individual" has, for decades, been used to refer both to natural as well as artificial persons, such as corporations. As Black's Law Dictionary explains, while this term "commonly" denotes "a private or natural person," "it is said that this restrictive signification is not necessarily inherent in the word, and that it may, in proper cases, include artificial persons." Black's Law Dictionary, 4 & 6 Editions.[31] The weight of authority, combined with the relevant statutory history, indicates that under most statutory schemes, including the TVPA, "individual" is equivalent to "person," which includes private corporations. Courts' interpretations of the term "individual" in the criminal law context, in particular, support the position that the term can include corporations.[32]

---

[30] S. Rep 102-249, 1991 WL 258662, at *7.

[31] The 4th edition of Black's Law Dictionary (at p. 913) refers the reader to The State of Ohio v. Bell Telephone Co., 36 Ohio St. 296, 310 (1880), in which the Supreme Court of Ohio interpreted the word "individual" in a statute to be synonymous with "person" and thus to "embrace[] artificial or corporate persons as well as natural." The 6th Edition (at p.773), which is the last edition to contain the definition of the noun "individual" (as contrasted with the adjective) simply refers the reader to "person," a term which, under the law, normally refers to corporations as well as natural persons.

[32] See, e.g., Metropolitan Life Ins. Co. v. Ward, 470 U.S. 869, 881 (1985); U.S. v. Turkette, 452 U.S. 576, 583 (1981) (using the term "individual" and "persons" interchangeably), accord, U.S. v. Cooper, 91 F. Supp. 2d 60 (D.D.C. 2000); U.S. v. Aimone, 715 F.2d 822 (3d Cir. 1983); U.S. v. Thevis, 665 F.2d 616 (5th Cir. 1982); U.S. v. Blinder, 10 F.3d 1468, 1473 (9 Cir. 1993)(under RICO, the term "group of individuals" encompassed "a group of corporations," and thus, that a group of corporations could constitute a criminal "enterprise" under RICO); U.S. v. Middleton, 231 F.3d 1207, 1210 (9 Cir. 2000) (rejecting ordinary dictionary definition of "individual" and relying, in part, upon Black's Law Dictionary definition,

Defendant cites to <u>Clinton v. New York</u>, 524 U.S. 417 (1998), where the Supreme Court examined the meaning of the word "individual" and found it to be synonymous with "person." Defendant appears to cite this case for the opposite proposition. In <u>Clinton</u>, the question was whether the term "individual" in the Line Item Veto Act allowed a corporation to challenge the President's authority to cancel provisions in federal statutes. The Supreme Court held that "Congress undoubtedly intended the word 'individual' to be construed as synonymous with the word 'person'" although the Line Item Veto Act allows "any individual adversely affected by [the Act] to bring an action." <u>Id</u>. at 428. The Supreme Court reasoned that "[a]lthough in ordinary usage both 'individual' and 'person' often refer to an individual human being, <u>see</u>, <u>e.g.</u>, Webster's Third New International Dictionary 1152, 1686 (1986) ('individual' defined as a 'single human being'; 'person' defined as 'an individual human being'), 'person' often has a broader meaning in the law, <u>see</u>, <u>e.g.</u>, 1 U.S.C. § 1 ('person' includes 'corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals')." <u>Clinton</u> at 428 n 13.

However, the point here is not to determine the ultimate definition of "individual," but the meaning of the word as it is used in the TVPA. Given the absolutely clear intent of Congress to have the TVPA applied as broadly as possible to reach a broad range of human rights abusers, this Court should construe "individual" in its broader sense to include corporations.

---

to find that a corporation was an "individual" within the meaning of statute criminalizing computer crimes that damage "individuals").

**B.    In the context of command responsibility and a pattern of indiscriminate brutality known to result in deaths, this incident rises to the level of an "extrajudicial killing."**

Defendant argues that the TVPA's jurisdiction for extrajudicial killings only encompasses deliberated - i.e., premeditated murders.  However, Defendant's conduct was part of a disturbing pattern of such abuses that has been denounced by human rights organizations.  See Complaint at ¶¶ 35-43, quoting "Private Security Contractors at War: Ending the Culture of Impunity," Human Rights First (January 2008).  The death of Ms. Antranick was one of hundreds of similar incidents mentioned in this report.

The TVPA defines an "extrajudicial killing" as

a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

Pub.L. 102-256 at § 3(a), 106 Stat. 73 (March 12, 1992), reprinted at 28 U.S.C.A. § 1350 note.  In actions brought under the ATS and the TVPA, the D.C. Circuit has said, in the context of command responsibility, that a course of indiscriminate brutality, known to result in deaths, rises to the level of "extrajudicial killings."  Flatow v. Islamic Republic of Iran, 999 F.Supp. 1,17 (D.D.C. 1998), citing Hilao v. Estate of Marcos, 103 F.3d 767, 776-77 (9th Cir. 1996); Kadic, 70 F.3d at 242; Paul v. Avril, 901 F.Supp. 330, 335 (S.D.Fla.1994); Xuncax v. Gramajo, 886 F.Supp. 162, 170 (D.Mass.1995); Forti v. Suarez-Mason, 672 F.Supp. 1531, 1537-38 (N.D.Cal.1987).  See also In re Yamashita, 327 U.S. 1, 14 (1946).

Plaintiff has alleged that Defendant RTI had command responsibility over the person or persons who killed Ms. Antranick. Complaint at ¶ 48. The fact that RTI

employees had left the vehicles shortly before the incident occurred does not absolve RTI of the duties that go along with command responsibility. Plaintiff has also alleged that RTI and URG together agreed on the Rules for the Use of Force and other security procedures to be followed. Complaint at ¶¶ 68, 80-81. This incident was part of a pattern of indiscriminate brutality by private military contractors operating in Iraq, known to result in deaths, at least one other of which - that of Professor Kays Juma - was perpetrated by an employee of Unity Resources Group while working for Defendant RTI. As a matter of law, these allegations, if true, would satisfy the TVPA's requirement that the killing be "deliberate", so Count Two of the Complaint should not be dismissed.

### V.     THIS CASE SHOULD NOT BE TRANSFERRED TO THE EASTERN DISTRICT OF NORTH CAROLINA.

Plaintiff has shown, and Defendant has not denied, that venue properly lies in this District pursuant to 28 U.S.C. §1391(b)(1), (c) and (d), and §1391(b)(2), (c) and (d). Defendant moves the Court for a transfer pursuant to § 1404 (a) to the Eastern District of North Carolina "for the convenience of the parties and the witnesses and in the interest of justice." Def's. Motion to Dismiss at 42. The moving party bears the burden of demonstrating that transfer pursuant to § 1404 is warranted. DeLoach v. Philip Morris Co., Inc., 132 F.Supp.2d 22, 24 (D.D.C. 2000).

Defendant recognizes that a prerequisite to such a transfer is that the instant action must be one which could have been brought in the proposed transferee district. Id. It's not clear at this point whether co-defendant Unity Resources Group can be sued there. Beattie v. U.S., 756 F.2d 91, 100 (D.C. Cir. 1984) (venue must be established for each separate cause of action)

Defendant also recognizes that Plaintiff's choice of forum is to be accorded substantial deference.  Reiffen v. Microsoft Corporation, 104 F.Supp.2d 51, 52 (D.D.C. 2000).  While the Defendant's choice of forum is also important, co-defendant Unity Resources Group has not joined in its motion, and appears to want to transfer the case to some forum outside the United States.  See Def. Unity Resources Group's Motion to Dismiss at 3 n 2.[33]  "Defendant's choice of forum" appears to be disputed by the two defendants in this case.

RTI further argues that this case has no meaningful ties to the District.  This case is about a USAID contractor whose guards killed Iraqi civilians in Baghdad.  Eyewitnesses and documentary evidence exist in Baghdad, but no adequate forum exists there.  Under Coalition Provsional Authority Order Number 17, the defendants are immune from Iraqi legal process.

USAID administers this contract and is located in Washington, D.C.  Plaintiff has argued in this brief the importance of determining the nature of the relationships between RTI and URG (the principal/agent issue) and between RTI and USAID (the state action issue).  USAID witnesses probably reside in the District.  Any witnesses from URG will probably have to fly through another U.S. city, perhaps even Washington, D.C., to get to North Carolina.  RTI admits that most of its own personnel with knowledge about this case work in Iraq, and may also have to fly through another U.S. city to get to the Raleigh-Durham area.

The ends of justice are better served by the exercise of jurisdiction in the District.  The U.S. government has at least as strong an interest in the behavior of USAID

---

[33] In its separate Motion to Dismiss, Unity Resources Group purports to reserve the right to make a second motion to dismiss based on the doctrine of forum non conveniens.  Plaintiff believes that this has been waived under Rules 12(g) and (h) of the Federal Rules of Civil Procedure.

contractors and their subcontractors in Iraq, as does the government of North Carolina. It's hard to view this case as a "local controversy" in North Carolina. Def's Motion to Dismiss at 43. A Congressional hearing has been held to investigate the Blackwater massacre. Finally, one would expect a court in North Carolina to be less familiar with Alien Tort Statute law, and this is the best court to set precedents on cases of national importance.

The best place to hear the case, then, is Washington D.C., the location of USAID, the U.S. Army, and the Federal Government. Defendant has not articulated any compelling reason to move the case to North Carolina, and has not met its burden to overcome the deference accorded to Plaintiff's chosen forum.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this court deny RTI's

motion to Dismiss, Strike and Transfer Plaintiff's claims.


Respectfully submitted,


Paul Wolf
D.C. Bar #480285
P.O. Box 11244
Washington, D.C. 20008-1244
(202) 674-9653
paulwolf@icdc.com


## Certificate of Service


I hereby certify that on July 26, 2008, I electronically filed the foregoing
document with the Clerk of the Court using CM/ECF. I also certify that the foregoing
document is being served this day on all counsel of record, either via transmission of
Notices of Electronic Filing generated by CM/ECF or in some other authorized manner
for those counsel or parties who are not authorized to receive electronically Notices of
Electronic Filing.


Paul Wolf